Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
Haig M. Maghakian (CA State Bar No. 221954)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:      (213) 892-4000
Facsimile:      (213) 629-5063

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Sallie B. Armstrong (NV State Bar No. 1243)
DOWNEY BRAND LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone:      (775) 329-5900
Facsimile:      (775) 786-5443
Email:          sarmstrong@downeybrand.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>CIRCUS AND ELDORADO JOINT VENTURE, *et al.*,<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Silver Legacy Capital Corp.<br><br>                              Debtors. | Chapter 11<br><br>Case No. BK-12-51156<br><br>(Jointly Administered)<br><br>**NOTICE OF FILING OF [PROPOSED] DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION (DATED JUNE 1, 2012)**<br><br>Hearing Date:  July 23, 2012<br>Hearing Time:  2:00 p.m.<br>Place:         300 Booth Street<br>               Reno, NV 89509 |

TO THE HONORABLE BRUCE T. BEESLEY, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL PARTIES IN INTEREST:

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession hereby file their *[Proposed] Disclosure Statement for Debtors' First Amended Joint Chapter 11 Plan of Reorganization (Dated June 1, 2012)*, a copy of which is attached hereto as Exhibit 1.

Dated:  June 29, 2012                    Respectfully submitted,

                                         Paul S. Aronzon, CA State Bar No. 88781
                                         Thomas R. Kreller, CA State Bar No. 161922
                                         Haig M. Maghakian (CA State Bar No. 221954)
                                         MILBANK, TWEED, HADLEY & McCLOY LLP
                                         601 South Figueroa Street, 30th Floor
                                         Los Angeles, California 90017

                                         Proposed Reorganization Counsel for
                                         Debtors and Debtors in Possession


                                         By:    */s/ Sallie B. Armstrong*
                                         Sallie B. Armstrong, NV State Bar No. 1243
                                         DOWNEY BRAND LLP
                                         427 West Plumb Lane
                                         Reno, Nevada 89509
                                         Telephone:    (775) 329-5900
                                         Facsimile:    (775) 786-5443
                                         Email:        sarmstrong@downeybrand.com

                                         Proposed Local Reorganization Counsel
                                         for Debtors and Debtors in Possession

# **EXHIBIT 1**

# **EXHIBIT 1**

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
Haig M. Maghakian (CA State Bar No. 221954)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:      (213) 892-4000
Facsimile:      (213) 629-5063

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Sallie B. Armstrong (NV State Bar No. 1243)
DOWNEY BRAND LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone:      (775) 329-5900
Facsimile:      (775) 786-5443
Email:          sarmstrong@downeybrand.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>CIRCUS AND ELDORADO JOINT VENTURE, *et al.*,<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Silver Legacy Capital Corp.<br><br><div align="right">Debtors.</div> | Chapter 11<br><br>Case No. BK-12-51156<br>Case No. BK-12-51157<br><br>(Jointly Administered)<br><br>**[PROPOSED] DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION (DATED JUNE 1, 2012)** |

**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN.   ACCORDINGLY, THE FILING AND ANY DISTRIBUTION OF THIS PROPOSED DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN.   THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE UNLESS AND UNTIL A DETERMINATION HAS BEEN MADE BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS   "ADEQUATE   INFORMATION"   WITHIN   THE   MEANING   OF SECTION 1125(a) OF THE BANKRUPTCY CODE.**

Legend to be removed upon entry of Disclosure Statement Order by the Clerk of the Bankruptcy Court.

PURSUANT TO BANKRUPTCY CODE SECTION 1128, A CONFIRMATION HEARING WILL BE HELD WITH RESPECT TO THE DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION (DATED JUNE 1, 2012) (THE "PLAN") OF CIRCUS AND ELDORADO JOINT VENTURE AND SILVER LEGACY CAPITAL CORP. ON [_____], 2012, AT [_____] [A.M.][P.M.] (PREVAILING PACIFIC TIME), BEFORE THE HONORABLE BRUCE T. BEESLEY, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, 300 BOOTH STREET, RENO, NEVADA 89509 (THE "CONFIRMATION HEARING"). OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [_____], 2012 AT 4:00 P.M. (PREVAILING PACIFIC TIME). THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT MADE AT THE CONFIRMATION HEARING OR AT ANY SUBSEQUENT ADJOURNED DATE OF THE CONFIRMATION HEARING.

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING DISTRIBUTED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN FROM THE PARTIES ENTITLED TO VOTE ON THE PLAN. THE DEBTORS INTEND TO SEEK TO CONFIRM THE PLAN AND TO CAUSE THE EFFECTIVE DATE OF THE PLAN TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. HOWEVER, THERE CAN BE NO ASSURANCE AS TO WHETHER OR WHEN THE CONFIRMATION OR THE EFFECTIVE DATE OF THE PLAN ACTUALLY WILL OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

A COPY OF THE PLAN IS ATTACHED AS EXHIBIT A HERETO. ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OF THE DEBTORS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. UNLESS OTHERWISE SPECIFIED HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS. YOU ARE ADVISED TO OBTAIN INDEPENDENT EXPERT ADVICE ON SUCH SUBJECTS.

THE OFFER OF NEW DEBT INSTRUMENTS OR EQUITY SECURITIES TO HOLDERS OF CERTAIN CLASSES OF CLAIMS HAVE NOT BEEN REGISTERED UNDER THE

SECURITIES ACT OF 1933 (AS AMENDED, THE "SECURITIES ACT") OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS.  THE OFFERS AND ISSUANCES ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE OR OTHER EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT.  NONE OF THE NEW DEBT INSTRUMENTS OR EQUITY SECURITIES TO BE ISSUED UNDER OR IN CONNECTION WITH THE PLAN OR UPON EXERCISE OF ANY WARRANTS OR OPTIONS CONTEMPLATED BY THE PLAN HAS BEEN APPROVED OR DISAPPROVED BY THE SEC OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995:  ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL.  ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.  SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS DO NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO OR HAVE BEEN OR WILL BE SEPARATELY FILED WITH THE BANKRUPTCY COURT.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER SUCH DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VII HEREIN, AND THE PLAN SUPPLEMENT

EXCEPT AS OTHERWISE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**IRS CIRCULAR 230 NOTICE**:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT:   (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**DISCLOSURE STATEMENT FOR DEBTORS'**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION................................................................................................4

        A.      Purpose, Limitations and Structure of this Disclosure Statement ....................................4

        B.      Summary of Classification and Treatment of Claims and Equity Interests Under the Plan.............5

        C.      Voting on the Plan...........................................................................................7

                1.      Classes Entitled to Vote.................................................................7
                2.      Votes Required for Acceptance of the Plan by a Class...........................7
                3.      Tabulation of Votes.......................................................................8
                4.      Voting Instructions.......................................................................8
                5.      Inquiries.....................................................................................9

        D.      Confirmation Hearing.....................................................................................9

        E.      Overview of Chapter 11 Process.......................................................................9

II.     GENERAL INFORMATION ABOUT THE DEBTORS ................................................10

        A.      Purpose of, and Substantial Creditor Support for, the Debtors' Restructuring Efforts ...........10

        B.      Description and History of the Debtors' Business ....................................................11

                1.      Operations.................................................................................11
                2.      Partnership Interests and Corporate Governance.................................12
                3.      Employees.................................................................................15

        C.      The Debtors' Prepetition Financing Arrangements....................................................15

                1.      Mortgage Notes..........................................................................15
                2.      Other Liabilities.........................................................................16

        D.      Events Leading to the Commencement of the Chapter 11 Cases....................................16

        E.      Commencement of Chapter 11 Cases .................................................................18

        F.      First Day Orders...........................................................................................18

        G.      Postpetition Financing and Use of Cash Collateral.................................................18

        H.      Appointment of Creditors' Committee ................................................................18

        I.      Bar Date and Summary of Claims .....................................................................18

                1.      Schedules and Statements..............................................................18
                2.      Bar Date...................................................................................18
                3.      Summary of Claims.......................................................................19

III.    THE PLAN......................................................................................................19

        A.      Administrative Claims, Priority Tax Claims and Other Priority Claims..........................19

                1.      Administrative Claims...................................................................19
                2.      Priority Tax Claims......................................................................20

        B.      Classification and Treatment of Holders of Claims and Equity Interests .......................20

                1.      Class 1:  Allowed Other Secured Claims.............................................21
                2.      Class 2:  Allowed Other Priority Claims.............................................21
                3.      Class 3: Allowed Mortgage Note Claims.............................................22
                4.      Class 4: Allowed US Foods Secured Claims.........................................23
                5.      Class 5: Allowed General Unsecured Claims.........................................23
                6.      Class 6: Equity Interests................................................................23

        C.      Means For Implementation of the Plan ...............................................................23

|   | 1. | Continued Existence and Vesting of Assets in the Reorganized Debtor | 23 |
|   | 2. | Transactions Dependent Upon Class 3 Acceptance/Rejection | 24 |
|   | 3. | Funding for Cash Distributions to Occur Under the Plan | 25 |
|   | 4. | Valuation | 25 |
|   | 5. | Corporate Governance; Employment and Compensation | 25 |
|   | 6. | Preservation of Rights of Action | 26 |
|   | 7. | Cancellation and Surrender of Instruments, Securities and Other Documentation | 26 |
|   | 8. | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes | 27 |
|   | 9. | Substantive Consolidation | 27 |
| D. | Treatment of Executory Contracts and Unexpired Leases | | 28 |
|   | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 28 |
|   | 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 28 |
|   | 3. | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan | 29 |
|   | 4. | Insurance Policies | 29 |
| E. | Provisions Governing Distributions | | 29 |
|   | 1. | Distributions for Claims Allowed as of the Effective Date | 29 |
|   | 2. | Method of Distributions to Holders of Claims | 29 |
|   | 3. | Compensation and Reimbursement for Services Related to Distributions | 29 |
|   | 4. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 30 |
|   | 5. | Distribution Record Date | 30 |
|   | 6. | Means of Cash Payments | 30 |
|   | 7. | Minimum Distributions | 31 |
|   | 8. | Surrender of Canceled Instruments or Securities | 31 |
| F. | Procedures for Resolving Disputed Claims | | 31 |
|   | 1. | Prosecution of Objections to Claims | 31 |
|   | 2. | Treatment of Disputed Claims | 31 |
|   | 3. | Distributions on Account of Disputed Claims Once Allowed | 32 |
|   | 4. | Estimation | 32 |
| G. | Discharge, Releases, Injunction and Settlement | | 32 |
|   | 1. | Discharge of Claims | 32 |
|   | 2. | Claims Enjoined | 32 |
|   | 3. | Global Settlement | 32 |
|   | 4. | Releases | 33 |
|   | 5. | Exculpation | 33 |
|   | 6. | Supplemental Injunction | 33 |
| H. | Retention of Jurisdiction | | 34 |
| I. | Miscellaneous Provisions | | 35 |
|   | 1. | Dissolution of Committee | 35 |
|   | 2. | Modification of the Plan | 35 |
|   | 3. | Revocation of the Plan | 35 |
|   | 4. | Severability of Plan Provisions | 35 |
|   | 5. | Successors and Assigns | 36 |
|   | 6. | Issuance of Notes Under Plan | 36 |
|   | 7. | Filing of Additional Documents | 36 |
| IV. | CONFIRMATION AND CONSUMMATION PROCEDURE | | 36 |
| A. | Confirmation of the Plan | | 36 |
|   | 1. | Confirmation Requirements | 36 |
|   | 2. | "Cramdown" under Bankruptcy Code section 1129(b) | 38 |
| B. | Conditions Precedent to Confirmation and Consummation of the Plan | | 38 |

|  |  | 1. | Conditions Precedent to Confirmation | 38 |
|  |  | 2. | Conditions Precedent to the Effective Date | 39 |
|  |  | 3. | Waiver of Conditions Precedent | 40 |
|  |  | 4. | Effect of Nonoccurrence of Conditions to the Effective Date | 40 |
| V. | SECURITIES LAW MATTERS | | | 40 |
|  | A. | U.S. Securities Law Matters | | 40 |
|  | B. | Section 1145 of the Bankruptcy Code | | 40 |
|  | C. | Section 4(2) of the Securities Act/Regulation D | | 41 |
|  | D. | Rule 144 and Rule 144A | | 41 |
| VI. | FINANCIAL INFORMATION and PROJECTIONS | | | 42 |
| VII. | RISK FACTORS | | | 42 |
|  | A. | Certain Bankruptcy Considerations | | 42 |
|  | B. | Business Risks | | 44 |
|  | C. | Risks Related to the Debtors' Post-Effective Date Capital Structure | | 51 |
|  | D. | Risks Related to the New First Lien Term Loan, the New Second Lien Notes and the Cram-Down Notes | | 54 |
|  | E. | Material United States Federal Income Tax Considerations | | 61 |
| VIII. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | | 61 |
|  | A. | Liquidation Under Chapter 7 | | 61 |
|  | B. | Alternative Plans of Reorganization | | 61 |
| IX. | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | | | 61 |
| X. | CONCLUSION AND RECOMMENDATION | | | 66 |

## EXHIBITS

**The Plan** ................................................................................................................................ **Exhibit A**

**Financial Projections** ...............................................................................................................**Exhibit B**

**Liquidation Analysis** ................................................................................................................ **Exhibit C**

# I.    INTRODUCTION

Circus and Eldorado Joint Venture, a Nevada general partnership (the "**Joint Venture**"), and Silver Legacy Capital Corp., a Nevada corporation ("**SLCC**", and together with the Joint Venture, the "**Debtors**"), submit this disclosure statement (the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") to holders of Claims against and Equity Interests in the Debtors in connection with:  (a) the solicitation of acceptances of the Debtors' First Amended Joint Chapter 11 Plan of Reorganization (Dated June 1, 2012), as the same may be amended (the "**Plan**"), filed with the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"); and (b) the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), scheduled for [_____], 2012 at [___] (prevailing Pacific time).  **Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement shall have the meanings ascribed to them in the Plan.  Headings are for convenience of reference and will not affect the meaning or interpretation of the Disclosure Statement.**

This solicitation is being conducted at this time in order to obtain sufficient votes to enable the Plan to be confirmed by the Bankruptcy Court.

The Plan sets forth how the Debtors' assets and operations will be reorganized and how Claims against and Equity Interests in the Debtors will be treated if the Plan is confirmed by the Bankruptcy Court and is thereafter consummated.  This Disclosure Statement describes certain aspects of the Plan and how it will be implemented if confirmed, the Debtors' business operations, significant events leading to and occurring during the Chapter 11 Cases, and related matters.  **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT AND ALL RELATED EXHIBITS AND SCHEDULES IN THEIR ENTIRETY.**

Attached as Exhibit A to this Disclosure Statement is a copy of the Plan.  The Debtors intend to file at a later date the Plan Supplement (defined below), which will include, among other things, term sheets for the various credit facilities, notes or indentures that may be entered into by the Debtors pursuant to the Plan.

THE DEBTORS BELIEVE THAT THE PLAN COMPLIES WITH ALL PROVISIONS OF THE BANKRUPTCY CODE AND WILL ENABLE THEM TO RESTRUCTURE OR OTHERWISE SATISFY THEIR DEBT SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11.   THE DEBTORS THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THE DEBTORS' ESTATES AND THEIR RESPECTIVE CREDITORS.

## A.    Purpose, Limitations and Structure of this Disclosure Statement

The purpose of this Disclosure Statement is to provide those holders of Claims against and Equity Interests in the Debtors that are entitled to vote on the Plan with adequate information to make an informed decision as to whether to accept or reject the Plan.  The information in this Disclosure Statement may not be relied upon for any other purpose, and nothing contained in this Disclosure Statement shall constitute an admission of any fact or liability or as a stipulation or waiver by any party, or be admissible in any other case or any bankruptcy or nonbankruptcy proceeding involving any of the Debtors or any other party, or be deemed conclusive advice on the tax, securities or other legal effects of the Plan.

On [__], 2012, after notice and a hearing, the Bankruptcy Court issued an order (the "**Disclosure Statement Order**") approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor being solicited to make an informed judgment whether to accept or reject the Plan.  **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT CONSTITUTES A DETERMINATION THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION REGARDING THE PLAN, BUT DOES <u>NOT</u> CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

Unless otherwise specified herein, the statements contained in this Disclosure Statement are made only as of the date hereof.  Delivery of this Disclosure Statement after such date does not mean that the information set forth in this Disclosure Statement remains unchanged since such date or the date of the materials relied upon in

preparing this Disclosure Statement. The Debtors have prepared the information contained in this Disclosure Statement in good faith, based upon the information available to them. Moreover, certain of the statements contained in this Disclosure Statement, by their nature, are forward-looking and contain estimates, assumptions and projections, and there can be no assurance that these forward-looking statements will be correct at any later date. Except as otherwise expressly stated, no audit of the financial information contained in this Disclosure Statement has been conducted.

If you are eligible to vote on the Plan, this Disclosure Statement and certain related solicitation materials should have been delivered to you. There are certain documents and other materials identified in this Disclosure Statement and the Plan that are not attached to this Disclosure Statement or the Plan (such documents and materials, the "**Plan Supplement**"). The Plan Supplement will be filed with the Bankruptcy Court on or before the date that is [ten (10) days] prior to the deadline to vote to accept or reject the Plan. Once it is filed, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. You may obtain a copy of the Plan Supplement once it is filed, or any of the schedules and exhibits to this Disclosure Statement, by accessing the website of the claims agent appointed in these chapter 11 cases (the "**Chapter 11 Cases**"), at *www.kccllc.net/silverlegacy*, or by sending a written request to the Debtors' counsel, Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017, Attention: Julian I. Gurule, Esq.

If you have any questions about the packet of materials you have received, you may contact the Debtors' counsel by mail at the address listed above, or by phone at (213) 892-4000.

B.      **Summary of Classification and Treatment of Claims and Equity Interests Under the Plan**

As described more fully in this Disclosure Statement, the Plan provides for significant distributions on account of certain Allowed Claims in the form of cash payments, assumption of specified liabilities, and new debt instruments. The Plan distributions will be in various amounts and will take various forms, depending on the classification and treatment of any particular Claim against or Equity Interest in any particular Debtor. The following tables summarize the classification and treatment of Claims and Equity Interests for each Debtor under the Plan. Because the Plan provides for the substantive consolidation of the Debtors, all Claims and Equity Interests are classified on a consolidated basis. *For a more detailed description of the classification and treatment of Claims and Equity Interests under the Plan, please see Section III.B.*

| Class | Claim | Treatment | Status | Estimated Amount of Claims[1] | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Paid in full in Cash or otherwise left Unimpaired | Unimpaired | Approximately $47,000 | 100% |
| 2 | Other Priority Claims | Paid in full in Cash or otherwise left Unimpaired | Unimpaired | $0.00 | 100% |
| 3 | Mortgage Note Claims | If Class 3 Acceptance occurs, each holder will receive its respective Pro Rata share of (i) the Class 3 Consensual Cash Distribution and (ii) the New Second Lien Notes.<br><br>If Class 3 Acceptance does not occur, each holder will receive its pro rata share of (i) the Class 3 Cram-Down Cash Distribution and (ii) the Cram-Down Notes. | Impaired | $142,800,000 in outstanding principal, $10,281,600 million in accrued but unpaid prepetition interest, plus interest, fees and expenses | If Class 3 Acceptance occurs, approximately 88.8%.[2]<br><br>If Class 3 Acceptance does not occur, 100% in the form of the Class 3 Cram-Down Cash Distribution and the Cram-Down Notes. |
| 4 | US Foods Secured Claims | Paid in full in Cash, but no payment of accrued interest on the Allowed US Foods Secured Claim | Impaired | $210,944.10 for prepetition sales and deliveries of goods to the Debtors, plus any and all accrued prepetition interest and postpetition interest on such amount | 100% of principal amount; 0% of any and all accrued prepetition interest or postpetition that would otherwise be payable to US Foods |
| 5 | General Unsecured Claims | Paid in full in Cash in four equal quarterly installments, the last of which shall occur no later than one year after the Effective Date, with interest accruing at a rate of 5% per annum from the Petition Date (defined | Impaired | Approximately $4.7 million | 100% of principal amount; no payment of prepetition accrued interest, but 5% |

[1] These estimates were compiled based upon a review of the Debtors' schedules and filed proofs of claim. These estimates may change as the claims analysis and resolution process proceeds.

[2] Estimated recovery amount includes distributions under the Plan and adequate protection payments made during the chapter 11 cases.

| Class | Claim | Treatment | Status | Estimated Amount of Claims[1] | Estimated Recovery (as % of Claim amount) |
|---|---|---|---|---|---|
| | | below) through the date that the Allowed General Unsecured Claim is paid in full, provided that, in the event that any distribution to be made to a Holder of an Allowed General Unsecured Claim (on account of the principal amount of such Allowed General Unsecured Claims) in the aggregate totals less than $15,000, the Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall make any such distribution in a single lump sum on the Effective Date, without interest. | | | postpetition interest |
| 6 | Equity Interests | Rights remain unaltered by the Plan. | Unimpaired | N/A | 100% |

C.        **Voting on the Plan**

The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from holders of Claims against and Equity Interests in the Debtors, which procedures are described below.

1.        _Classes Entitled to Vote_

Pursuant to the provisions of the Bankruptcy Code, only holders of claims or interests that are members of a class that (a) is "impaired" within the meaning of section 1124 of the Bankruptcy Code (an "**Impaired Class**") and (b) is not deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code are entitled to vote to accept or reject a plan of reorganization (each, a "**Voting Class**"). Classes of claims or interests that are not impaired under Bankruptcy Code section 1124 are conclusively presumed to have accepted the plan and are not entitled to vote to accept or reject the plan.

Only holders of record of Claims as of [July 23], 2012 that are classified in Voting Classes have been sent a copy of this Disclosure Statement and an appropriately customized ballot to vote on the Plan (a "**Ballot**").

Under the Plan, the Voting Classes are Classes 3, 4 and 5.

Under the Plan, the Classes that are not entitled to vote (each, a "**Non-Voting Class**") are Classes 1, 2, and 6.

2.        _Votes Required for Acceptance of the Plan by a Class_

Pursuant to the Bankruptcy Code, a class of claims is considered to have accepted a proposed plan of reorganization if the plan is accepted by more than one-half in number of the class members that actually voted on the plan, holding at least two-thirds in dollar amount of the claims in that class for which a valid Ballot was submitted. Thus, for each of Classes 3, 4 and 5 under the Plan, the Class will have accepted the Plan if, of the total

number of Class members that vote, more than one-half vote to accept the Plan, and such majority of voters holds at least two-thirds of the total dollar amount of the Claims in that Class for which a Ballot was properly submitted.

3.    *Tabulation of Votes*

A vote to accept or reject the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not cast in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  A Ballot that does not indicate the acceptance or rejection of the Plan or that indicates both acceptance and rejection of the Plan will be disregarded.  If the holder of a Claim or Equity Interest does not properly submit its Ballot, or that holder's vote is disregarded, that holder and that holder's Claim or Equity Interest will not be included in deciding whether the requisite number of Class members and amount of Claims or Equity Interests voted to accept or reject the Plan.

If one or more of the Classes of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan and/or request confirmation of the Plan (including seeking the alternative treatment for Holders of Allowed Class 3 Claims if Class 3 Acceptance does not occur) pursuant to section 1129(b) of the Bankruptcy Code, or both, without providing further notice to the holders of any Claim or Equity Interest.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of the plan by one or more Impaired Classes of claims or interests.  Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.  Holders of Claims and Equity Interests should assume that, if one or more of the Classes of Claims entitled to vote on the Plan reject the Plan, the Debtors will request confirmation of the Plan (including seeking the alternative treatment for Holders of Allowed Class 3 Claims if Class 3 Acceptance does not occur) pursuant to section 1129(b) of the Bankruptcy Code at the currently scheduled Confirmation Hearing (as defined herein).  *For a more detailed description of the requirements for confirmation of a plan that has been rejected by one or more classes, please see Section IV.A.2.*

4.    *Voting Instructions*

If you are entitled to vote on the Plan, a Ballot is enclosed with this Disclosure Statement.  If you are entitled to vote in more than one Class, you will receive separate Ballots for each Claim, which must be used for each separate Class of Claims.  Please refer to your Ballot and the Disclosure Statement Order for more specific instructions on voting on the Plan.

The Debtors recommend that you **vote in favor** of confirmation of the Plan.

**If you are a holder of record of a Claim:**

Please vote and return your Ballot(s) in accordance with the instructions set forth herein and in the instructions accompanying your Ballot(s), to:

Circus and Eldorado Joint Venture Ballot Processing Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA  90245

**TO BE COUNTED, YOUR EXECUTED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED AT THE ADDRESS ABOVE NO LATER THAN 4:00 P.M.  (PREVAILING PACIFIC TIME) ON [_____], 2012 (THE "VOTING DEADLINE").  ANY BALLOT RECEIVED THAT IS NOT EXECUTED, DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL BE DISREGARDED.  DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT. FACSIMILE BALLOTS WILL NOT BE ACCEPTED.**

**If you hold your Claim through a nominee:**

Holders of Class 3 Claims who are the beneficial owners of the Mortgage Notes, as applicable, but hold those securities through a nominee who is the record holder of such security, must submit their votes as directed by the record holder or nominee. Record holders have two options for soliciting votes from their beneficial holders: (a) record holders may pre-validate a Ballot by completing the first item in the Ballot, executing the Ballot and sending that pre-validated Ballot to the beneficial holder with instructions for the beneficial holder to complete the remaining portions of the Ballot and deliver it to the Voting Agent prior to the Voting Deadline, or (b) record holders may send a Ballot which is not pre-validated to the beneficial holder with instructions to complete all items in the Ballot, execute the Ballot and return the executed Ballot to the record holder. In the case of clause (b), the record holder will then tabulate on a master Ballot all of the information contained in all of the Ballots submitted to it by its beneficial holders, execute the master Ballot and deliver the executed master Ballot to the Voting Agent prior to the Voting Deadline. In the case of clause (b), it is important that beneficial holders return their Ballots to their record holder sufficiently in advance of the Voting Deadline to allow the record holder to prepare and submit its master Ballot prior to the Voting Deadline. For more detailed instructions on the balloting procedures, see the voting instructions attached to the Ballot enclosed with this Disclosure Statement.

5. *Inquiries*

If you are a holder of a Claim entitled to vote on the Plan and either did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have questions about the procedures for voting your Claim, or about the packet of materials that you received, please contact Kurtzman Carson Consultants LLC (the "**Voting Agent**"), at 2335 Alaska Avenue, El Segundo, CA 90245, Attention: Circus and Eldorado Joint Venture Ballot Processing, or by telephone at (877) 634-7162.

If you wish to obtain additional copies of the Plan, this Disclosure Statement, the Plan Supplement or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, Los Angeles, CA 90017, Attention: Julian I. Gurule, Esq. by telephone at (213) 892-4000 or by electronic mail at jgurule@milbank.com.

**D.     Confirmation Hearing**

Pursuant to Bankruptcy Code section 1128, the Confirmation Hearing will commence on [_____], 2012, beginning at [_____] [__.m.] (prevailing Pacific time), before the Honorable Bruce T. Beesley, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Nevada, 300 Booth Street, Reno, Nevada 89509. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before [_____], 2012 at 4:00 p.m. (prevailing Pacific time). The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Subsequent to the Confirmation Hearing, the Bankruptcy Court may issue an Order confirming the Plan (the "**Confirmation Order**").

**E.     Overview of Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of the debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor in property as of the Petition Date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the terms for satisfying claims against and equity interests in a debtor. Upon confirmation of a plan of reorganization, it is binding on the debtor, any issuer of securities under the plan, and any creditor or equity interest holder of the debtor. Subject to certain limited exceptions, the

confirmation order discharges the debtor from any debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a chapter 11 plan has been filed, holders of certain claims against and equity interests in a debtor are permitted to vote to accept or reject such plan.  Before soliciting acceptances of the proposed plan, however, a debtor is required under section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Debtors are submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.  This Disclosure Statement sets forth specific information regarding the pre-bankruptcy history of the Debtors, the nature and progress of the Chapter 11 Cases, and the anticipated organizational and capital structure as well as the operations of the Debtors' properties after confirmation of the Plan and emergence from chapter 11.  This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, certain risk factors associated with the debt and equity securities that will be issued to holders of certain Classes of Claims and Equity Interests, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote must follow in order for their votes to be counted.

## II.    GENERAL INFORMATION ABOUT THE DEBTORS

The Joint Venture is a Nevada general partnership that owns and operates the Silver Legacy Resort Casino ("**Silver Legacy**"), a premier nineteenth century silver mining themed hotel, casino and entertainment complex.  The Silver Legacy Property is strategically located on two city blocks in downtown Reno directly off Interstate 80, the principal highway connecting Reno with San Francisco, Sacramento and other cities in northern California.  Silver Legacy is among the largest hotel-casinos in the Reno market and offers a dynamic gaming environment and a wide variety of amenities delivered with special attention to personal service to appeal to multiple customer segments, including preferred casino players.

### A.    Purpose of, and Substantial Creditor Support for, the Debtors' Restructuring Efforts

The Debtors' ordinary course business operations historically have generated, and are expected to continue to generate, positive cash flow on an ongoing basis – even under what have been extraordinarily difficult economic conditions and an extremely competitive environment for Silver Legacy in recent years.  The Debtors' need to restructure through chapter 11 thus is not the result of operational issues, but rather is driven by the need to restructure the Mortgage Notes as a consequence of their maturity on March 1, 2012.  Indeed, the Debtors' operations are sound, and the Debtors, through the efforts of their very strong and experienced management team, enjoy excellent relationships with their employees, customers and vendors.

The strength of the Debtors' relationships with their key vendors – and the support with those vendors for the continued operations of the Debtors and a prompt and successful restructuring of the Debtors' long-term debt – are evidenced by the fact that, prior to the filing of the Chapter 11 Cases, the Debtors were able to enter into support agreements (collectively, the "**Vendor Support Agreements**" or the "**VSA's**") with approximately 32 of their vendors, who collectively hold an estimated $2.4 million in prepetition claims against the Debtors.  The Debtors estimate that this represents over 78% in number of their vendors that have claims in excess of $18,000 and 79% in dollar amount of the total amount of prepetition trade debt held by vendors above that same threshold.  The Debtors believe that this overwhelming vendor support will be a vital component of the Debtors' successful reorganization.

As discussed in more detail below, the Mortgage Notes matured on March 1, 2012.  The objective of the Debtors' restructuring efforts, which have been ongoing for over one year, has been to refinance or restructure the Mortgage Notes.  Also as described in more detail below, the result of those efforts has been the Debtors' entry into a Restructuring Support Agreement with a holder of a substantial portion of the Mortgage Notes, Capital Research and Management Company (together with the noteholders owned and/or controlled thereby, "**Cap Re**") (the "**RSA**," and, together with the VSA's, the "**Support Agreements**").  Under the RSA, the Debtors have agreed to pursue and Cap Re has agreed to support the negotiated, "Consensual Treatment" for the Class 3 - Mortgage Note

Claims as set forth in the Plan, subject to certain specified, terms, conditions and timing milestones. The RSA does not, however, obligate Cap Re to support the "Cram Down Treatment" for Class 3 if Class 3 Acceptance does not occur.

The Debtors are hopeful that the substantial creditor support they have garnered to date will allow for an expeditious plan process and a prompt emergence from these Chapter 11 Cases, with minimal disruption to the Debtors' businesses, employees, customers, and vendors and the Reno community in general.

**B.    Description and History of the Debtors' Business**

1.    _Operations_

Silver Legacy opened in July 1995, with a capital investment of over $360 million. The property includes an approximately 87,300 square-foot casino with 1,399 slot machines, 63 table games, including blackjack, craps, and roulette, and a race and sports book. Silver Legacy also has (i) a 37-story hotel tower, the tallest building in Reno, with 1,711 guest rooms, including many high-end suites, (ii) six dining venues, and (iii) approximately 50,000 square feet of in-house exhibit and convention space. The casino and entertainment areas at Silver Legacy are seamlessly connected, by approximately 200-foot wide "skyway" corridors, to the Eldorado Hotel & Casino and the Circus Circus Reno, each of which is owned by affiliates of the Debtors.[3] Together the three properties comprise the heart of Reno's gaming area and room base.

Silver Legacy's hotel, the tallest building in northern Nevada, is a "Y"- shaped structure with three wings, consisting of 37-, 34- and 31-floor tiers. An enclosed, climate-controlled skywalk over North Sierra Street links the hotel to the main casino, restaurants and additional public areas on the mezzanine level. The hotel currently offers 1,711 guest rooms, including 141 player spa suites, eight penthouse suites, and seven hospitality suites.

Silver Legacy's dining options are offered in six venues:

- **Sterling's Seafood Steakhouse**, which has a seating capacity of approximately 170, offering the finest in steaks and seafood along with an extensive wine list, tableside desserts and an extravagant Sunday Brunch;

- **Flavors! The Buffet**, which has a seating capacity of approximately 500;

- **Fairchild's Oyster Bar**, which has a seating capacity of approximately 55, offering specialized seafood dining;[4]

- **Café Sedona**, which has a seating capacity of approximately 330, offering an extensive menu that includes American classics and Chinese cuisine 24 hours a day;

- **Fresh Express Food Court**, which has a seating capacity of approximately 110, offering a range of options including a deli and grill, authentic Asian cuisine and American classics; and

- **Sips Coffee House**, situated in the hotel lobby, offering gourmet coffee and teas.

Silver Legacy is one of downtown Reno's leading convention destinations, currently offering approximately 50,000 square feet of in-house exhibit and convention space that includes an approximately 20,000

---

[3]  Eldorado Hotel & Casino is owned by Eldorado Resorts LLC, the principal owner of Eldorado Limited Liability Company. Circus Circus Reno is indirectly owned by MGM Resorts International, which is the indirect owner of Galleon (defined below). The entities identified in this footnote are not debtors in these chapter 11 cases.

[4]  On June 25, 2012, the Debtors filed a motion [Docket No. 230] seeking authority to enter into a real property lease, as lessor, pursuant to which the Debtors would lease the restaurant space at their hotel and casino that is currently occupied by Fairchild's Oyster Bar ("Fairchild's") to a third-party restaurant operator for the operation of a casual dining Mexican restaurant (the "New Restaurant"). On July [__], 2012, the Court entered its Order [Docket No. __] granting the Debtors' motion. Accordingly, the Debtors anticipate that Fairchild's will be replaced by the New Restaurant in the fourth quarter of 2012.

square-foot divisible ballroom and approximately 30,000 square feet of space for additional breakout rooms, all located within the casino complex.

In addition to in-house exhibit and convention space, Silver Legacy operates and manages a 50,000 square-foot ballroom containing approximately 35,000 square feet of convention space that is owned by the City of Reno and is located across North Virginia Street from the Silver Legacy. The ballroom complements the existing Reno Events Center and provides an elegant venue for large dinner functions and convention meeting space along with concert seating for approximately 3,000 attendees.

Silver Legacy's amenities also include retail shops, exercise and spa facilities, a beauty salon, and an outdoor swimming pool and sundeck. Silver Legacy's 10-story parking facility is capable of accommodating approximately 1,800 vehicles.

Silver Legacy carefully targets its marketing programs to five segments of the gaming market:

• leisure travellers,

• preferred casino customers,

• convention groups,

• local patrons, and

• wholesale and on-line travel agency customers.

The majority of the Debtors' revenues is derived from the casino, although the hotel, restaurants, bars, shops and other services also are important revenue sources. The following table sets forth the respective contributions to the Debtors' net revenues on a dollar and percentage basis of the Debtors' major revenue sources at Silver Legacy for each of the four most recent fiscal years.

| | 2011 | | 2010 | | 2009 | | 2008 | |
|---|---|---|---|---|---|---|---|---|
| | | | **(dollars in thousands)** | | | | | |
| Revenues: | | | | | | | | |
| Casino(1) .............................. | $68,852 | 56.1% | $67,397 | 55.9% | $68,767 | 56.3% | $74,834 | 53.7% |
| Hotel(2)................................. | $31,485 | 25.6% | $31,009 | 25.7% | $31,009 | 25.4% | $36,551 | 26.2% |
| Food and beverage(2) ........... | $32,695 | 26.6% | $31,365 | 26.0% | $31,871 | 26.1% | $34,966 | 25.1% |
| Other(2) ............................... | $7,613 | 6.2% | $7,622 | 6.3% | $7,939 | 6.5% | $9,654 | 6.9% |
| | $140,645 | 114.5% | $137,393 | 113.9% | $139,586 | 114.3% | $156,005 | 111.9% |
| Less: | | | | | | | | |
| Promotional allowances(2) ... | $(17,790) | (14.5)% | $(16,764) | (13.9)% | $(17,842) | (14.3)% | $(16,530) | (11.9)% |
| Net revenues ........................ | $122,855 | 100% | $120,629 | 100% | $122,104 | 100% | $139,475 | 100% |

(1)    Casino revenues are the net difference between the sums received as winnings and the sums paid as losses, less cash and free play incentives provided to customers.

(2)    Hotel, food and beverage and other include the retail value of services which are provided to casino customers and others on a complimentary basis. Such amounts are then deducted as promotional allowances to arrive at net revenue.

2.    *Partnership Interests and Corporate Governance*

Eldorado Limited Liability Company ("**Eldorado**") and Galleon, Inc. ("**Galleon**"; together with Eldorado, the "**Partners**") are the partners in the Joint Venture, each holding a 50% general partnership interest.

Eldorado is a subsidiary of Eldorado Resorts LLC and certain of its affiliates, which have ownership interests in and operate casino and hotel properties located in Northern Nevada and Louisiana. Galleon is an indirect wholly-owned subsidiary of MGM Resorts International.

Neither Eldorado nor Galleon has filed a chapter 11 petition and, thus, neither entity is a debtor in these cases. The Partners are not obligors on or guarantors of the Mortgage Notes or any obligations under the Indenture or otherwise with respect to the Mortgage Notes, and the Prepetition Indenture expressly provides that each Partner shall not have any liability for such obligations.

SLCC is a wholly-owned subsidiary of the Joint Venture that was created and exists for the sole purpose of serving as a co-issuer of the Mortgage Notes (as defined below). SLCC has no operations, assets or revenues.

The management of the Joint Venture is governed by that certain Amended and Restated Agreement of Joint Venture, dated as of September 4, 2002, by and among Galleon and Eldorado (as amended, modified, restated or supplemented from time to time, the "**JV Agreement**"). Pursuant to the JV Agreement, Galleon was appointed as the Managing Partner. However, Galleon has delegated a substantial portion of its duties to the General Manager, who is responsible for the day-to-day management of the Joint Venture's business affairs. The Managing Partner appoints the General Manager, who also serves as the Chief Executive Officer of the Joint Venture, and a Controller, who serves as the Chief Accounting and Financial Officer of the Joint Venture. Gary Carano is the current General Manager and Chief Executive Officer of the Joint Venture. Stephanie Lepori is the current Controller and Chief Accounting and Financial Officer of the Joint Venture.

In addition, pursuant to the JV Agreement each of the Partners appoints a specified number of individuals to a five-member Executive Committee. The duties of the Executive Committee generally include (i) consulting with, reviewing, monitoring and overseeing the performance of Silver Legacy, (ii) reviewing and approving the terms of any material transactions to be entered into by the Joint Venture, and (iii) approving the appointment of the General Manager and the Controller.

a.    <u>Executive Officers, Members of the Executive Committee and Directors</u>

The following table sets forth certain information concerning the Debtors' executive officers, members of the Joint Venture's executive committee and the members of the board of directors of SLCC as of December 31, 2011.

| Name | Age | Positions |
| --- | --- | --- |
| Gary L. Carano | 59 | General Manager of Silver Legacy, Chief Executive Officer of the Joint Venture, and President and Chief Executive Officer of SLCC |
| Glenn T. Carano | 56 | Executive Director of Marketing of Silver Legacy and Secretary of the Joint Venture and SLCC |
| Bruce C. Sexton | 58 | Assistant General Manager of Silver Legacy and Vice President of SLCC |
| Stephanie D. Lepori | 41 | Chief Financial Officer of Silver Legacy, Controller and Chief Accounting and Financial Officer of the Joint Venture, and Treasurer and Chief Accounting and Financial Officer of SLCC |
| Robert M. Jones | 68 | Member of the Joint Venture's Executive Committee, Audit Committee and Director of SLCC |
| Corey I. Sanders | 48 | Member of the Joint Venture's Executive Committee and Director of SLCC |
| Donald D. Thrasher | 57 | Member of the Joint Venture's Executive Committee, Audit Committee and Director of SLCC |

| | | |
|---|---|---|
| John M. McManus | 45 | Member of the Joint Venture's Executive Committee and Director of SLCC |
| Thomas R. Reeg | 40 | Member of the Joint Venture's Executive Committee and Director of SLCC |

*Gary L. Carano.* Mr. Carano has served as General Manager of Silver Legacy and Chief Executive Officer of the Joint Venture since January 1995 and President and Chief Executive Officer of SLCC since its incorporation in August 2001. He is also President and Chief Operating Officer, and a member of the board of managers, of Eldorado Resorts LLC and Treasurer of Recreational Enterprises, Inc. Previously, he served as Assistant General Manager, General Manager and Chief Operating Officer of Eldorado Hotel & Casino from 1980 to 1994. Eldorado Resorts LLC and Recreational Enterprises, Inc. are affiliates of the Joint Venture and SLCC. Gary L. Carano, Glenn T. Carano and Gene R. Carano are brothers.

*Glenn T. Carano.* Mr. Carano has been the Director of Marketing of Silver Legacy since January 1995, Secretary of the Joint Venture since August 2001 and Secretary of SLCC since November 2001. Prior to 1995, he served as Director of Marketing at the Eldorado Hotel & Casino for eight years. Mr. Carano has served as chairman of the board of directors of the Airport Authority of Washoe County and is a member of the board of the Reno-Sparks Convention & Visitors Authority. He is also presently Secretary of Recreational Enterprises, Inc. From 1977 to 1983, Mr. Carano was a quarterback for the Dallas Cowboys football team. Eldorado Resorts LLC, the owner of Eldorado Hotel & Casino, and Recreational Enterprises, Inc. are affiliates of the Joint Venture and SLCC.

*Bruce C. Sexton.* Mr. Sexton has been the Assistant General Manager of Silver Legacy and Vice President of SLCC since June 2006. From January 1995 to June 2006, Mr. Sexton was the Chief Financial Officer or Director of Finance and Administration of Silver Legacy and Controller and Chief Accounting and Financial Officer of the Joint Venture. He was Treasurer of SLCC from its incorporation in August 2001, and its Chief Accounting and Financial Officer from November 2001 to June 2006. Mr. Sexton began working at the Circus Circus Reno in 1978 as chief accountant and, before joining Silver Legacy, held the position of Controller at that property for eight years. Circus Circus Reno is an affiliate of the Joint Venture and SLCC.

*Stephanie D. Lepori.* Ms. Lepori has been the Chief Financial Officer of Silver Legacy, Controller and Chief Accounting and Financial Officer of the Joint Venture, and Treasurer and Chief Accounting and Financial Officer of SLCC since June 2006. Ms. Lepori was the Director of Finance or Controller of Silver Legacy from March 1995 until June 2006. From 1992 until she joined Silver Legacy, Ms. Lepori was employed by Arthur Andersen LLP, serving that firm in various positions. Ms. Lepori is a Certified Public Accountant.

*Robert M. Jones.* Mr. Jones has been a member of the executive committee of the Joint Venture since November 1995 and a director of SLCC since November 2001. He has been the Chief Financial Officer of Eldorado Resorts LLC or its predecessor since 1989. Prior to joining Eldorado Resorts LLC in 1984, Mr. Jones spent fourteen years in public accounting, ten of which were as an audit principal with the international accounting firm of Arthur Young & Company. Mr. Jones is a former Certified Public Accountant. Eldorado Resorts LLC is an affiliate of the Joint Venture and SLCC. Mr. Jones was selected to serve as a member of the executive committee of the Joint Venture due to his extensive industry knowledge and leadership experience, including his experience as a principal financial officer of Eldorado Resorts LLC and his background at a major international accounting firm.

*Corey I. Sanders.* Mr. Sanders has been a member of the executive committee of the Joint Venture and a director of SLCC since February 2010. Mr. Sanders has served as the Chief Operating Officer for MGM Resorts International since September 2010. He served as the Chief Operating Officer for the Core Brand Properties of MGM Resorts International from August 2009 to September 2010. Previously, Mr. Sanders served as Executive Vice President of operations for MGM Resorts International since August 2007. Mr. Sanders held the position of Executive Vice President and Chief Financial Officer for MGM Grand Resorts from April 2005 to August 2007. Mr. Sanders served as Executive Vice President and Chief Financial Officer for MGM Grand from August 1997 to April 2005. MGM Resorts International is an affiliate of the Joint Venture and SLCC. Mr. Sanders was selected to serve as a member of the executive committee of the Joint Venture due to his extensive industry knowledge and leadership experience, including his experience in various executive and senior management positions at public gaming companies.

*Donald D. Thrasher.*  Mr. Thrasher has been a member of the executive committee of the Joint Venture and a director of SLCC since December 2009 and was appointed as a member of the Joint Venture's audit committee in February 2010. Mr. Thrasher has served as President and Chief Operating Officer of Circus Circus Las Vegas since August 2009 and additionally has oversight responsibilities for Circus Circus Reno, Gold Strike-Jean, and Railroad Pass, all of which are located in Nevada. Mr. Thrasher held the position of Vice President and General Manager of Circus Circus Las Vegas from April 1998 until August 2009. Mr. Thrasher is a Certified Public Accountant. MGM Resorts International, the owner of Circus Circus Las Vegas, Circus Circus Reno and Railroad Pass, is an affiliate of the Joint Venture and SLCC. Mr. Thrasher was selected to serve as a member of the executive committee of the Joint Venture due to his extensive industry knowledge and leadership experience, including his experience in various executive and senior management positions and his background in accounting.

*John M. McManus.*  Mr. McManus has been a member of the executive committee of the Joint Venture and a director of SLCC since August 2011. He has been Secretary of Galleon since December 2009 and previously served as Assistant Secretary of Galleon from July 2009 until December 2009. Mr. McManus has served as Executive Vice President, General Counsel and Secretary of MGM Resorts International since July 2010. He served as Senior Vice President, Acting General Counsel and Secretary of MGM Resorts International from December 2009 to July 2010. He served as Senior Vice President, Deputy General Counsel and Assistant Secretary of MGM Resorts International from September 2009 to December 2009. He served as Senior Vice President, Assistant General Counsel and Assistant Secretary of MGM Resorts International from July 2008 to September 2009. He served as Vice President and General Counsel for CityCenter's residential and retail divisions from January 2006 to July 2008. Prior thereto, he served as General Counsel or Assistant General Counsel for various operating subsidiaries of MGM Resorts International from May 2001 to January 2006. MGM Resorts International is an affiliate of the Joint Venture and SLCC.

*Thomas R. Reeg.*  Mr. Reeg has been a member of the executive committee of the Joint Venture and a director of SLCC since August 2011. Since December 2007, he has been a member of Eldorado Resorts LLC's Board of managers and in January 2011, he became the Senior Vice President of Strategic Development for Eldorado Resorts LLC. Mr. Reeg was the Senior Managing Director of Newport Global Advisors L.P. from September 2005 through November 2010. Prior to joining Newport Global Advisors L.P., Mr. Reeg held a number of positions, most recently Managing Director and portfolio manager, in the High Yield Group of AIG Global Investment Group from 2002 to September 2005. Mr. Reeg was a member of the Board of Managers of NGA HoldCo, LLC from January 2007 through November 2010. Eldorado Resorts LLC is an affiliate of the Joint Venture and SLCC.

3.  *Employees*

As of the Petition Date, Silver Legacy employed approximately 1,770 persons, most of whom were full-time employees. Currently, none of the Debtors' employees is employed pursuant to a collective bargaining agreement. The number of people employed at any time is subject to seasonal fluctuation. The Debtors believe that their employee relations are excellent.

C.    **The Debtors' Prepetition Financing Arrangements**

The Debtors' principal liabilities and obligations as of the Petition Date are summarized below.

1.  *Mortgage Notes*

In March 2002, the Joint Venture and SLCC co-issued $160.0 million in principal amount of $10\frac{1}{8}\%$ senior secured mortgage notes due March 1, 2012 (the "**Mortgage Notes**") pursuant to that certain Indenture, dated March 5, 2002 (as amended, modified, restated or supplemented from time to time, the "**Indenture**"), entered into by the Joint Venture and SLCC, as issuers, and Bank of New York, as trustee (in such capacity, the "**Prepetition Indenture Trustee**").  The holders of the Mortgage Notes are referred to herein as the "**Prepetition Noteholders**" and, together with the Prepetition Indenture Trustee, are referred to as the "**Prepetition Secured Parties.**"  In February 2009, the Joint Venture purchased and retired $17.2 million in aggregate principal amount of the Mortgage Notes, and as a result of such purchase, approximately $142.8 in aggregate principal

amount of the Mortgage Notes was outstanding as of the Petition Date.  In addition, $10,281,600 in accrued interest was outstanding as of the Petition Date.

Pursuant to that certain Security Agreement, dated March 5, 2002 (as amended, modified, restated or supplemented from time to time, the "**Prepetition Security Agreement**") between the Debtors, as grantors, and the Prepetition Indenture Trustee, the Debtors granted to the Prepetition Indenture Trustee liens and security interests on substantially all of the Debtors' assets (but subject to applicable restrictions under Nevada gaming law) as collateral to secure the Debtors' obligations under and in respect of the Indenture and the Mortgage Notes.

The Debtors also entered into certain other security agreements with the Prepetition Indenture Trustee (each, as amended, modified, supplemented or restated from time to time) in connection with the issuance of the Mortgage Notes, including:

(a)    that certain Deed of Trust, Fixture Filing and Security Agreement with Assignment of Rents, dated as of February 26, 2002, pursuant to which the Joint Venture granted the Prepetition Indenture Trustee (i) liens on the land upon which the Debtors' casino is located (the "**Land**"), the improvements on the Land, the various fixtures located on the Land, and (ii) an assignment of the rents, issues and profits from the Land and the improvements thereon;

(b)    hat certain Assignment of Rents and Revenues, dated as of February 26, 2002, pursuant to which the Joint Venture granted and assigned to the Prepetition Indenture Trustee all of the Joint Venture's right, tile and interest in the rents and revenues generated or derived from the Land, the improvements thereon and the operation of the Debtors' casino and hotel business; and

(c)    that certain letter form account control agreement, dated March 5, 2002, by and between the Debtors, the Prepetition Indenture Trustee and Bank of America, pursuant to which the Joint Venture granted the Prepetition Indenture Trustee control over certain of the Joint Venture's deposit accounts maintained with Bank of America.

In connection with the Indenture and the issuance of the Mortgage Notes, each of the Partners entered into that certain Pledge Agreement, dated as of September 4, 2002, pursuant to which the Partners granted to the Prepetition Indenture Trustee, a lien on and security interest in each Partner's respective partnership interests in the Joint Venture.  However, the Partners are not obligors on or guarantors of the Mortgage Notes or any obligations under the Indenture or otherwise with respect to the Mortgage Notes, and the Prepetition Indenture expressly provides that each Partner shall not have any liability for such obligations..

2.    *Other Liabilities*

The Debtors owe approximately $412,000 in long-term debt relating to capital leases for equipment used in connection with the Debtors' hotel and casino operations.  In addition, as of the Petition Date, the Debtors owe approximately $4.3 million in trade, vendor and general unsecured debt (excluding payroll and other employee-related obligations).

D.    **Events Leading to the Commencement of the Chapter 11 Cases**

As discussed above, the Debtors are obligors with respect to $142.8 million in aggregate principal amount of the Mortgage Notes that matured on March 1, 2012.  Although the Joint Venture generated sufficient cash from operations to make the semi-annual interest payments that were due prior to the maturity of the Mortgage Notes, the business of the Joint Venture has been adversely impacted by the national and local recessions, the slow pace of the economic recovery and the effects of high unemployment, weakness in the housing market and general concerns about the economy on consumer confidence, discretionary spending levels and travel patterns.  In addition, a significant portion of the Joint Ventures' revenues are generated from patrons who are residents of northern

California and the Joint Venture's results of operations have been adversely impacted by increased competition from the growth in Native American gaming in northern California.

These adverse changes in the results of the Joint Venture's operations complicated the Debtors' ability to obtain financing on acceptable terms that would facilitate the repayment of the Mortgage Notes. Indeed, multiple efforts by the Debtors from April 2011 through early 2012 to refinance the Mortgage Notes proved unsuccessful.

In the Spring of 2011, the Debtors worked with both JP Morgan Chase ("**JP Morgan**") and Bank of America Merrill Lynch ("**BAML**") as potential initial purchasers in a proposed refinancing of the Mortgage Notes. Although no formal offering of new debt was made at that time, JP Morgan's and BAML's "soft" marketing campaign indicated there was insufficient interest in the capital markets for a refinancing of the Mortgage Notes at that time.

Subsequently, in August 2011, the Debtors retained Evercore Group L.L.C. ("Evercore") as their investment banker to assist the Debtors with their refinancing efforts. In August and September 2011, the Debtors and Evercore drafted and finalized marketing materials using public information to send to potential debt capital providers. In early September 2011, the Debtors and Evercore contacted, and distributed the marketing materials to, several traditional commercial lenders. Those lenders, however, were not willing to provide financing on terms acceptable to the Debtors. Based on this feedback, the Debtors briefly placed their marketing efforts on hold.

In late January 2011, the Debtors had extensive discussions with Deutsche Bank regarding a potential refinancing of the Mortgage Notes with Deutsche Bank as the initial purchaser. The Debtors proceeded with a formal offering of the new notes in early 2012, but due to insufficient interest in the capital markets this refinancing effort ultimately proved unsuccessful.

Following the unsuccessful offering of the new notes, and during the period leading up to and immediately following the maturity of the Mortgage Notes, the Debtors and Evercore once again reached out to certain traditional and alternative debt capital providers to ascertain interest in a first lien facility. Those efforts ultimately generated interest from multiple debt capital providers and spurred the discussions with Cap Re regarding the terms of the proposed transaction reflected in the RSA and discussed further below. Because this process was not completed prior March 1, 2012, the Debtors were unable to repay the Mortgage Notes as of their maturity and or make the scheduled interest payment due at maturity.[5]

### *The Prepetition Forbearance Agreement and Restructuring Support Agreement*

During the months leading up to the Petition Date, the Debtors and the Partners were in active discussions with the principal holders of the Mortgage Notes, including Cap Re, regarding potential out-of-court and in-court restructuring options. As the maturity date of the Mortgage Notes approached, the Debtors, the Partners and Cap Re were able to negotiate a Forbearance Agreement, dated as of March 1, 2012 (the "**Forbearance Agreement**"), pursuant to which Cap Re agreed to forbear for a brief period of time to permit the parties to continue their restructuring discussions.

Subsequently, on March 15, 2012, the Debtors, the Partners and Cap Re entered into the original RSA, pursuant to which the parties outlined the general terms of a consensual restructuring. In general (and subject to specified terms and conditions), the consensual restructuring would provide the holders of the Mortgage Notes with the following consensual treatment if either the restructuring could occur out-of-court or the holders of Mortgage Notes voted to accept such treatment under a chapter 11 plan: (a) an approximate $100 million cash payment to be funded through a combination of (i) a new $70 million first lien term loan facility, (ii) a $15 million aggregate cash contribution from the Partners, and (iii) approximately $15 million from the Joint Venture's existing cash balances; and (b) the issuance of $27.5 million in new second lien notes.

---

[5] Commencing on June 1, 2012 the Debtors are making postpetition interest payments to the Indenture Trustee as adequate protection.

Since the original RSA was entered into, discussions have continued with Cap Re and limited discussions have occurred with other holders of Mortgage Notes. As a result of various of those discussions and other developments, the Debtors, the Partners and Cap Re have agreed to several extensions of the Forbearance Agreement and the deadlines in the RSA, but the economic terms of the proposed consensual treatment have not changed. It became apparent, however, that pursuit of the proposed consensual restructuring contemplated by the RSA was not feasible on an out-of-court basis and instead would require a chapter 11 process. The RSA was amended and restated as of May 15, 2012 to reflect this fact, as well as to adjust certain other deadlines, terms and conditions.

### E.    Commencement of Chapter 11 Cases

On May 17, 2012 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. These Chapter 11 Cases are jointly administered in the Bankruptcy Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### F.    First Day Orders

On or about March 18, 2012, the Bankruptcy Court approved certain "first day" orders on an interim basis that were designed to minimize the disruption of the Debtors' business operations and to facilitate their reorganization. After the first day hearing, the Debtors engaged in discussions and negotiations with the Committee (as defined below) regarding certain of the first day relief sought by the Debtors. The Debtors and the Committee reached agreements resolving all of the issues raised by the Committee with respect to the first day orders (which resolutions were reflected in revised versions of the "first day" orders granting the requested relief on a final basis). On June 12, 2012, the Bankruptcy Court held a hearing and approved the Debtors' requested first day relief on a final basis.

### G.    Postpetition Financing and Use of Cash Collateral

In anticipation of the filing of the Chapter 11 Cases, the Debtors negotiated and reached agreement with the Prepetition Indenture Trustee regarding the terms and use of certain "cash collateral" and other cash on hand to fund the Debtors' business operations and otherwise administer these Chapter 11 Cases (the "**Cash Collateral Stipulation**"). On or about May 18, 2012, the Bankruptcy Court entered its interim order approving the Cash Collateral Stipulation. On June [__], 2012, the Bankruptcy Court entered its final order approving a revised, final version of the Cash Collateral Stipulation that was reviewed and agreed to by the Committee.

### H.    Appointment of Creditors' Committee

On or about May 29, 2012, the Office of the United States Trustee appointed a statutory committee of unsecured creditors in these Chapter 11 Cases pursuant to the Notice of Appointment of Committee of Unsecured Creditors filed with the Bankruptcy Court [Docket No. 103] (as such committee may be reconstituted from time to time, the "**Committee**"). The members of the Committee are (i) Associated Laundry Management, LLC; (ii) International Game Technology; and (iii) Shuffle Master, Inc.

### I.    Bar Date and Summary of Claims

1.    *Schedules and Statements*

On June 18, 2012, the Debtors filed with the Bankruptcy Court their respective Statements of Financial Affairs and Schedules of Assets and Liabilities (collectively, as amended, the "**Schedules**").

2.    *Bar Date*

By order dated [_____], 2012 (the "**Bar Date Order**"), pursuant to Bankruptcy Rule 3003(c)(3), the Bankruptcy Court set [August 17], 2012 at 4:00 p.m. (prevailing Pacific time) (the "**Bar Date**"), as the date and time by which general proofs of claim were required to be filed by substantially all claimants of the Debtors. Unless specifically exempted by the Bar Date Order, all potential creditors were required to file

proofs of claim notwithstanding section 1111(a) of Bankruptcy Code and Bankruptcy Rule 3003(c)(2), which generally requires a proof of claim be filed only with respect to prepetition claims that are not scheduled in the Debtors' Schedules or which is listed in the Schedules as disputed, contingent or unliquidated.

Notice of the Bar Date and a proof of claim form were mailed to (i) all creditors and other known holders of claims, including all creditors listed in the Debtors' Schedules; (ii) all parties to executory contracts and unexpired leases of the Debtors; (iii) all parties to litigation with the Debtors; (iv) all members of the Committee; (v) all persons and entities included in the Debtors' master service list; and (vi) all persons and entities requesting notice pursuant to Bankruptcy Rule 2002 as of the entry of the Bar Date Order.

3.    *Summary of Claims*

Based upon the Debtors' Schedules, the Debtors estimate that the aggregate amount of Claims in each Class are as follows:[6]

- Class 1 – Other Secured Claims:  Approximately $47,000

- Class 2 – Other Priority Claims:  $0.00

- Class 3 – Mortgage Note Claims:  $142.8 million in outstanding principal, $10,281,600 in accrued but unpaid interest, plus interest, fees and expenses

- Class 4:  US Foods Secured Claims:  $210,944.10

- Class 5:  General Unsecured Claims:  Approximately $4.7 million

## III.    THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND A DESCRIPTION OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN .  THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBITS ATTACHED HERETO, AND TO THE PLAN SUPPLEMENT.  IN THE EVENT OF ANY INCONSISTENCIES, THE PROVISIONS OF THE PLAN AND OTHER DEFINITIVE DOCUMENTS SHALL GOVERN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.

### A.    Administrative Claims, Priority Tax Claims and Other Priority Claims

Pursuant to Bankruptcy Code section 1123(a)(1), the Claims against each of the Debtors set forth in Article II are not classified within any Classes.  The Holders of such Claims are not entitled to vote on the Plan. The treatment of the Claims set forth below is consistent with the requirements of Bankruptcy Code section 1129(a)(9).

1.    *Administrative Claims*

Except as specified in Article III.A.1, unless the Holder of an Administrative Claim agrees to less favorable treatment with the Debtors or Reorganized Debtors or unless a Final Order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (i) on the Effective

---

[6] These estimates were compiled based upon a review of the Debtors' schedules and filed proofs of claim.  These estimates may change as the claims analysis and resolution process proceeds.

Date, (ii) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or as soon thereafter as is reasonably practicable, or (iii) in the ordinary course of business and dealings between the Debtors and such Holder.

<div align="center">a.    <u>Statutory Fees</u></div>

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid in Cash equal to the amount of such Administrative Claims.   All fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Reorganized Debtors in accordance therewith until the closing of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

<div align="center">b.    <u>Ordinary Course Liabilities</u></div>

Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of their business (including Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years commencing after the Petition Date) and Administrative Claims arising from those contracts and leases of the kind described in Article V.C of the Plan) will be paid by the Reorganized Debtors pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims.

<div align="center">c.    <u>Professional Compensation</u></div>

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court an application for final allowance of such Fee Claim by no later than 60 days after the Effective Date; <u>provided</u>, <u>however</u>, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order.

<div align="center">2.    <i>Priority Tax Claims</i></div>

The legal, equitable and contractual rights of the Holders of Priority Tax Claims are unaltered by the Plan.  Subject to Article VII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by such Holder; or (c) pursuant to and in accordance with Bankruptcy Code sections 1129(a)(9)(C) and (D), Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date; <u>provided</u>, <u>further</u>, that Priority Tax Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors without further notice to or order of the Bankruptcy Court.

**B.    Classification and Treatment of Holders of Claims and Equity Interests**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court or other court of appropriate jurisdiction determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of, or ownership interest in, the debtor.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.  If a class of claims or interests is "impaired," the Bankruptcy Code affords certain

rights to holders of such claims or interests, including the right to vote on the plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, grants such holder a claim for damages incurred, and does not otherwise alter the holders' legal, equitable and contractual rights.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, confirmation and distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123(a)(1). The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date. If there are no Claims or Interests in a particular Class, then such Class of Claims or Interests shall not exist for all purposes of the Plan.

1.    *Class 1:  Allowed Other Secured Claims*

*Classification:*  Class 1 consists of the Other Secured Claims against the Debtors.

*Treatment:*  Each Holder of an Allowed Other Secured Claim will be placed in a separate subclass of Class 1, and each subclass will be treated as a separate class for distribution purposes. On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, one of the following treatments as determined by the Debtors or the Reorganized Debtors, as applicable:

(a)    the Debtors will pay the Allowed Other Secured Claim in full in Cash;

(b)    the Debtors will Reinstate the Allowed Other Secured Claim;

(c)    the Debtors will treat the Allowed Other Secured Claim in a manner indubitably equivalent to the treatments set forth in subsections (a) and (b) above; or

(d)    the Holder will receive such other treatment otherwise agreed to between the Holder and the Debtors.

*Voting*:  Allowed Other Secured Claims are unimpaired, and the Holders of Allowed Other Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.    *Class 2:  Allowed Other Priority Claims*

*Classification:*  Class 2 consists of the Other Priority Claims against the Debtors.

*Treatment:*  The legal, equitable and contractual rights of the Holders of Allowed Other Priority Claims are unaltered by the Plan.  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, one of the following treatments, as determined by the Debtors or the Reorganized Debtors, as applicable:

(a)    the Debtors will pay the Allowed Other Priority Claim in full, without interest, in Cash on the Effective Date or as soon thereafter as is practicable, provided that, any Allowed Other Priority Claim that was not due and owing as of the Petition Date and is not due and owing as of the Effective Date will be paid in full in Cash when such Allowed Other Priority Claim becomes due and owing in accordance with its terms; or

(b)    each Allowed Other Priority Claim will be treated in any other manner so that such Claim shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.

*Voting:*  Allowed Other Priority Claims are unimpaired, and the Holders of Allowed Other Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    *Class 3: Allowed Mortgage Note Claims*

*Classification:*  Class 3 consists of the Mortgage Note Claims.

*Consensual Treatment*:  If Class 3 Acceptance occurs, on the Effective Date, each Holder of an Allowed Mortgage Note Claim will receive, on account, and in full satisfaction, of its Allowed Mortgage Note Claim:

(a)    its respective Pro Rata share of (i) the Class 3 Consensual Cash Distribution and (ii) the New Second Lien Notes; and

(b)    the benefit of the release and injunctive provisions set forth in Article IX of the Plan.

If Class 3 Acceptance occurs, the Debtors estimate that the amount of Available Balance Sheet Cash to be distributed as part of the Class 3 Consensual Cash Distribution, based on an anticipated Effective Date of September 30, 2012, will be $7.8 million.  This anticipated amount of Available Balance Sheet Cash is an estimate by the Debtors solely for purposes of this Disclosure Statement and is subject to change based on various factors, including, but not limited to, variances in the Debtors' financial projections, the Debtors' actual financial performance up to and including the Effective Date, the costs of the Debtors' chapter 11 cases and other factors that may impact the Debtors' cash on hand.

*Cram-Down Treatment:*  If Class 3 Acceptance does not occur, on the Effective Date, each Holder of an Allowed Mortgage Note Claim will receive, on account, and in final satisfaction, of its Allowed Mortgage Note Claim, its respective Pro Rata share of (i) the Class 3 Cram-Down Cash Distribution and (ii) the Cram-Down Notes.

If Class 3 Acceptance does not occur, the Debtors estimate that the amount of Available Balance Sheet Cash to be distributed as part of the Class 3 Cram-Down Cash Distribution, based on an anticipated Effective Date of September 30, 2012, will be $11.2 million.  This anticipated amount of Available Balance Sheet Cash is an estimate by the Debtors solely for purposes of this Disclosure Statement and is subject to change based on various factors, including, but not limited to, variances in the Debtors' financial projections, the Debtors' actual financial performance up to and including the Effective Date, the costs of the Debtors' chapter 11 cases and other factors that may impact the Debtors' cash on hand.

*Voting:  Allowed Mortgage Note Claims are impaired, and Holders of Allowed Mortgage Note Claims are entitled to vote to accept or reject the Plan.*

4.      *Class 4: Allowed US Foods Secured Claims*

*Classification:*  Class 4 consists of the US Foods Secured Claims.

*Treatment*:  The US Foods Secured Claims shall be Allowed in the amount of (a) $210,944.10 based on US Foods' sales and deliveries of goods to the Debtors prior to the Petition Date pursuant to the US Foods Customer Agreement, invoices or otherwise, plus (b) any and all accrued interest (calculated in accordance with the US Foods Customer Agreement) on the amount set forth in the immediately preceding clause (a), whether such interest accrued prior to or subsequent to the Petition Date.  On the Effective Date, (i) the Holders of the Allowed US Foods Secured Claims shall be paid, on account of such Allowed Claims, Cash in the amount of $210,944.10, and (ii) and there shall be no payment of any accrued interest (whether accrued prior to or subsequent to the Petition Date) included in the Allowed US Foods Secured Claims.

*Voting:*  Allowed US Foods Secured Claims are impaired, and the Holders of the Allowed US Foods Secured Claims are entitled to vote to accept or reject the Plan.

5.      *Class 5: Allowed General Unsecured Claims*

*Classification:*  Class 5 consists of the General Unsecured Claims against the Debtors.

*Treatment:  Each Holder of an Allowed General Unsecured Claim will receive, on account, and in full satisfaction of its Allowed General Unsecured Claim, payment in full in Cash to be made in four equal quarterly installments, the last of which shall occur no later than one year after the Effective Date, with interest accruing at a rate of 5.0% per annum commencing on the Petition Date through the date that the Allowed General Unsecured Claim is paid in full, provided that, (a) there shall be no payment of any interest accrued prior to the Petition Date on any Allowed General Unsecured Claim, and (b) notwithstanding the foregoing, this provision shall not accelerate the time that any Allowed General Unsecured Claim will become due and payable.*

*Voting:  Allowed General Unsecured Claims are impaired, and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.*

6.      *Class 6: Equity Interests*

*Classification:*  Class 6 consists of the Equity Interests in the Debtors.

*Treatment:*  The legal, equitable, contractual, and ownership rights of the Holders of Equity Interests are unaltered by the Plan.  Upon the Effective Date, the Holders of Equity Interests in the Joint Venture shall retain their Equity Interest in the Joint Venture, provided that, if the business form of the Joint Venture is changed pursuant to Article IV.A, the equity in the Joint Venture, as so reconstituted, shall be held equally among the Partners.

*Voting*:  Equity Interests are unimpaired, and the Holders of Equity Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

C.      **Means For Implementation of the Plan**

1.      *Continued Existence and Vesting of Assets in the Reorganized Debtor*

The Debtors will, as the Reorganized Debtors, continue to exist after the Effective Date, with all the corporate or partnership powers, as applicable, under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law, and the Debtors may enter into and consummate one or more corporate restructuring transactions, including, but not limited to,

changing the business or corporate form of either or both of the Debtors and/or dissolving SLCC. Except as otherwise provided herein, as of the Effective Date, all property of the Estates of the Debtors, and any property acquired by the Debtors or Reorganized Debtors under the Plan, will vest in the Reorganized Debtors, free and clear of all Claims, liens, charges, other encumbrances and interests, other than those (a) provided for in the New First Lien Credit Agreement and the New Second Lien Indenture, or the Cram-Down Indenture, as applicable, and the respective collateral and security documents delivered in connection the New First Lien Credit Agreement, the New Second Lien Indenture or the Cram-Down Indenture, as applicable, or (b) otherwise expressly provided for pursuant to the Plan. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

2.    *Transactions Dependent Upon Class 3 Acceptance/Rejection*

a.    Class 3 Acceptance

If Class 3 Acceptance occurs, on the Effective Date, (a) the Reorganized Debtors shall enter into the New First Lien Credit Agreement, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the continuation or creation or perfection of liens in connection therewith, (b) the Reorganized Debtors shall enter into or issue, as the case may be, the New Second Lien Indenture, the New Second Lien Notes, and any documents or agreements in connection therewith, including, without limitation, any documents required in connection with the continuation or creation or perfection of liens in connection therewith, and (c) the Debtors shall enter into or issue, as the case may be, the New Subordinated Notes, and any documents or agreements in connection therewith, including, without limitation, any documents required in connection with the continuation or creation or perfection of liens in connection therewith.

The New Second Lien Notes will be in the original principal amount of $27.5 million and will mature on the five and a half year anniversary of the Effective Date. Interest on the New Second Lien Notes will be payable for the first two years of the term of the New Second Lien Notes at a rate equal to either (i) 10% per annum paid in cash, or (ii) 12% accrual on PIK interest, with the Reorganized Debtors having the option to pay in cash or as PIK, provided, however, that the Reorganized Debtors will be prohibited from electing to pay interest as PIK for any period(s) when the terms of the New First Lien Credit Agreement would permit the payment of that interest in cash. At the beginning of third year of the term of the New Second Lien Notes, the interest rate will increase to 12% if paid in cash or 14% if paid as PIK interest, again at the election of the Reorganized Debtors; provided, however, that the Reorganized Debtors will be prohibited from electing to pay interest as PIK for any period(s) when the terms of the New First Lien Credit Agreement would permit the payment of that interest in cash. The New Second Lien Notes will be secured by second priority liens over the assets of the Reorganized Debtors securing the New First Lien Term Loan that will be junior and subordinate to the liens securing the New First Lien Term Loan.

b.        Class 3 Rejection

If Class 3 Acceptance does not occur, on the Effective Date, the Reorganized Debtors shall enter into the Cram-Down Indenture, the Cram-Down Notes, and any documents or agreements in connection therewith, including, without limitation, any documents required in connection with the continuation or creation or perfection of liens in connection therewith.

The Cram-Down Notes will have a term of five years.  The Cram-Down Notes will bear interest at 7.3% per annum.  The Cram-Down Notes will pay interest semi-annually.   After the payment of the anticipated Class 3 Cram Down Distribution (which consists of approximately $10.8 million in accrued but unpaid interest as of and including the Effective Date and an anticipated $10.2 million in Available Balance Sheet Cash used to pay down outstanding principal), the Debtors anticipate that the aggregate principal amount of the Cram-Down Notes will be $131.6 million.  The Cram-Down Notes either: (i) shall be secured by liens on the Debtors' property of the same extent and priority as the prepetition liens that secured the Mortgage Notes; or (ii) shall provide the Holders of the Mortgage Note Claims with the indubitable equivalent of the Allowed Mortgage Note Claims.

3.        _Funding for Cash Distributions to Occur Under the Plan_

If Class 3 Acceptance occurs, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan (a) to the Holders of Allowed Mortgage Note Claims will be obtained from (i) the Available Balance Sheet Cash, (ii) the Debtors' Cash Balances, (iii) proceeds from the issuance of the New Subordinated Notes, and (iv) proceeds from borrowings under the New First Lien Credit Agreement, and (b) to all other Holders of Claims entitled to payment will be obtained from the Reorganized Debtors' Cash balances.

If Class 3 Acceptance does not occur, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan:

a.        to the Holders of Allowed Mortgage Note Claims will be obtained from the Available Balance Sheet Cash and the Debtors' Cash Balances; and

b.        to all other Holders of Claims entitled to payment will be obtained from the Reorganized Debtors' Cash Balances.

4.        _Valuation_

In connection with seeking confirmation of the Plan, the Debtors anticipate establishing that the aggregate going concern value of their business and assets is within a range of approximately $154 million to $159 million.  The Debtors intend to provide evidence of such going concern valuation at or prior to the Confirmation Hearing.

5.        _Corporate Governance; Employment and Compensation_

a.        Articles of Incorporation, Certificate of Designations and Bylaws

Subject to Article IV.A of the Plan, the Reorganized Debtors shall continue to be bound by the existing partnership agreements, articles of incorporation and bylaws of the Debtors, as applicable, and such partnership agreements, articles of incorporation and bylaws shall, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code, except to the extent necessary to comply with applicable gaming regulations; provided that, upon or after the Effective Date the Debtors will be authorized and empowered to amend their respective organizational documents in accordance with each Debtor's existing organizational documents and applicable law and change their corporate structure, including but not limited to reforming, with respect to each Debtor, as a corporation or limited liability company in the Reorganized Debtors' sole discretion.

b.        Directors and Officers of the Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial officers, directors and executive committee members, as applicable, of each Reorganized Debtor will consist of the existing officers, directors and executive committee members of such Debtor. The tenure of each officer, director and executive committee member of the Reorganized Debtors will be governed by the terms of the existing partnership agreements, articles of incorporation, or bylaws of the Debtors, as the same may be amended from time to time in accordance with the Plan, any existing employment agreements and applicable state law.

> c.     <u>Employment, Retirement, Indemnification and Other Related Agreements and Management Incentive Programs</u>

As of the Effective Date, the Reorganized Debtors will have authority to: (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active directors, executive committee members, officers and employees, subject to the terms and conditions of any such agreement; and (b) adopt, execute and implement new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees, if any, as determined by the Reorganized Debtors' directors and executive committee members, as applicable. To the extent any existing employment, retirement, welfare, incentive, severance, indemnification or other agreement with its active directors, executive committee members, officers and employees constitutes an executory contract, such executory contract shall be assumed as of the Effective Date.

Notwithstanding the foregoing, the obligation of the Debtors to indemnify any person or entity serving at any time on the Petition Date or thereafter as one of their directors, executive committee members, officers, or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any other corporation or legal entity, to the extent provided in the Debtors' constituent documents or by a written agreement with the Debtors or in accordance with any applicable law shall be deemed and treated as executory contracts that are assumed by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.

> d.     <u>Corporate Action</u>

The Reorganized Debtors will have the authority to, without further act or action under applicable law, regulation, order or rule, and shall on the Effective Date: (a) if Class 3 Acceptance occurs, (i) enter into the New First Lien Credit Agreement, (ii) enter into the New Second Lien Indenture and issue the New Second Lien Notes, and (iii) issue the New Subordinated Notes and consummate the transactions contemplated thereunder; (b) if Class 3 Acceptance does not occur, enter into the Cram-Down Indenture and issue the Cram-Down Notes; (c) make all other distributions provided for in the Plan pursuant to the terms set forth herein; and (d) adopt, execute, deliver and implement all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing. In addition, any other matters provided for under the Plan involving the partnership or corporate structure of the Debtors or Reorganized Debtors or partnership or corporate action to be taken by or required of the Debtors or Reorganized Debtors will occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the partners, managers, directors or executive committee members of the Debtors or the Reorganized Debtors.

> 6.     *Preservation of Rights of Action*

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any claims, demands, rights and Causes of Action that the Debtors or the Estates may hold against any entity, to the extent not released under Article IX of the Plan. The Reorganized Debtors or their successors may pursue such retained claims, demands, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successors holding such claims, demands, rights or Causes of Action.

> 7.     *Cancellation and Surrender of Instruments, Securities and Other Documentation*

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III, the Mortgage Notes and any securities, notes, documents and instruments which evidence such Claims shall (1) be canceled and (2) have no further force and effect other than the right to participate in distributions, if any, provided under the Plan in respect of such Claims, without any further action on the part of the Debtors or Reorganized Debtors.  The holders of or parties to such canceled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that no distribution under the Plan will be made to or on behalf of any holder of an Allowed Claim evidenced by such canceled instruments or securities unless and until such instruments or securities are received by the applicable Disbursing Agent or Indenture Trustee to the extent required in Article VI.H of the Plan.

On the Effective Date, the Indenture shall be cancelled, except for purposes of effectuating the distributions under the Plan and allowing the Indenture Trustee to retain all charging liens pursuant to the terms of the Indenture with respect to distributions under the Plan.  Except as otherwise provided in the Plan, the Debtors, on the one hand, and the Indenture Trustee, on the other hand, will be released from any and all obligations under the Indenture except with respect to the distributions required to be made to the Indenture Trustee as provided in the Plan or with respect to such other rights of the Indenture Trustee that, pursuant to the terms of the Indenture, survive the termination of the Indenture.

8.    _Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes_

The General Manager, Chief Executive Officer, President and Chief Financial Officer of the Debtors or the Reorganized Debtors, as applicable, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The Secretary of the Debtors or the Reorganized Debtors, as applicable, will be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax or similar Tax: (1) the vesting of the assets of the Estate in the Reorganized Debtors on the Effective Date; (2) the creation of any mortgage, deed of trust, lien or other security interest pursuant to the terms of the Plan; (3) the assumption of any executory contract or unexpired lease or the making or assignment of any lease or sublease; (4) if Class 3 Acceptance occurs, the entry into the New First Lien Credit Agreement and the issuance of the New Second Lien Notes; (5) if Class 3 Acceptance does not occur, the issuance of the Cram-Down Notes; or (6) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan

9.    _Substantive Consolidation_

The Debtors' request for confirmation of the Plan also is a motion by the Debtors that the Confirmation Order include provisions ordering the substantive consolidation of the Estates into a single consolidated Estate for the limited purposes of confirming and consummating the Plan, including, but not limited to, voting and distribution.  If substantive consolidation of all of the Estates is ordered, then on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Joint Venture for the limited purposes of confirming and consummating the Plan, including, but not limited to, voting and distribution.

Section 105 of the Bankruptcy Code, embodying the general equitable powers of the bankruptcy courts, has been interpreted to provide authority to grant substantive consolidation of debtors.  _See Augie/Restivo Banking Co., Ltd._, 860 F.2d 515, 518 n.1 (2d Cir. 1988); _see also Alexander v. Compton (In re Bonham)_, 229 F. 3d 750, 763 (9th Cir. 2000) ("The bankruptcy court's power of substantive consolidation has been considered part of the bankruptcy court's general equitable powers since the passage of the Bankruptcy Act of 1898").  Courts in the Ninth Circuit follow the test for substantive consolidation set forth in _Augie/Restivo_.  _See Bonham_, 229 F. 3d at 766 (adopting the _Augie/Restivo_ test for substantive consolidation because it "is more grounded in substantive consolidation and economic theory; it is also more easily applied"); _see also Salyer v. SFK Aviation, LLC (In re SK Foods, L.P.)_, U.S. Dist. Lexis 136071 (E.D. Cal. Dec. 9, 2010) (following the _Bonham_ decision).  Under such test, bankruptcy courts may "consolidate […] assets [to] create a single fund from which all claims against the consolidated debtors are satisfied; duplicate and inter-company claims are extinguished; and the creditors of the

consolidated entities are combined for purposes of voting on reorganization plans." *Bonham*, 299 F.3d at 764 (internal citation omitted).

When deciding whether substantive consolidation is appropriate, courts in the Ninth Circuit consider two alternative factors: "(1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the affairs of the debtor are so entangled that consolidation will benefit all creditors." *Id.* at 766 (citing *Augie/Restivo*, 860 F.2d at 518). According to the *Bonham* decision, either factor may constitute a sufficient basis to order substantive consolidation. *Id.* In addition, courts in other circuits have held that a *prima facie* case of substantive consolidation can be established if, in the course of its prepetition dealings with the debtors, the objecting creditor understood it was dealing with the debtors as one indistinguishable entity and did not rely on the debtors' separate existence in extending credit to the debtors. *See In re Owens Corning*, 419 F3d 195, 215 (3d Cir. 2005); *see also In re The Lodge at Big Sky, LLC*, 2011 WL 1344632, at *4 (Bankr. D. Mont. Apr. 8, 2011) (granting the debtors' motion for substantive consolidating finding because of both creditor reliance on corporate integration and hopeless entanglement); *In re Introgen Therapeutics, Inc.*, 429 B.R. 570, 583 (Bankr. W.D. Tex. 2010) (approving substantive consolidation because, among other things, the debtors established that creditors were treating the debtors as a single economic unit and did not rely on the debtors' separate identity in extending credit). Furthermore, courts in the Ninth Circuit have held that substantive consolidation can be based on the individual circumstances of the case and may even be "temporary" (i.e., consolidated for chapter 11 voting and distribution, but not consolidated upon emergence). *See In re Standard Brands Paint Company*, 154 B.R. 563, 571 (Bankr. C.D. Cal. 1993) (recognizing that the confirmation of one plan for five debtor entities would remove the delay, uncertainty and additional cost created by five separate plans and noting the benefit to debtors, shareholders and creditors of a single plan's efficiency).

The Debtors believe that the limited substantive consolidation provided for in the Plan is legally justified and satisfies the tests set adopted by the Ninth Circuit and other courts, is in the best interest of the Debtors' Estates and will promote a more expeditious and streamlined distribution and recovery process for all creditors. As had been disclosed in the Debtors' historic public filings, SLCC was established solely for the purpose of serving as a co-issuer of the Mortgage Notes and, as such, does not have, and has never had, any operations, assets, or revenues. Thus, SLCC's creditors, effectively treated the Debtors as a single economic unit and did not rely on the Debtors' separate identity in extending credit. In addition, the proposed substantive consolidation will not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, any contract, instrument, or other agreement or document pursuant to the Plan (including the New First Lien Credit Agreement, the New Second Lien Indenture, the New Subordinated Notes or the Cram-Down Notes, as applicable), or, any contracts or leases that were assumed or entered into during the Chapter 11 Cases. Accordingly, substantive consolidation of SLCC with the Joint Venture will not affect creditor recoveries or prejudice any creditor rights in any manner whatsoever.

### D.        Treatment of Executory Contracts and Unexpired Leases

#### 1.        *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Any executory contract and unexpired lease that (i) has not expired by its own terms on or prior to the Effective Date, (ii) has not been assumed or rejected by the Debtors during the pendency of the Chapter 11 Cases, (iii) is not listed in a Plan Supplement as executory contracts or unexpired leases to be rejected, and (iv) is not the subject of a pending motion to reject such executory contract or unexpired lease, shall be deemed assumed by the Debtors as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumption pursuant to section 365(a) and 1123 of the Bankruptcy Code. Any executory contract or unexpired lease listed in a Plan Supplement as an executory contract or unexpired lease to be rejected by the Debtors shall be deemed rejected by the Debtors as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

#### 2.        *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All proofs of claim arising from the rejection (if any) of executory contracts or unexpired leases must be filed with the Claims Agent by no later than 30 days after the earlier of: (i) the date of entry of an order of

the Bankruptcy Court approving any such rejection and (ii) the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease for which no proof of claim was timely filed will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates and property. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunctions set forth in the Plan.

<p style="text-align:center">3.    <u>Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to</u></p>

<u>Plan</u>

Any monetary amounts by which an executory contract or unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of any dispute regarding the amount of any cure payments, (a) the Bankruptcy Court will retain jurisdiction to adjudicate any such dispute, and (b) if the Bankruptcy Court determines that any such disputed cure amount is required to be paid (in full or in part) by the Debtors pursuant to section 365(b)(1) of the Bankruptcy Code, the Debtors will pay such cure amount in the ordinary course following entry of the Bankruptcy Court's Final Order resolving such cure dispute, <u>provided</u> <u>that</u>, the Debtor or Reorganized Debtor shall have the right, following entry of such a Final Order fixing a cure amount (if any) to reject the applicable executory contract or unexpired lease and any such rejection shall be deemed to have occurred immediately prior to the Effective Date.

<p style="text-align:center">4.    <u>Insurance Policies</u></p>

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

**E.    Provisions Governing Distributions**

<p style="text-align:center">1.    <u>Distributions for Claims Allowed as of the Effective Date</u></p>

Except as otherwise provided in Article VI, distributions to Holders of Claims that are Allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (a) 60 days after the Effective Date or (b) such later date when the applicable conditions of Article V.C of the Plan (regarding cure payments for executory contracts and unexpired leases being assumed), Article VI.D.2 of the Plan (regarding undeliverable distributions) or Article VI.H of the Plan (regarding surrender of cancelled instruments and securities) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Article VII.C of the Plan.

<p style="text-align:center">2.    <u>Method of Distributions to Holders of Claims</u></p>

The Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion, and the Indenture Trustee with respect to distributions to Holders of Allowed Mortgage Note Claims, will make all distributions of Cash and other instruments or documents required under the Plan. Each Disbursing Agent and the Indenture Trustee will serve without bond, and any Disbursing Agent or the Indenture Trustee may employ or contract with other entities to assist in or make the distributions required by the Plan.

On the Effective Date, the Reorganized Debtors shall coordinate with the Indenture Trustee to effectuate the delivery of (a) if Class 3 Acceptance occurs, the New Second Lien Notes and Cash distributions required under the Plan, or (b) if Class 3 Acceptance does not occur, the Cram-Down Notes, to the Holders of Allowed Mortgage Note Claim.

<p style="text-align:center">3.    <u>Compensation and Reimbursement for Services Related to Distributions</u></p>

Each Third Party Disbursing Agent providing services related to distributions pursuant to the Plan will receive from the Reorganized Debtors, without further Bankruptcy Court approval, such reasonable

compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services as may be agreed to by the Debtors or Reorganized Debtors. These payments will be made on terms agreed to with Reorganized Debtors and will not be deducted from distributions to be made pursuant to the Plan to Holders of Allowed Claims receiving distributions from a Third Party Disbursing Agent.

The Indenture Trustee shall not be required to give any bond or surety or other security for the performance of its duties as Disbursing Agent or stock transfer agent unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent or stock transfer agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

4.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

a.    Delivery of Distributions

Each distribution to a Holder of an Allowed Claim entitled to distribution will be made by the Disbursing Agent to the address set forth in (a) such Holder's proof of claim (if any) or (b) the Debtors' schedules of assets and liabilities, provided that, the Indenture Trustee will make distributions to Holders of Allowed Mortgage Note Claims in accordance with the addresses contained in its records.

b.    Undeliverable Distributions Held by Disbursing Agents and Indenture Trustee.

(i)    Holding of Undeliverable Distributions

Subject to Article VI.D.2.c of the Plan, undeliverable distributions will remain in the possession of the applicable Disbursing Agent or Indenture Trustee pursuant to Article VI.D.2.a of the Plan until such time as a distribution becomes deliverable. Subject to Article VI.D.2.c of the Plan, undeliverable New Second Lien Notes or Cram-Down Notes, as applicable, will be held by the Indenture Trustee for the benefit of the potential claimants of such securities.

(ii)    After Distributions Become Deliverable

The Disbursing Agent or Indenture Trustees, as applicable, will promptly make all distributions that become deliverable to Holders of Allowed Claims.

(iii)    Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable distribution to be made by the Disbursing Agent or Indenture Trustee within two years after the Effective Date will have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against the Reorganized Debtors or their property. If any New Second Lien Notes or Cram-Down Notes, as applicable, remain unclaimed at the end of such period, those New Second Lien Notes or Cram-Down Notes, as applicable, will be surrendered to the Reorganized Debtors for cancellation. Nothing contained in the Plan will require the Debtors, Reorganized Debtors, Disbursing Agent or Indenture Trustee to attempt to locate any holder of an Allowed Claim.

5.    *Distribution Record Date*

The Debtors, Reorganized Debtors, Disbursing Agent or Indenture Trustee will have no obligation to recognize the transfer or sale of any Mortgage Note Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those Holders of Mortgage Note Claims who are Holders of such Claims as of the close of business on the Distribution Record Date

6.    *Means of Cash Payments*

Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Debtors or Reorganized Debtors or, at the option of the Debtors or Reorganized Debtors, by wire transfer from a domestic bank; provided that, Cash payments to foreign holders of Allowed Claims may be made, at the option of the Debtors or Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction

### 7.    *Minimum Distributions*

In the event that any distribution to be made to a Holder of an Allowed General Unsecured Claim (on account of the principal amount of such Allowed General Unsecured Claims) in the aggregate totals less than $15,000, the Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall make any such distribution in a single lump sum on the Effective Date, without interest.

### 8.    *Surrender of Canceled Instruments or Securities*

#### a.    Tender of Mortgage Notes

Except as provided in Article VI.H.2 of the Plan for lost, stolen, mutilated or destroyed Mortgage Notes, as a precondition to receiving any distributions provided for under the Plan, each Holder of an Allowed Mortgage Note Claim must tender the applicable Mortgage Notes to the Indenture Trustee in accordance with a letter of transmittal to be provided to such Holders by the Indenture Trustee as promptly as practicable following the Effective Date.  All surrendered Mortgage Notes will be marked as canceled and delivered.

#### b.    Lost, Stolen, Mutilated or Destroyed Mortgage Notes

Any Holder of an Allowed Mortgage Note Claim with respect to which the underlying Mortgage Notes have been lost, stolen, mutilated or destroyed must, in lieu of surrendering such notes, deliver to the Indenture Trustee: (a) evidence satisfactory to the Indenture Trustee of the loss, theft, mutilation or destruction and (b) such security or indemnity as may be required by the Indenture Trustee to hold the Indenture Trustee and the Reorganized Debtors harmless from any damages, liabilities or costs incurred in treating such individual as a Holder of an Allowed Mortgage Note Claim.  Upon compliance with Article VI.H.2 of the Plan by a Holder of an Allowed Mortgage Note Claim, such Holder will, for all purposes under the Plan, be deemed to have surrendered the applicable Mortgage Note

#### c.    Failure to Surrender Mortgage Notes

Any Holder of an Allowed Mortgage Note Claim that fails to surrender or is deemed not to have surrendered the applicable Mortgage Notes within two years after the Effective Date will to the fullest extent permitted by law have its right to distributions pursuant to the Plan on account of such notes discharged and will be forever barred from asserting any such Claim against the Reorganized Debtors or their respective property.  In such case, any New Second Lien Notes or Cram-Down Notes, as applicable, held for distribution on account of such Allowed Mortgage Note Claim will be treated pursuant to the provisions set forth in Article VI.D.2.c of the Plan.

### F.    **Procedures for Resolving Disputed Claims**

#### 1.    *Prosecution of Objections to Claims*

As discussed above, pursuant to the Bar Date Order, the Bankruptcy Court established [August 17], 2012, as the general deadline for filing proofs of Claim against the Debtors or the Estates, as well as certain other deadlines and procedures relating to the filing of proofs of Claim.  After the Confirmation Date, only the Debtors or the Reorganized Debtors, as applicable, will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  After the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

#### 2.    *Treatment of Disputed Claims*

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of a Disputed Claims until such Claim becomes an Allowed Claim.

3.      *Distributions on Account of Disputed Claims Once Allowed*

The Disbursing Agent or Indenture Trustee, as applicable, will promptly make all distributions on account of any Disputed Claim that has become an Allowed Claim. Such distributions will be made pursuant to the provisions of the Plan governing the applicable Class

4.      *Estimation*

The Debtors or the Reorganized Debtors, as the case may be, may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. If the Bankruptcy Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement under the Plan, or (c) a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as the case may be, may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another

**G.      Discharge, Releases, Injunction and Settlement**

1.      *Discharge of Claims*

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims against the Debtors arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

2.      *Claims Enjoined*

Except as provided in the Plan or the Confirmation Order or agreed to by the Debtors or the Reorganized Debtors, as of the Effective Date all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Plan will be permanently enjoined from taking any enforcement actions on account of any such discharged Claim, debt or other liability, including, but not limited to, (i) commencing or continuing in any manner any action or other proceeding, (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (iii) creating, perfecting or enforcing any lien or encumbrance, (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors, and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the terms of the Plan.

3.      *Global Settlement*

Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement, and the Plan constitutes a request to authorize and approve such compromise and settlement, of all Claims among the Debtors, the Reorganized Debtors, the Released Parties and any Related Person (the "Global Settlement").  Any distributions or contributions (including the proceeds from the New Subordinated Notes) to be made pursuant to the Plan shall be made on account of and in consideration of the Global Settlement, which, upon the Effective Date of the Plan, shall be binding on the Debtors and their Estates, the Reorganized Debtors, the Released Parties and all Holders of Claims against and Equity Interests in any Debtor.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's

approval, as of the Effective Date, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests, and that the Global Settlement is fair, equitable, and reasonable, and otherwise satisfies the requirements of Bankruptcy Rule 9019.

4.      *Releases*

As of the Effective Date, each of the Released Parties and each of their respective Related Persons shall be, and shall be deemed to be, released from all claims owned, held, or which could have been, or may be asserted by, any other Released Party whether prior to or subsequent to the Petition Date but in all cases not subsequent to the Effective Date arising from or related to the Debtors, their assets, businesses, property or estates, the Chapter 11 Cases, the Disclosure Statement, the Plan or the solicitation of votes on the Plan; provided that, nothing herein will in any way limit or modify any and all debts or obligations of the Released Parties or the substantial consummation obligations of the Released Parties, as required under the Plan, all agreements entered into in connection with the Plan, or any prior order of the Bankruptcy Court.  As of the Effective Date, for good and valuable consideration, including, but not limited to, the funding under the New Subordinated Notes, each Holder of a Claim or Equity Interest shall, and shall be deemed to, release the Released Parties and each of their respective Related Persons from any and all claims, whether arising prior to or subsequent to the Petition Date but in all cases not subsequent to the Effective Date arising from or related to the Debtors, their assets, businesses, property or estates, the Chapter 11 Cases, the Disclosure Statement, the Plan or the solicitation of votes on the Plan; provided that, these releases will have no effect on the liability of any Released Party arising out of gross negligence or willful misconduct; and provided further that, nothing herein will in any way limit or modify any and all debts or obligations owed to such a Holder pursuant to the Plan or prior order of the Bankruptcy Court.  As used in this paragraph, "claims" shall include, without limitation, any and all claims, debts, demands, obligations, rights, causes of action, or liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, suspected or unsuspected, foreseen or unforeseen, now existing or hereafter arising, in law, equity or otherwise (including, but not limited to, those arising under section 541-550 of the Bankruptcy Code).  It is the intent of the parties that this release be general and interpreted as broadly as possible under applicable law.

5.      *Exculpation*

The Released Parties and each of their respective Related Persons shall incur no liability to any Holder of a Claim or Equity Interest for any act, event, or omission in connection with, or arising out of, the Chapter 11 Cases, the Confirmation of the Plan, the solicitation in connection with the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, in each case relating to any fact or circumstance existing prior to or as of the Effective Date.  The Debtors and their Related Persons have, and are deemed to have, participated in good faith (within the meaning of section 1125(e) of the Bankruptcy Code) and in compliance with the applicable provisions of the Bankruptcy Code with respect to the solicitation of acceptances or rejections of the Plan and the distributions made pursuant to the Plan.  Specifically, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their Related Persons shall not have any liability for any violation of any applicable law, rule or regulation arising from or connected with (i) the transmittal of solicitation packages (including transmittal of the Plan and Disclosure Statement), (ii) the solicitation of votes to accept or reject the Plan, or (iii) the offer, issuance, sale or purchase of any securities offered or sold under or in connection with the Plan.

6.      *Supplemental Injunction*

***In order to preserve and promote the settlements contemplated by and provided for in the Plan and as described in Article IX of the Plan, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons and any Person claiming by or through them, which have held or asserted, which currently hold or assert, or which may hold or assert any Claims or any other Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies, or liabilities of any nature whatsoever, and all Equity Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Equity Interest in any of the Debtors, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly***

*collecting, recovering or receiving any payment or recovery with respect to any such Claims or other Causes of Action, obligations, suits, judgments, damages, debts, rights remedies or liability, and all Equity Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date, including, but not limited to (i) commencing or continuing in any manner any action or other proceeding, (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (iii) creating, perfecting or enforcing any lien or encumbrance, (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Released Party, and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the terms of the Plan.*

a.    <u>Bankruptcy Rule 3016 Compliance</u>

The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

b.    <u>Consent to Injunction</u>

By accepting distributions pursuant to the Plan, each Holder of a Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Article IX of the Plan.

## H.    Retention of Jurisdiction

The Plan provides that, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

i.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance, priority or classification of Claims or Equity Interests;

ii.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

iii.    Resolve any matters related to the assumption of any executory contract and unexpired lease to which a Debtor is a party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any disputed cure amount;

iv.    Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

v.    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors or the Reorganized Debtors that may be pending on the Effective Date or brought thereafter prior to the closing of the Chapter 11 Cases;

vi.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

vii.    Resolve any case, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

viii.     Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, the Plan Supplement, or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement, the Plan Supplement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

ix.     Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

x.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

xi.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; and

xii.     Enter a final decree closing the Chapter 11 Cases.

**I.     Miscellaneous Provisions**

1.     _Dissolution of Committee_

On the Effective Date, the Committee will dissolve and the members of the Committee and any of its Professionals will be released and discharged from all duties and obligations arising from or related to the Chapter 11 Cases. The Professionals retained by the Committee and the respective members thereof will not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Article III.A.1.d of the Plan and in connection with any appeal of the Confirmation Order.

2.     _Modification of the Plan_

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, upon not less than ten days' prior written notice, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend or modify the Plan before its substantial consummation; provided that if Class 3 Acceptance occurs, any alterations, amendments or modifications of the Plan shall require the consent of the Required Consenting Mortgage Noteholders (such consent not to be unreasonably withheld).  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Claims or Equity Interests pursuant to the Plan, the Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Confirmation Order or any related documents, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

3.     _Revocation of the Plan_

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors, (2) prejudice in any manner the rights of the Debtors or any other party in interest, or (3) constitute an admission of any sort by the Debtors of any other party in interest.

4.     _Severability of Plan Provisions_

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan to the extent that the general intent of the Plan can be effectuated will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

5. *Successors and Assigns*

The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

6. *Issuance of Notes Under Plan*

The issuance of the New Second Lien Notes or the Cram-Down Notes, as applicable, to the Holders of Allowed Mortgage Note Claims shall be exempt from registration under the Securities Act of 1933, as amended and similar state or local laws pursuant to section 1145 of the Bankruptcy Code.  The Confirmation Order shall include a finding and conclusion, binding upon all parties to the Chapter 11 Cases, the Securities and Exchange Commission and all state regulatory enforcement agencies, to the effect that such offer, issuance and sale fall within the exemption set forth in section 1145 of the Bankruptcy Code.

7. *Filing of Additional Documents*

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## IV.    CONFIRMATION AND CONSUMMATION PROCEDURE

### A.    Confirmation of the Plan

1. *Confirmation Requirements*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of chapter 11 of the Bankruptcy Code that must be satisfied in order for a plan to be confirmed.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the following requirements of section 1129 of the Bankruptcy Code:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment:  (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the approval of the Bankruptcy Court as reasonable, if such payment is to be fixed after confirmation of the Plan.

- The Debtors, as proponents of the Plan, have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as the Plan Administrator, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy.

- The Debtors have disclosed the identity of any insider that will be employed or retained as or by the Plan Administrator and the nature of any compensation for such insider.

- Each holder of an impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value as of the Effective Date that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code (the "best interests" test).

- The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the hypothetical liquidation of the Debtors' assets in the context of a chapter 7 liquidation (such amount, the "**Liquidation Proceeds**"). The Liquidation Proceeds must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Cases and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses, a chapter 7 trustee's fees, and the fees and expenses of professionals retained by the chapter 7 trustee). The potential chapter 7 liquidation distribution in respect of each Class must be reduced further by costs imposed by the delay caused by conversion to chapter 7. In addition, inefficiencies in the claims resolution process in a chapter 7 would negatively impact the recoveries of creditors. The net present value of a hypothetical chapter 7 liquidation distribution in respect of an impaired claim is then compared to the recovery provided by the Plan for such impaired claim.

- Based on the Debtors' liquidation analysis attached as Exhibit C hereto (the "**Liquidation Analysis**"), the Debtors believe that all Creditors in impaired Classes will receive under the Plan a recovery at least equal in value to the recovery such Creditors would receive pursuant to a liquidation under chapter 7 of the Bankruptcy Code regardless of whether Class 3 Acceptance occurs or does not occur.

- Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests either has accepted the Plan or is not an Impaired Class under the Plan.

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims, Priority Tax Claims and Other Priority Claims will be paid in full or otherwise treated in accordance with Bankruptcy Code section 1129(a)(9) as required by the Bankruptcy Code.

- At least one Impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Impaired Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. In order to determine whether the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the projections set forth in Exhibit B attached hereto (the "**Financial Projections**"). Based upon the Financial Projections, the Debtors believe that the Plan will meet the feasibility requirements of the Bankruptcy Code.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee will be paid as of the Effective Date.

    2.    *"Cramdown" under Bankruptcy Code section 1129(b)*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a chapter 11 plan of reorganization even if not all impaired classes have accepted the plan, provided that such plan has been accepted by at least one impaired class.

The Debtors will seek to confirm the Plan notwithstanding its rejection by any of the Impaired Classes. Specifically, if Class 3 votes to reject the Plan, the Debtors will seek to confirm the Plan utilizing the "Cram-Down Treatment" provided for Class 3 and described in Section III.B.3 above.

In order to obtain such nonconsensual confirmation (or "cramdown") of the Plan, the Debtors must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that voted to reject the Plan (each such Impaired Class, a "**Non-Accepting Class**").

    a.    <u>Fair and Equitable Test</u>

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" and sets different standards for secured creditors, unsecured creditors, and equity holders, as follows:

    (i)    <u>Secured Creditors</u>

With respect to Non-Accepting Classes of Secured Claims, the "fair and equitable" test requires that either (i) each impaired secured creditor retains the liens securing its allowed secured claim and receives on account of that claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (ii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (iii) of this paragraph; or (iii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim.

    (ii)    <u>Unsecured Creditors</u>

With respect to Non-Accepting Classes of Unsecured Claims, the "fair and equitable" test requires that (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed claim; or (ii) the holders of any claims (or Equity Interests) that are junior to the Non-Accepting Class will not receive any property under the Plan. (This provision is often referred to as the "absolute priority" rule.)

    b.    <u>No Unfair Discrimination</u>

A plan does not "discriminate unfairly" with respect to a Non-Accepting Class if the value of the cash and/or securities to be distributed to the Class is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the Non-Accepting Class. Exact parity is not required. The Debtors believe that any discrepancy in treatment or potential distributions to otherwise unsecured creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.

The Debtors will establish at the Confirmation Hearing that each of these requirements has been satisfied under the Plan.

**B.    Conditions Precedent to Confirmation and Consummation of the Plan**

    1.    *Conditions Precedent to Confirmation*

*The Confirmation of the Plan shall be conditioned upon, and shall not occur, unless and until each of the following conditions have been satisfied or waived pursuant to the terms of Article VIII:*

*(i)      The Bankruptcy Court shall have entered a Final Order, in form and in substance acceptable to the Debtors, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.*

*(ii)      The Plan and all schedules, documents, supplements and exhibits relating to the Plan, including, but not limited to, any Plan Supplement, shall have been filed in form and in substance acceptable to the Debtors and, if Class 3 Acceptance occurs, reasonably acceptable to the Required Consenting Mortgage Noteholders.*

    (iii)      The proposed Confirmation Order shall be in form and substance acceptable to the Debtors and, if Class 3 Acceptance occurs, reasonably acceptable to the Required Consenting Mortgage Noteholders.

    2.      <u>Conditions Precedent to the Effective Date</u>

The Effective Date shall be conditioned upon, and shall not occur, and the Plan shall not be consummated unless and until each of the following conditions have been satisfied or waived pursuant to the terms of Article VIII:

    (i)      The Confirmation Order, in form and substance acceptable to the Debtors, shall have become a Final Order.

    (ii)      If Class 3 Acceptance occurs, the New First Lien Credit Agreement and the other documents effectuating the New First Lien Credit Agreement shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Required Consenting Mortgage Noteholders and shall have been executed and delivered by the parties thereto.

    (iii)      If Class 3 Acceptance occurs, the New Second Lien Indenture, the New Second Lien Notes and the other documents effectuating the New Second Lien Indenture shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Required Consenting Mortgage Noteholders and shall have been executed and delivered by the parties thereto.

    (iv)      If Class 3 Acceptance occurs, the New Subordinated Notes and the other documents effectuating the New Subordinated Notes shall be acceptable in form and substance to the Debtors and shall have been executed and delivered by the parties thereto.

    (v)      If Class 3 Acceptance does not occur, the Cramdown Indenture, the Cram-Down Notes and the other documents effectuating the Cram-Down Notes shall be acceptable in form and substance to the Debtors and shall have been executed and delivered by the parties thereto.

    (vi)      The Debtors or the Reorganized Debtors, as applicable, shall have paid in Cash in full all of the Prepetition Payments (as defined in the Cash Collateral Stipulation) and Adequate Protection Payments (as defined in the Cash Collateral Stipulation) that are due and owing as of the Effective Date; <u>provided that</u>, as to any Adequate Protection Payments that have not been invoiced to the Debtors at least five (5) Business Days in advance of the Effective Date, the Debtors may pay such Adequate Protection Payments as soon as practicable after the Effective Date and such payment after the Effective Date shall not be deemed a failure of this condition.

(vii)    All actions necessary to implement the Plan shall have been completed.

(viii)    All material consents, actions, documents, certificates and agreements necessary to implement the Plan, including any required governmental or regulatory consents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

3.    *Waiver of Conditions Precedent*

The Debtors shall have the right to waive any of the conditions precedent set forth in Article VIII of the Plan at any time without leave of or notice to the Bankruptcy Court and without any formal action other than proceeding with consummation of the Plan.  Further, the stay of the Confirmation Order, pursuant to Bankruptcy Rule 3020(e), shall be deemed waived by entry of the Confirmation Order; provided that, (a) if Class 3 Acceptance occurs, any waiver of the conditions set forth in Article VIII.B(ii) and (iii) of the Plan shall require the consent of the Required Consenting Mortgage Noteholders (such consent not to be unreasonably withheld) and (b) any waiver of the conditions set forth in Article VIII.B(vi) of the Plan shall require the consent of the Indenture Trustee.

4.    *Effect of Nonoccurrence of Conditions to the Effective Date*

Subject to Article XI.C of the Plan, if each of the conditions to the Effective Date is not satisfied, then upon motion by the Debtors or any party in interest made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to Article VIII.D of the Plan, (1) the Plan will be null and void in all respects, including with respect to: (a) the discharge of Claims pursuant to section 1141 of the Bankruptcy Code; (b) the assumptions of Executory Contracts and Unexpired Leases pursuant to Article V.A of the Plan; and (c) the releases described in Article IX.D of the Plan; and (2) nothing contained in the Plan will: (a) constitute a waiver or release of any Claims by or against, or any Equity Interest in, the Debtors; or (b) prejudice in any manner the rights of the Debtors or any other party in interest

## V.    SECURITIES LAW MATTERS

### A.    U.S. Securities Law Matters

Except as set forth below, any and all debt instruments and equity securities to be issued in conjunction with the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code or, if applicable, in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

### B.    Section 1145 of the Bankruptcy Code

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering.  Therefore, the securities issued pursuant to a section 1145 exemption may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code.  In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states.  However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(l) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim with a view to distribution of any security to be

received in exchange for such claim, or (b) offers to sell securities offered or sold under the plan for the holders of such securities, or (c) offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in section 2(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer." Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed "underwriters" receive securities under the Plan, resales of such securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law, Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act

### C.    Section 4(2) of the Securities Act/Regulation D

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.

The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.

Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act,

### D.    Rule 144 and Rule 144A

Under certain circumstances, affiliates and holders of restricted securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., that the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act. Rule 144 provides that: (i) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one-year holding period if there is not current public information regarding the issuer at the time of the sale; and (ii) an affiliate may sell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a year holding period if there is not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sate and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities"

within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions).  Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, "dealers" registered as such pursuant to section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers.  Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system.

Any holder of securities issued under the Plan may transfer such securities to a new holder at such times as (i) such securities are sold pursuant to an effective registration statement under the Securities Act or (ii) such holder delivers to the issuer an opinion of counsel reasonably satisfactory to the issuer, to the effect that such shares are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to the issuer an opinion of counsel reasonably satisfactory to the issuer to the effect that such shares are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such shares may be sold without registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE ISSUER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE ANY SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## VI.    FINANCIAL INFORMATION AND PROJECTIONS

In essence, the Plan provides that, upon the Effective Date, the Debtors will be revested with their existing assets and will reorganize with a new capital structure that will be dependent on the outcome of Class 3's voting on the Plan.  Exhibit B attached hereto contains certain financial projections for the Reorganized Debtors. The projections are subject to the assumptions and limitations contained in Exhibit B, as well as any business, operational, strategic or financial decisions that the Reorganized Debtors, their management and the Partners, may make with respect to the operations of the Reorganized Debtors in the future.  Subject to those limitations and assumptions and to the Risk Factors set forth in this Disclosure Statement, the Debtors believe that Exhibit B demonstrates that the Reorganized Debtors have a reasonable prospect of success in their future operations following the Effective Date of the Plan.

## VII.    RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT.  THE RISK FACTORS SET FORTH BELOW SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    Certain Bankruptcy Considerations

1.    *Risk of Non-Confirmation of the Plan*

In order for the Debtors to implement the Plan, the Debtors, like any other chapter 11 debtors, must obtain approval of the Plan from their creditors and confirmation of the Plan through the Bankruptcy Court, and then successfully implement the Plan.  The foregoing process requires the Debtors to:  (a) meet certain statutory

requirements with respect to the adequacy of this Disclosure Statement; (b) solicit and obtain creditor acceptances of the Plan; and (c) fulfill other statutory conditions with respect to the confirmation of the Plan.

The Debtors may or may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the Debtors will seek confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors will nevertheless seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as long as at least one Impaired Class has accepted the Plan (determined without including the acceptance of any "insider" in such Impaired Class).

Even if the requisite acceptances of the Plan are received, or the Debtors are able to seek a "cramdown" confirmation, the Bankruptcy Court may not confirm the Plan as proposed. A holder of a Claim in a Non-Accepting Class could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. See Section IV.A. above for a discussion of these requirements.

The Bankruptcy Court may determine that the Plan does not satisfy one or more of these applicable requirements, in which case the Plan could not be confirmed by the Bankruptcy Court. If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize their businesses and what, if any, distributions holders of Claims and Equity Interests ultimately would receive with respect to their Claims or Equity Interests. In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization with respect to the Chapter 11 Cases that is acceptable to the Bankruptcy Court and the holders of Claims and Equity Interests. Furthermore, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.

2.      *Risk of Non-Occurrence of Effective Date*

Although the Debtors anticipate that the Effective Date will occur soon after the Confirmation Date, if any, there can be no assurance as to such timing. If each of the Conditions Precedent are not satisfied or duly waived, the Confirmation Order will be vacated without further order of the Bankruptcy Court, in which event the Plan would be deemed null and void.

3.      *Risk that Claims Will Be Higher Than Estimated*

The projected distributions and recoveries set forth in this Disclosure Statement and the Liquidation Analysis are based on the Debtors' initial estimate of Allowed Claims, without having undertaken a substantive review of all filed Claims. In the event the projections that presume the Debtors will be able to pay certain Classes of Allowed Claims in full are incorrect and the actual amounts due under the Allowed Claims are substantially greater than the Debtors have anticipated, the feasibility of the Plan as currently proposed will be affected. The Debtors reserve the right to seek estimation of such Disputed Claims pursuant to section 502(c) of the Bankruptcy Code. The actual amount at which such Disputed Claims are ultimately allowed may differ from the estimates. Holders of Disputed Claims are entitled to receive distributions under the Plan upon allowance of such Claims solely from the Disputed Claim Reserve. If insufficient Plan consideration is available for distribution from the Disputed Claim Reserve at the time of allowance of a Disputed Claim, the distributions on account of such Allowed Claim will be limited to such available amounts and the holder of such Allowed Claim will have no recourse against the Debtors for any deficiency that may arise. The Debtors project that the Claims and Equity Interests asserted against them will be resolved in and reduced to an amount that approximates their estimates. There can be no assurance, however, that the Debtors' estimates will prove accurate. If claims are ultimately allowed in amounts higher than estimated, for example, distributions and recoveries on account of claims may be lower than estimated.

4.      *Liquidity Risks Prior to Consummation of the Plan*

a.      The Debtors' Postpetition Revenues and Cash on Hand May Be Insufficient to Fund the Debtors' Business Operations

Although the Debtors project that they will have sufficient liquidity to operate their businesses through the Effective Date, there can be no assurance that the Debtors' cash on hand and the revenues generated by the Debtors' business operations will be sufficient to fund the Debtors' operations, especially as the Debtors expect to incur substantial professional and other fees related to the Chapter 11 Cases. In the event that the Debtors' cash on hand and revenue flows are not sufficient to meet the Debtors' liquidity requirements, the Debtors may be required to seek additional sources of liquidity or financing. There can be no assurance that such additional liquidity or financing would be available or, if available, offered on terms that are favorable to the Debtors or terms that would be approved by the Bankruptcy Court. If, for one or more reasons, the Debtors are unable to obtain such additional liquidity or financing, the Debtors' businesses and assets may be subject to liquidation under chapter 7 of the Bankruptcy Code and the Debtors may cease to continue as going concerns.

b.    Reduction in Availability of Trade Credit

The public disclosure of the Debtors' liquidity constraints and the Chapter 11 Cases has impaired the Debtors ability to maintain normal credit terms with certain of its suppliers. As a result, the Debtors have been required to pay cash in advance to certain vendors and have experienced restrictions on the availability of trade credit, which has further reduced the Debtors' liquidity. If liquidity deteriorates further, the Debtors' suppliers could refuse to provide key products and services.

5.    *The Debtors' Management Team May Allocate Less Time to the Operation of the Debtors' Business Operations*

So long as the Chapter 11 Cases continue, the Debtors' management team will be required to spend a significant amount of their time attending to the Debtors' restructuring instead of focusing exclusively on the Debtors' business operations.

6.    *Estimated Valuation and the Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent the Potential Market Value (if any) of the Plan Consideration*

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of any components of the Plan Consideration. The estimated recoveries are based on numerous assumptions (the realization of many of which are beyond the control of the Debtors), including, without limitation: (a) the successful implementation of the Plan; (b) an assumed date for the occurrence of the Effective Date; (c) the ability of the Reorganized Debtors to achieve the operating and financial results included in the Financial Projections; (d) the ability of the Reorganized Debtors to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

7.    *Certain Tax Implications of the Plan*

Holders of Allowed Claims should carefully review Section IX herein, "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

**B.    Business Risks**

1.    *Risks Related to the Chapter 11 Cases*

During the Chapter 11 Cases, the Debtors' operations are subject to the risks and uncertainties associated with bankruptcy, but not limited to, the following:

- The Chapter 11 Cases may adversely affect the Debtors' business prospects and/or the Debtors' ability to operate during the reorganization.

- The Chapter 11 Cases and attendant difficulties of operating the Debtors' properties while attempting to reorganize the business in bankruptcy may make it more difficult to maintain and promote the Debtors' properties and attract customers to the Debtors' properties.

- The Chapter 11 Cases may cause the Debtors' vendors and service providers to require stricter terms and conditions.

- The Chapter 11 Cases will cause the Debtors to incur substantial costs for professional fees and other expenses associated with the bankruptcy.

- The Chapter 11 Cases may adversely affect the Debtors' ability to maintain the Debtors' gaming licenses in the jurisdictions in which they operate.

- The Chapter 11 Cases may restrict the Debtors' ability to pursue opportunities to grow the Debtors' business. Among other things, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell or otherwise dispose of all or substantially all of the Debtors' assets or grant liens. These restrictions may place us at a competitive disadvantage.

- The Chapter 11 Cases may adversely affect the Debtors' ability to maintain, expand, develop and remodel their properties.

- Transactions by the Debtors outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit their ability to respond timely to certain events or take advantage of certain opportunities.

- The Debtors may not be able to obtain Bankruptcy Court approval or such approval may be delayed with respect to actions they seek to undertake in the Chapter 11 Cases.

- The Debtors may be unable to retain and motivate key executives and employees through the process of reorganization, and they may have difficulty attracting new employees. In addition, so long as the Chapter 11 Cases continues, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

- There can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm and consummate one or more plans of reorganization with respect to the Chapter 11 Cases that are acceptable to the Bankruptcy Court and the Debtors' creditors, equity holders and other parties in interest. Additionally, third parties may seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Company to propose and confirm one or more plans of reorganization, to appoint a Chapter 11 Trustee, or to convert the cases to Chapter 7 cases.

  2.  _**Prolonged Continuation of the Chapter 11 Cases May Harm the Debtors' Business**_

If the Chapter 11 Cases continue for a prolonged amount of time, the proceedings could adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers, suppliers and agents will lose confidence in the Debtors' ability to successfully reorganize the Debtors' business and seek to establish alternative commercial relationships. Furthermore, so long as the Chapter 11 Cases continues, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the Chapter 11 Cases. Prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing. It may not be possible for the Debtors to obtain additional financing during or after the Chapter 11 Cases on commercially favorable terms or at all. If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, their chances of successfully reorganizing their business may be seriously jeopardized.

  3.  _**The Debtors Face Substantial Competition in the Hotel and Casino Industry**_

The hotel and casino industry is very competitive. The Debtors compete for customers primarily on the basis of location, range and pricing of amenities and overall atmosphere. Of the 31 casinos currently operating in the Reno market, the Debtors compete principally with the six other hotel-casinos that, like Silver Legacy, each generate at least $36 million in annual gaming revenues.

According to statistics published by the Reno-Sparks Convention & Visitors Authority, there were approximately 15,600 hotel rooms in the Reno area at December 31, 2011. At this time, the Debtors cannot predict the extent to which new and proposed projects will be undertaken or the extent to which current hotel and/or casino space may be expanded in the future. There can be no assurance that any growth in Reno's room base or gaming capacity will not adversely affect the Debtors' financial condition or results of operations.

A substantial number of customers travel to both Reno and Lake Tahoe during their visits. Consequently, the Debtors believe that the Reno market's visitation is influenced, to some degree, by the visitation of the Lake Tahoe market. The number of visitors decreased slightly during the twelve-month period ended December 31, 2011 compared with the same prior year period and any further such decline could adversely affect the Debtors' operations.

Reno casinos, including Silver Legacy, also compete with Native American gaming in California and the northwestern United States. The Debtors also compete with hotel- casinos located in Las Vegas, Nevada and the Lake Tahoe area. To a lesser extent, the Debtors compete with hotel-casinos in other parts of the United States and with dockside gaming facilities, riverboat casinos, state-sponsored lotteries, on-and-off track pari-mutuel wagering, Internet gaming, card clubs, riverboat casinos and other forms of legalized gaming. Land-based, dockside or riverboat casino gaming, other than that conducted on Native American-owned land, is currently legal in 15 states and gaming on Native American-owned land is legal in a number of states, including California, Washington and Oregon.

Management believes the Reno market draws over 50% of its visitors from California. California allows other non-casino style gaming, including pari-mutuel wagering, a state-sponsored lottery, card clubs, bingo and off-track betting. Certain constituencies have proposed ballot initiatives from time to time in California that would legalize casino-style gaming generally. As a result, there can be no assurance that casino-style gaming in California will not be expanded beyond the currently legal Native American gaming. Any such expansion could have a material adverse effect on the Debtors' operations. Further, there can be no assurance that Internet sweepstakes cafes, which are designed to look and feel like digital slot machines, will not expand into the Reno market, which could have a material adverse effect on the Debtors' operations.

The competitive impact on Nevada gaming establishments, in general, and the Debtors' operations, in particular, from the continued growth of gaming outside Nevada cannot be determined at this time. The Debtors believe that the further expansion of casino gaming in markets close to Nevada, such as California, and, to a lesser extent, Washington and Oregon, could have a material adverse affect on the Debtors' operations depending on the nature, location and scope of those operations

4.    *Native American Gaming in California has Adversely Affected the Reno Market and Continued Growth of Native American Gaming in California Could Have a Material Adverse Effect Beyond That Experienced to Date*

Since visitors from California comprise a significant portion of the Debtors' customer base, the Debtors also compete with Native American gaming operations in California. In total, the State of California has signed and ratified compacts with 68 Native American tribes, and there are currently 59 Native American casinos operating in California, including casinos located in Northern California, which the Debtors consider to be a significant target market. These Native American tribes are allowed to operate slot machines, lottery games, and banking and percentage games on Native American lands. Although many existing Native American gaming facilities in northern California are modest compared to Silver Legacy, a number of Native American tribes have established large-scale gaming facilities in California and some Native American tribes have announced that they are in the process of expanding, developing, or are considering establishing, large-scale hotel and gaming facilities in northern California.

Under their original compacts, most Native American tribes in California may operate up to 2,000 slot machines, and up to two gaming facilities may be operated on any one reservation. However, under action taken by the National Indian Gaming Commission, gaming devices similar in appearance to slot machines, but which are deemed to be technological enhancements to bingo style gaming, are not subject to such limits and may be used by tribes without state permission. Additionally, the number of slot machines the tribes are allowed to operate has increased as a result of many new or amended compacts the tribes have entered into with the State of California.

Increased competition from Native American gaming, including increases in competition attributable to additional gaming licenses being granted to Native American tribes and expanded Native American gaming operations in northern California, may result in a decline in the Debtors' revenues and have a material adverse effect on the Debtors' business. While the Debtors cannot predict the precise extent of any future effects, they could be significant.

5. *The Debtors' Business is Sensitive to Reductions in Discretionary Consumer Spending and May Be Affected by General Economic Conditions*

Consumer demand for casino hotel properties, such as ours, is particularly sensitive to downturns in the economy and the associated impact on discretionary spending on leisure activities. Any adverse change in general economic conditions, such as the current economic downturn, can adversely affect consumer spending, which can have a negative impact on the Debtors' ability to generate revenues from the Debtors' operations. Increases in gasoline prices, including increases prompted by global political and economic instabilities, can adversely affect the Debtors' operations because most of the Debtors' patrons travel to Reno by car or on airlines that may pass on increases in fuel costs to their passengers in the form of higher ticket prices. The Debtors are also a large consumer of electricity. Consequently, an increase in the cost of electric power increases the Debtors' operating costs and, depending on the extent of any increase, could adversely affect the Debtors' results of operations.

The current global, national and regional economic downturn, including the housing crisis, credit crisis, lower consumer confidence, and other related factors which impact discretionary consumer spending and other economic activities that have direct effects on the Debtors' business, have resulted in a decline in the tourism industry that has adversely impacted the Debtors' operations. The Debtors cannot be sure how long these factors will continue to impact the Debtors' operations in the future or the extent of the impact.

6. *Energy and Fuel Price Increases May Adversely Affect the Debtors' Business and Results of Operations*

The Debtors use significant amounts of electricity, natural gas and other forms of energy. An increase in the cost of any source of energy may negatively affect the Debtors' results of operations. In addition, energy and fuel price increases could negatively impact the Debtors' business and results of operations by causing a decrease in visitation to the Debtors' properties, including by making it difficult for potential patrons to travel to the Debtors' properties, or by causing patrons who do visit the Debtors' properties to decrease their spending, including due to reductions in disposable income as a result of escalating energy and fuel prices.

7. *The Debtors Are Entirely Dependent on Silver Legacy for All of Their Revenues and Are Therefore Subject to Greater Risks Than a Gaming Company That is Geographically or Otherwise Diversified*

The Debtors are entirely dependent upon Silver Legacy for all of the Debtors' revenues. Therefore, the Debtors are subject to greater degrees of risk than a gaming company that is geographically or otherwise diverse. The risks to which the Debtors have a greater degree of exposure include the following:

- local economic and competitive conditions;

- inaccessibility due to weather conditions, road construction or closure of primary access routes;

- changes in local and state governmental laws and regulations, including gaming laws and regulations;

- natural and other disasters, including acts of terrorism and global geopolitical events that impact leisure and business travel and discretionary consumer spending;

- a decline in the number of residents near, or visitors to, Silver Legacy; and

- a decrease in gaming activities at Silver Legacy.

Any of the factors outlined above could adversely affect the Debtors' business, financial condition and results of operations, as well as the Debtors' ability to generate sufficient cash flow to make payments on the new first lien term loan facility, the New Second Lien Notes, the Mortgage Notes, or the Cram-Down Notes, as applicable, and may adversely affect our ability to restructure.

> 8. _The Hotel-Casinos in the Reno Market Have Been Subject to Seasonal Variations and Quarterly Fluctuations in Operating Results and Such Variations and Fluctuations Are Expected in the Future_

Historically, hotel-casino operations in the Reno market, including Silver Legacy, have been subject to seasonal variations. Traditionally, the strongest operating results have occurred in the second and third quarters and the weakest results have occurred during the period from November through February when weather conditions adversely affected operating results. Excessive snowfall during the winter months can make travel to the Reno area more difficult. This often results in significant declines in traffic on major highways, particularly on routes to and from northern California, and causes a downturn in customer volume. Furthermore, the Debtors' management believes that approximately two-thirds of visitors to the Reno market arrive by some form of ground transportation. Therefore, even normal winter weather may cause the Debtors' revenues and cash flows to be adversely affected.

The Debtors expect the highest level of customer visits to occur during the summer months, because of the more favorable weather conditions. A poor summer season due to any reason, including events outside the Debtors' control, would adversely affect the Debtors' business. Congestion on the roads leading to Reno, common during the peak summer season, holidays and other times, may discourage potential customers from traveling to the Debtors' hotel-casino, particularly if road construction is in process.

> 9. _Security Concerns, Terrorist Attacks, and Other Geopolitical Events Could Have Adverse Effects on the Debtors' Operations_

Security concerns, terrorist attacks and other geopolitical events can have a material adverse effect on leisure and business travel, discretionary spending and other areas of economic behavior that directly impact the gaming and entertainment industries in general and the Debtors' business in particular. The Debtors cannot predict the extent to which any future security alerts, terrorist attacks or other geopolitical events might impact the Debtors' business, results of operations or financial condition.

> 10. _The Hotel-Casinos in the Reno Market Are Highly Dependent on Surrounding Market Areas_

Management believes that visitors from California, Washington and Oregon account for approximately two-thirds of the visitors to the Reno market. The Debtors are primarily dependent upon the gaming activities of customers visiting the Reno market from these areas for the Debtors' revenues. A decline in the economies of any one or more of these areas, such as the economic decline in each of these states associated with the current downturn, or a decline in the number of gaming customers traveling to Reno from these areas for any reason, including increased competition, such as card clubs and Native American gaming in California, Washington and Oregon, could have a material adverse effect on the Debtors' business, results of operations and financial condition.

> 11. _Significant Conflicts of Interest May Arise in the Performance of the Duties of the Members of The Debtors' Executive Committee and Executive Officers_

Silver Legacy is situated between the Circus Circus Reno, which is wholly-owned by MGM Resorts International, and the Eldorado Hotel & Casino, which is wholly-owned by Eldorado Resorts LLC. The Debtors' partners are a wholly-owned subsidiary of MGM Resorts International and a 96%-owned subsidiary of Eldorado Resorts LLC, and their respective personnel who participate in decisions that affect Silver Legacy may be

deemed to be in a conflict of interest position, to the extent they participate in decisions relating to Silver Legacy that affect, or may be perceived to affect, the Circus Circus Reno and/or the Eldorado Hotel & Casino. The potential for these conflicts of interest may be exacerbated by the design of Silver Legacy, which connects its casino and core entertainment center with the Circus and Eldorado properties by enclosed skyways.

Each member of the executive committee of the Joint Venture is currently an employee of, and/or holds an executive position with, MGM Resorts International or Eldorado Resorts LLC or one of their respective affiliates, and the majority of the Debtors' executive officers had a similar relationship before assuming his present position with the Joint Venture. Accordingly, these individuals may be deemed to be in a conflict of interest position with respect to business decisions they make that affect, or may be perceived to affect, the Circus or Eldorado properties. Furthermore, a conflict of interest may be deemed to exist by reason of the access any of these individuals has to information or business opportunities that may be useful to the Eldorado or Circus properties. No specific procedures for resolving these conflicts of interest have been developed and there can be no assurance that effective procedures for addressing these matters can be developed.

12. *The Debtors Are Subject to Extensive State and Local Regulation, and Licensing and Gaming Authorities Have Significant Control Over the Debtors' Operations, Which Could Adversely Affect the Debtors' Business*

The ownership and operation of casino gaming facilities are subject to extensive state and local regulation. The Joint Venture currently holds all state and local licenses and related approvals necessary to conduct its present gaming operations. The Joint Venture is required by the State of Nevada, as well as the applicable local authorities, to comply with all applicable gaming laws and regulations and to maintain its various licenses and registrations, findings of suitability, permits and approvals in good standing. The gaming authorities in Nevada may deny, limit, condition, suspend or revoke a gaming license or related approval for violations of applicable gaming laws and regulations and may impose substantial fines and take other actions, any one of which could have a significant adverse effect on the Debtors' business, financial condition, and results of operations. If additional gaming laws or regulations are adopted, these regulations could impose restrictions or costs that could have a significant adverse effect on the Debtors.

The Nevada Gaming Commission may, in its discretion, require the holder of any securities that the Debtors issue, including the Mortgage Notes, the New Second Lien Notes and the Cram-Down Notes, to file applications, be investigated, and be found suitable to own the Debtors' securities if it has reason to believe that the security ownership would be inconsistent with the declared policies of the State of Nevada. Further, the costs of any investigation conducted by the Nevada Gaming Commission under these circumstances must be paid by the applicant and refusal or failure to pay these charges may constitute grounds for a finding that the applicant is unsuitable to own the securities. If the Nevada Gaming Commission determines that a person is unsuitable to own the Debtors' securities, then, under the Nevada Gaming Control Act and the regulations promulgated under this Act, the Debtors can be sanctioned, including the loss of the Debtors' approvals, if, without the prior approval of the Nevada Gaming Commission, the Debtors:

- pay to the unsuitable person any dividend, interest or any distribution whatsoever;

- recognize any voting right by the unsuitable person in connection with the securities;

- pay the unsuitable person remuneration in any form; or

- make any payment to the unsuitable person including any principal, redemption, conversion, exchange, liquidation or similar payment.

The Debtors may not make a public offering of the Debtors' securities without prior approval of the Nevada Gaming Commission if the Debtors intend to use the securities or proceeds from the offering to:

- construct, acquire or finance gaming properties in Nevada; or

- retire or extend obligations incurred for these purposes or for similar transactions.

If the Nevada gaming authorities were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue having a relationship with us, the Debtors would have to sever all relationships

with that person. Furthermore, the Nevada Gaming Commission may require us to terminate the employment of any person who refuses to file appropriate applications. Either result could materially adversely affect the Debtors' gaming operations.

13.     *The Debtors Are Subject to Extensive Federal, State and Local Environmental Laws and Regulations, Which Creates Uncertainty Regarding Future Environmental Expenditures and Liabilities*

The Debtors have incurred and may continue to incur costs to comply with extensive federal, state and local environmental laws and regulations, such as those relating to discharges into the air, water and land, the handling and disposal of, and exposure to, solid and hazardous waste, and the cleanup of properties affected by hazardous substances, as well as the impacts of developments on wetlands. Violation of such laws and regulations could lead to substantial civil and criminal penalties. Under certain environmental laws and regulations, the Debtors, as an owner of the property on which Silver Legacy is situated, may be required to investigate and clean up hazardous or toxic substances or chemical releases at that property. As an owner or operator, the Debtors could also be held responsible to a governmental entity or third parties for property damage, personal injury and for investigation and cleanup costs incurred by them in connection with any such contamination. Environmental laws can impose cleanup responsibility and liability without regard to whether the owner or operator knew of or caused the presence of the contaminants and the liability under these laws has been interpreted to be joint and several. The costs of investigation, remediation or removal of such contaminants may be substantial, and the presence of such contaminants, or the failure to remediate, may adversely affect the Debtors' ability to rent or otherwise utilize the Debtors' property. The Debtors do not have environmental liability insurance to cover these events. While the Debtors believe that the future cost of compliance with environmental laws and regulations and liabilities associated with the Debtors' operations will not have a material adverse effect on the Debtors' business, the Debtors cannot assure you that future events, such as new or more stringent environmental laws and regulations, the discovery of currently unknown environmental conditions and any related damages claims, would not require us to incur additional costs that could have a material adverse effect on the Debtors' financial results.

Petroleum and chlorinated solvent contamination of soil and groundwater is known to exist at and in the vicinity of the Silver Legacy. The Debtors are required to pay assessments averaging approximately $20,000 annually in contribution to a Washoe County special assessment district which is undertaking community wide remediation of groundwater solvent contamination. These assessments may increase in the future. State law exempts property owners who did not cause or contribute to the solvent contamination from civil and criminal liability for the cost of remediation and any related damages, except to the extent of unpaid assessments. This provision would not be effective to shield us from liability under federal laws.

The possibility exists that additional contamination, as yet unknown, may exist on the Silver Legacy site. Although the Debtors believe that any remaining contamination arose from activities of prior owners or occupants, or from offsite sources and not as a result of any of the Debtors' actions or operations, the Debtors cannot make any assurances that the Debtors will not incur expenditures for environmental investigations or remediation in the future.

14.     *An Earthquake or Other Natural Disaster Could Adversely Affect the Debtors' Business*

The Reno area has been, and may in the future be, subject to earthquakes and other natural disasters. Depending upon the magnitude and location of such an event, Silver Legacy could be severely damaged, which could adversely affect the Debtors' business and operations. The Debtors currently maintain earthquake and flood insurance for Silver Legacy and the resulting business interruption. However, there is no assurance that the Debtors' coverage will be sufficient if there is a major earthquake. In addition, upon the expiration of the Debtors' current policies, which expire in July 2012, the Debtors cannot assure that adequate coverage will be available at economically justifiable rates, if at all.

15.     *The Debtors Rely on Key Personnel*

The Debtors' future success will depend upon, among other things, the Debtors' ability to keep the Debtors' senior executives and highly qualified employees. The Debtors compete with other potential employers for employees, and the Debtors may not succeed in hiring or retaining the executives and other employees that the

Debtors need. The Debtors do not have employment contracts with any of the Debtors' senior executives and the Debtors do not maintain key-man insurance policies for any of the Debtors' executives. A sudden loss of or inability to replace key employees could have a material adverse effect on the Debtors' business, financial condition and results of operation

16.    *The Debtors May Face Difficulties in Attracting and Retaining Qualified Employees For Their Casino*

The operation of the Debtors' business requires qualified executives, managers and skilled employees with gaming industry experience and qualifications who are able to obtain the requisite licenses and approval from the Nevada Gaming Commission. While not currently the case, there has from time to time been a shortage of skilled labor in the Reno area. In addition to limitations that may otherwise exist in the supply of skilled labor, the continued growth of Native American gaming in northern California may make it more difficult for us to attract qualified individuals. While the Debtors believe that Silver Legacy will continue to be able to attract and retain qualified employees, shortages of skilled labor will make it increasingly difficult and expensive to attract and retain the services of a satisfactory number of qualified employees, and the Debtors may incur higher costs than expected as a result

17.    *The Debtors Are or May Become Involved in Legal Proceedings That, If Adversely Adjudicated or Settled, Could Impact Their Business and Financial Condition*

From time to time, the Debtors are named in lawsuits or other legal proceedings relating to the Debtors' business. In particular, the nature of the Debtors' business subjects us to the risk of lawsuits filed by customers, past and present employees, competitors, business partners and others in the ordinary course of business. As with all legal proceedings, no assurances can be given as to the outcome of these matters. Moreover, legal proceedings can be expensive and time consuming, and the Debtors may not be successful in defending or prosecuting these lawsuits, which could result in settlements or damages that could significantly impact the Debtors' business, financial condition and results of operations

18.    *The Volatility and Disruption of the Capital and Credit Markets and Adverse Changes in the U.S. and Global Economies May Negatively Impact the Debtors' Revenues and Ability to Access Financing*

During the recent years, a confluence of many factors has contributed to diminished expectations for the U.S. economy and increased market volatility for publicly traded securities, including the common shares and notes issued by publicly owned companies. These factors include the availability and cost of credit, declining business and consumer confidence and increased unemployment. These conditions have combined to create an unprecedented level of market volatility, which the Debtors believe has influenced the price of the Debtors' debt securities. These economic conditions have also affected lenders who provide capital that the Debtors use to support elements of the Debtors' business strategy.

Further, if adverse regional and national economic conditions persist or worsen, the Debtors could experience material decreases in revenues from the Debtors' operations attributable to decreases in consumer spending levels and could fail to satisfy covenants imposed by the Debtors' existing debt agreements

**C.    Risks Related to the Debtors' Post-Effective Date Capital Structure**

1.    *The Debtors' substantial post-Effective Date indebtedness could adversely affect the Debtors' financial results and prevent the Debtors from fulfilling their obligations under the New First Lien Credit Agreement and the New Second Lien Notes or the Cram-Down Notes, as applicable*

The Reorganized Debtors will have a significant amount of indebtedness upon the Effective Date of the Plan, whether in the form of the New First Lien Term Loan and the New Second Lien Notes if Class 3 Acceptance occurs, or, in the form of the Cram-Down Notes if the Class Acceptance does not occur.  The amount of the Reorganized Debtors' total long-term funded indebtedness, after giving pro forma effect to the transactions contemplated under the Plan would be approximately $112.5 million if Class 3 Acceptance occurs and $131.6

million if Class 3 Acceptance does not occur. The Reorganized Debtors' significant indebtedness could have important consequences to you, such as:

- limiting the Reorganized Debtors' ability to satisfy their obligations with respect to the New Second Lien Notes and or the Cram-Down Notes, as applicable;

- limiting the Reorganized Debtors' ability to obtain additional financing to fund the Reorganized Debtors' working capital requirements, capital expenditures, debt service, general corporate or other obligations, including the Reorganized Debtors' obligations with respect to the New Second Lien Notes and or the Cram-Down Notes, as applicable;

- limiting the Reorganized Debtors' ability to use operating cash flow in other areas of their business because they must dedicate a significant portion of these funds to principal and/or interest payments on the Reorganized Debtors' indebtedness;

- causing the Reorganized Debtors' failure to comply with the financial and restrictive covenants contained in the agreements evidencing the New First Lien Term Loan, the New Second Lien Notes or the Cram-Down Notes, as applicable, which could cause a default under those instruments and which, if not cured or waived, could have a material adverse effect on the Reorganized Debtors;

- placing the Reorganized Debtors at a competitive disadvantage to their competitors who are not as highly leveraged;

- affecting the Reorganized Debtors' ability to renew gaming and other licenses necessary to conduct their business; and

- increasing the Reorganized Debtors' vulnerability to, and limiting the Reorganized Debtors' ability to react to, changing market conditions, changes in their industry and economic downturns.

If the Reorganized Debtors do not generate sufficient cash from our operations to make scheduled payments on the New First Lien Term Loan, the New Second Lien Notes or the Cram-Down Notes, as applicable, or to meet our other obligations, the Reorganized Debtors will need to take one or more actions including the refinancing of their debt, obtaining additional financing, selling assets, obtaining additional equity capital, or reducing or delaying capital expenditures, and the Reorganized Debtors' ability to take one or more of these actions may be limited by the financial and other restrictive covenants contained in the agreements and indenture governing their indebtedness. The Reorganized Debtors cannot assure you that their business will generate cash flow or that they will be able to obtain funding sufficient to satisfy their debt service requirements.

2. *The Credit Agreement governing the New First Lien Term Loan, the Indenture governing the New Second Lien Notes or the Indenture Governing the Cram-Down Notes, as applicable, will contain covenants that will restrict the Reorganized Debtors' ability to engage in certain transactions*

The New First Lien Credit Agreement, the New Second Lien Indenture and the Cram-Down Indenture, as applicable, will impose operating and financial restrictions on the Reorganized Debtors. The restrictions that will be imposed under the indenture may include, among other things, limitations on the Reorganized Debtors' ability to:

- incur additional debt;

- create liens or other encumbrances;

- pay dividends or make other restricted payments;

- prepay subordinated indebtedness;

- make investments, loans or other guarantees;

- sell or otherwise dispose of a portion of the Reorganized Debtors' assets;

- enter into certain types of transactions with affiliates;

- make capital expenditures; or

- make acquisitions or merge or consolidate with another entity.

In addition, the Reorganized Debtors may be subject to additional covenants, including requirements to comply with specified financial metrics pursuant to the New First Lien Credit Agreement. The Reorganized Debtors' ability to comply with these provisions may be affected by general economic conditions, industry conditions and other events beyond the Reorganized Debtors' control. The Reorganized Debtors cannot assure you that they will be able to comply with these covenants. If the Reorganized Debtors fail to comply with the covenants or other restrictions contained in the New Second Lien Indenture or the Cram-Down Indenture or any future financing agreements, an event of default could occur. An event of default could result in acceleration of some or all of the Reorganized Debtors' indebtedness and the inability to borrow additional funds. The Reorganized Debtors would not have, and are not certain they would be able to obtain, sufficient funds to repay their indebtedness if it is accelerated, including the Reorganized Debtors' payments on the New Second Lien Notes or the Cram-Down Notes, as applicable.

      3.      *Servicing the Reorganized Debtors' debt will require a significant amount of cash, and the Reorganized Debtors' ability to generate sufficient cash will depend on many factors, some of which are beyond their control*

The Reorganized Debtors' ability to make payments on and refinance their indebtedness and to fund their capital expenditures will depend on their ability to generate cash flow and secure financing in the future. The Reorganized Debtors' ability to generate cash flow will depend upon:

- the Reorganized Debtors' future operating performance;

- the demand for services the Reorganized Debtors provide;

- general economic conditions;

- competition; and

- legislative and regulatory factors affecting the Reorganized Debtors' operations and business.

Some of these factors are beyond the Reorganized Debtors' control. The Reorganized Debtors cannot assure you that their business will generate cash flow from operations or that the Reorganized Debtors will have the ability to make future borrowings in an amount sufficient to fund their liquidity needs. As a result, the Reorganized Debtors may need to refinance all or a portion of their indebtedness, including the New Second Lien Notes or the Cram-Down Notes, as applicable, on or before maturity. The Reorganized Debtors cannot assure you that they will be able to refinance any of their indebtedness on favorable terms, or at all. Any inability to generate sufficient cash flow or refinance our indebtedness on favorable terms could have a material adverse effect on the Reorganized Debtors' financial condition.

      4.      *The Reorganized Debtors may not have access to other capital resources to fund their liquidity needs*

The New First Lien Credit Agreement and the New Second Lien Indenture will limit the Reorganized Debtors' ability to incur additional debt.  There is no assurance that cash generated from the Reorganized Debtors' operations will be sufficient to finance our capital projects or otherwise fund our liquidity needs.

If the Reorganized Debtors' future cash flows from operations and other capital resources are insufficient to finance their capital projects or otherwise fund their liquidity needs, the Reorganized Debtors may be forced to:

- reduce or delay their business activities and capital expenditures;

- sell assets;

- obtain additional debt or equity capital; or

- restructure or refinance all or a portion of their debt, including the New Second Lien Notes or the Cram-Down Notes, as applicable, on or before maturity.

The Reorganized Debtors cannot assure you that their cash on hand and cash flow from operations will be sufficient to accomplish any of these alternatives on a timely basis or on satisfactory terms, if at all. In addition, the

terms of the Reorganized Debtors' debt, including the New First Lien Credit Agreement, the New Second Lien Notes and the Cram-Down Notes, as applicable, will limit the Reorganized Debtors' ability to pursue any of these alternatives.

5.    _The Reorganized Debtors' partnership agreement contains a buy-sell provision which, if exercised by either of the Partners, could adversely affect the Reorganized Debtors' management and operations_

The JV Agreement contains a buy-sell provision pursuant to which either of the Partners may elect to offer to purchase the entire interest of the other Partner. If either Partner makes such an offer, the JV Agreement requires the other Partner to either sell its partnership interest or purchase the partnership interest of the offering Partner, in each case at the price proposed by the offering Partner. An election by either of the Reorganized Debtors' Partners to exercise its buy-sell right, which would result in the buy-out of one of the Partners, could adversely affect the continuity of the Reorganized Debtors' management as well as any existing affiliate arrangements and agreements with the Partner who would be bought out.

6.    _Debtor SLCC does not have any operations or assets and does not have any revenues_

SLCC is a wholly-owned subsidiary of the Joint Venture.  SLCC exists for the sole purpose of serving as a co-issuer of the Mortgage Notes.  As such, it does not have any operations, assets or revenues.

Consequently, the holders of the New Second Lien Notes or the Cram-Down Notes, as applicable, should not expect SLCC to participate in servicing the principal, interest, premium or any other payment obligations on the New Second Lien Notes or the Cram-Down Notes, as applicable, or the Reorganized Debtors' other obligations. The Reorganized Debtors' only source of cash to make interest payments on the New Second Lien Notes or the Cram-Down Notes, as applicable, and pay the Reorganized Debtors' other obligations and to repay the principal amount of these obligations, including the New Second Lien Notes or the Cram-Down Notes, as applicable, will be the cash that the Reorganized Debtors generate from their operations and their borrowings.

D.    **Risks Related to the New First Lien Term Loan, the New Second Lien Notes and the Cram-Down Notes**

1.    _In the event the Debtors default on the payment of the New First Lien Term Loan, the New Second Lien Notes or Cram-Down Notes, any resulting foreclosure sale of Silver Legacy may be hindered by applicable gaming laws and regulations or by bankruptcy laws_

The New First Lien Term Loan, New Second Lien Notes or Cram-Down Notes will be secured by a lien on Silver Legacy and other related assets, constituting substantially all of the Reorganized Debtors' existing and future assets, other than certain excluded assets, including certain licenses that may not be pledged under applicable law.  In any foreclosure sale of Silver Legacy or the gaming equipment constituting collateral securing the New First Lien Term Loan, New Second Lien Notes or Cram-Down Notes, the purchaser or the operator of the facility and/or such gaming equipment would need to be licensed in order to operate the facility under the Nevada gaming laws and regulations.  If the trustee is unable, or chooses not to sell Silver Legacy, the trustee would not be permitted to continue gaming operations at Silver Legacy unless it retained an entity licensed under the Nevada gaming laws in order to conduct gaming operations at the facility.  Because potential bidders who wish to operate the facility as a casino must satisfy these requirements, the number of potential bidders in a foreclosure sale could be less than in foreclosures of other types of facilities and these requirements might delay the sale of, and adversely affect the sales price for Silver Legacy.  The ability to take possession and dispose of the collateral securing the New First Lien Term Loan, New Second Lien Notes or Cram-Down Notes upon acceleration of the New First Lien Term Loan, New Second Lien Notes or Cram-Down Notes is likely to be significantly impaired or delayed by applicable bankruptcy law if a bankruptcy case is commenced by or against the Reorganized Debtors prior to a taking of possession or disposition of the collateral securing the New First Lien Term Loan, New Second Lien Notes or Cram-Down Notes by the agent or trustee for the benefit of the holders of the New First Lien Term Loan, New Second Lien Notes or Cram-Down Notes.  If the liens that secure the New First Lien Term Loan, New Second Lien Notes or

Cram-Down Notes are held to be invalid or unenforceable or are limited in accordance with their terms, the New First Lien Term Loan, New Second Lien Notes or Cram-Down Notes will be unsecured.

2.    *The New Second Lien Notes will effectively be subordinate to the New First Lien Credit Agreement and the New Second Lien Notes or Cram-Down Notes will effectively be subordinate to any other debt secured by permitted prior liens to the extent of the property securing that indebtedness and in the event of a default and foreclosure, there may not be sufficient collateral available to satisfy the Reorganized Debtors' obligations under the New First Lien Credit Agreement, if any, such other indebtedness and the New Second Lien Notes or Cram-Down Notes*

The New Second Lien Notes or Cram-Down Notes will be secured by a lien on Silver Legacy and other related assets, constituting most of the Reorganized Debtors' assets.  The liens securing the New Second Lien Notes will be subordinate to the liens securing the New First Lien Credit Agreement and the New Second Lien Notes and the Cram-Down Notes will be subordinate to other permitted prior liens.  In the event there is a default and foreclosure on the collateral, the proceeds from the sale of collateral may not be sufficient to satisfy the Reorganized Debtors' obligations under the New Second Lien Notes or Cram-Down Notes.  This is because proceeds from the sale of the collateral would be distributed first to satisfy the Reorganized Debtors' outstanding obligations under the New First Lien Credit Agreement, if any, and other obligations which, in the case of proceeds from collateral, are secured by priority liens before they would be available for payment of amounts then due and payable under the New Second Lien Notes or Cram-Down Notes and other obligations secured by parity liens, if any.  As a result, in the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the Debtors cannot assure you that the proceeds from any sale or liquidation of the collateral or any of the other assets or value of the Reorganized Debtors' business will be sufficient to pay the obligations due under the New Second Lien Notes or Cram-Down Notes.  The holders of the New Second Lien Notes will not receive any proceeds from the sale of collateral unless and until all indebtedness under the New First Lien Credit Agreement and the holders of the New Second Lien Notes or the Cram-Down Notes will not receive any proceeds from the sale of collateral unless and until other debt secured by permitted prior liens, to the extent of the value of collateral securing such debts, are repaid in full.

In the event that a bankruptcy case is commenced by or against the Reorganized Debtors, if the value of the collateral is less than the amount of principal and accrued and unpaid interest on the New Second Lien Notes or Cram-Down Notes and any other senior secured obligations, interest may cease to accrue on the New Second Lien Notes or Cram-Down Notes from and after the date the bankruptcy petition is filed.

The Debtors cannot assure you of the value of the collateral or that the net proceeds received upon a sale of the collateral would be sufficient to repay all amounts due on the New First Lien Credit Agreement, if any, any additional secured debt that may be outstanding at that time and the New Second Lien Notes or Cram-Down Notes following a foreclosure upon the collateral (and any payments in respect of prior liens) or a liquidation of the Reorganized Debtors' assets that may grant these security interests.  The value of the collateral will depend on the actual fair market value of the collateral at such time, market and economic conditions, the timing and the manner of the sale, the availability of buyers and other factors.  In addition, courts could limit recoverability with respect to the collateral if they apply laws of a jurisdiction other than the State of New York to a proceeding and deem a portion of the interest claim usurious in violation of applicable public policy.  By its nature, some or all of the collateral may be illiquid and may have no readily ascertainable market value.  Likewise, the Debtors cannot assure you that the collateral will be saleable or, if saleable, that there will not be substantial delays in its liquidation. To the extent that liens, rights and easements granted to third parties encumber assets located on property owned by the Reorganized Debtors or constitute senior, pari passu or subordinate liens on the collateral, those third parties have or may exercise rights and remedies with respect to the property subject to such encumbrances (including rights to require marshalling of assets) that could adversely affect the value of the collateral located at a particular site and the ability of the collateral trustee to realize or foreclose on the collateral at that site.  As a result, liquidating the collateral securing the New Second Lien Notes or Cram-Down Notes may not produce proceeds in an amount sufficient to pay any amounts due on the New First Lien Credit Agreement, if any, any additional secured debt that may be outstanding at that time and the New Second Lien Notes or Cram-Down Notes.

3.       *The intercreditor agreement could subject the holders of the New Second Lien Notes to certain risks including the inability of the holders of the New Second Lien Notes to control decisions regarding the collateral*

The trustee under the indenture governing the New Second Lien Notes will enter into an intercreditor agreement amongst it, the administrative agent under the New First Lien Credit Agreement, the collateral trustee and the Reorganized Debtors. The intercreditor agreement will provide for the allocation of rights among the collateral trustee, trustee and administrative agent under the New First Lien Credit Agreement with respect to their respective interests in the collateral, and the enforcement of those related provisions. Until the indebtedness under the New First Lien Credit Agreement, including any permitted refinancings and all other debt secured by a priority lien, has been satisfied in full, the lenders thereunder will have the exclusive right to determine the circumstances and manner in which the collateral securing the New Second Lien Notes and the New First Lien Credit Agreement may be disposed of. As a result, the lenders under the New First Lien Credit Agreement may take actions with respect to the collateral securing the New Second Lien Notes which holders of the New Second Lien Notes may disagree with or which may be contrary to the best interest of the holders of the Notes. This includes, without limitation, the right to determine whether to foreclose on the collateral and when and at what price to sell the collateral following an event of default under the New Second Lien Notes or the New First Lien Credit Agreement.

4.       *The collateral securing the New Second Lien Notes or Cram-Down Notes may be subject to other security interests*

The indenture governing the New Second Lien Notes will permit liens in addition to those that would be permitted under the New First Lien Credit Agreement and any permitted refinancing of that facility, including additional debt secured by priority liens. Furthermore, landlords', warehousemens' and materialmens' liens and some tax liens and liens of some lenders, such as purchase money lenders, may, as a matter of law, have priority over the liens granted in the collateral to the collateral trustee in respect the New Second Lien Notes or Cram-Down Notes.  The Debtors cannot assure you that the collateral is not and will not become subject to other security rights which will have priority over the security rights granted to the collateral trustee for the benefit of the holders of the New Second Lien Notes or Cram-Down Notes.

In addition, certain categories of assets will be excluded from the collateral securing the New Second Lien Notes or Cram-Down Notes.  Excluded assets include the Reorganized Debtors' gaming licenses, certain real property the Reorganized Debtors may lease, and motor vehicles that the Reorganized Debtors may own, and assets subject to, or interests in, contracts the terms of which prohibit granting liens thereof.  If an event of default occurs and the New Second Lien Notes or Cram-Down Notes are accelerated, the New Second Lien Notes or Cram-Down Notes will rank equally with the holders of other senior unsecured indebtedness of the relevant entity with respect to such excluded property.

5.       *The liens encumbering the collateral securing the New Second Lien Notes or Cram-Down Notes may be eliminated if the liens securing the Reorganized Debtors' credit facilities or other debt secured by permitted priority liens are foreclosed upon*

Pursuant to the indenture and the collateral trust agreement, the collateral securing the New Second Lien Notes or Cram-Down Notes may be subject to liens that have priority over the liens encumbering such collateral for the benefit of the holders of the New Second Lien Notes or Cram-Down Notes. The creditors holding such permitted liens will be permitted to foreclose upon such collateral before the corresponding liens upon such collateral securing the New Second Lien Notes or Cram-Down Notes are foreclosed and, upon such foreclosure, the liens securing the New Second Lien Notes or Cram-Down Notes upon such collateral will be terminated and any excess proceeds remaining after the payment of priority lien obligations and obligations secured by permitted prior liens would be applied to repay the New Second Lien Notes or Cram-Down Notes only to the extent that the New Second Lien Notes or Cram-Down Notes have become due and payable at such time.  Furthermore, because much of the Reorganized Debtors' gaming equipment is subject to liens by vendors, the loss of such collateral could limit the Reorganized Debtors' ability to continue operations. To prevent foreclosure, the Reorganized Debtors may be motivated to commence voluntary bankruptcy proceedings, or the holders of the New Second Lien Notes or Cram-Down Notes and/or various other interested persons may be motivated to institute bankruptcy proceedings against the Reorganized Debtors. The commencement of such bankruptcy proceedings would expose the holders of the New

Second Lien Notes or Cram-Down Notes to additional risks, including additional restrictions on exercising rights against collateral. The collateral trustee will agree not to challenge the validity, enforceability or priority of liens on any collateral granted to any lender that is a party to the collateral trust agreement.

6. _The collateral securing the New Second Lien Notes or Cram-Down Notes may be diluted under certain circumstances_

The indenture governing the New Second Lien Notes or Cram-Down Notes will and the credit agreement governing the New First Lien Credit Agreement, if any, is expected to permit, under certain circumstances, the issuance of additional senior secured indebtedness, including additional borrowings under the New First Lien Credit Agreement, if any.

Any additional notes issued under the indenture governing the New Second Lien Notes or Cram-Down Notes or other additional priority lien debt would be guaranteed by the same guarantors and would have the same security interests, with the same priority, as currently secure the New Second Lien Notes or Cram-Down Notes. As a result, the collateral securing the New Second Lien Notes or Cram-Down Notes would also secure any such additional notes or priority lien debt, and an issuance of such additional notes or priority lien debt would dilute the value of the collateral compared to the aggregate principal amount of New Second Lien Notes or Cram-Down Notes issued.

7. _A financial failure by the Reorganized Debtors may hinder the receipt of payment on the New Second Lien Notes or Cram-Down Notes_

If the Reorganized Debtors become a debtor subject to insolvency proceedings under the United States Federal Bankruptcy Code, it is likely to result in delays in the payment of the New Second Lien Notes or Cram-Down Notes and in the exercise of enforcement remedies under the New Second Lien Notes or Cram-Down Notes. Provisions under the United States Federal Bankruptcy Code or general principles of equity that could result in the impairment of your rights include the automatic stay, voidance of preferential transfers by a trustee or debtor-in-possession, substantive consolidation, limitations on collectability of unmatured interest or attorneys' fees and forced restructuring of the New Second Lien Notes or Cram-Down Notes.

8. _In the event of a bankruptcy, the ability of the holders of the New Second Lien Notes or Cram-Down Notes to realize upon the collateral will be subject to certain bankruptcy law limitations_

The ability of holders of the New Second Lien Notes or Cram-Down Notes to realize upon the collateral will be subject to certain bankruptcy law limitations in the event of a bankruptcy. Under applicable federal bankruptcy laws, secured creditors are prohibited from repossessing their security from a debtor in a bankruptcy case, or from disposing of security repossessed from a debtor in a bankruptcy case, without bankruptcy court approval. Moreover, applicable federal bankruptcy laws generally permit the debtor to continue to retain collateral even though the debtor is in default under the applicable debt instruments, provided generally that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" may vary according to the circumstances, but is intended in general to protect the value of the secured creditor's interest in the collateral as measured at the commencement of the bankruptcy case and may include cash payments or the granting of additional security, if and at such times as the presiding court in its discretion determines, for any diminution in the value of the collateral as a result of the stay of repossession or disposition of the collateral during the pendency of the bankruptcy case. In view of the lack of a precise definition of the term "adequate protection" and the broad discretionary powers of a U.S. bankruptcy court, the Debtors cannot predict whether payments under the New Second Lien Notes or Cram-Down Notes would be made following commencement of and during a bankruptcy case, whether or when the collateral trustee could foreclose upon or sell the collateral or whether or to what extent holders of New Second Lien Notes or Cram-Down Notes would be compensated for any delay in payment or loss of value of the collateral through the provision of "adequate protection."

9. _The Partners will not be required to make any payments on the New Second Lien Notes or Cram-Down Notes or to make any other payments or equity contributions to or for the Reorganized Debtors' operations_

The Reorganized Debtors' obligations under the New Second Lien Notes or Cram-Down Notes will be non-recourse to the Partners. Accordingly, Eldorado Limited Liability Company and Galleon, Inc. will not be liable for the Reorganized Debtors' obligations other than with respect to their pledges of their interests in the Reorganized Debtors. Following the issuance of the New Second Lien Notes or Cram-Down Notes, the entities that own the Partners, Eldorado Resorts LLC and MGM Resorts International, will have no legal obligation to supply any additional funding to the Reorganized Debtors if the Reorganized Debtors' revenues or other financings are insufficient to support the Reorganized Debtors' continuing operations or to fund the Reorganized Debtors' obligations, including the Reorganized Debtors' obligations under the New Second Lien Notes or Cram-Down Notes.

10. *Federal and state statutes allow courts, under specific circumstances, to void Guarantees and require holders of the New Second Lien Notes or Cram-Down Notes to return payments received from any Guarantors*

Unless designated as an unrestricted subsidiary in accordance with the terms of the indenture governing the New Second Lien Notes or Cram-Down Notes, each and any domestic subsidiary that the Reorganized Debtors form or acquire (other than certain immaterial subsidiaries) (each, a "**Guarantor**") will be required to guarantee the New Second Lien Notes or Cram-Down Notes (a "**Guarantee**"). Although such Guarantees would provide you with a direct claim against such Guarantors, under the United States Federal Bankruptcy Code and comparable provisions of state fraudulent transfer laws, a Guarantee could be voided or claims in respect of a Guarantee could be subordinated to all other debts of that Guarantor. A court might do so if it found that when such Guarantor entered into its Guarantee or, in some states, when payments became due under the Guarantee, such Guarantor received less than reasonably equivalent value or fair consideration and either:

- was insolvent or rendered insolvent by reason of the incurrence;

- was engaged in a business or transaction for which such Guarantor's remaining assets constituted unreasonably small capital; or

- intended to incur, or believed that it would incur, debts beyond its ability to pay the debts as they mature.

The court might also void (i.e., cancel) a Guarantee, without regard to the above factors, if the court found that a Guarantor entered into its Guarantee with the actual intent to hinder, delay or defraud its creditors.

A court would likely find that a Guarantor did not receive reasonably equivalent value or fair consideration for its Guarantee if such Guarantor did not substantially benefit directly or indirectly from the issuance of the New Second Lien Notes or Cram-Down Notes. If a court were to void a Guarantee, holders of the New Second Lien Notes or Cram-Down Notes would no longer have a claim against such Guarantor. Sufficient funds to repay the New Second Lien Notes or Cram-Down Notes may not be available from other sources, including the remaining Guarantors, if any. In addition, the court might direct holders of the New Second Lien Notes or Cram-Down Notes to repay any amounts that they already received from such Guarantor.

The measures of insolvency for purposes of these fraudulent transfer laws will vary depending upon the law applied in any proceeding to determine whether a fraudulent transfer has occurred. Generally, however, a Guarantor would be considered insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

A Guarantee would contain a provision intended to limit such Guarantor's liability to the maximum amount that it could incur without causing the incurrence of obligations under its Guarantee to be a fraudulent transfer. This provision may not be effective to protect such Guarantee from being voided under fraudulent transfer law.

11.    *Unrestricted subsidiaries that the Reorganized Debtors may form in the future generally will not be subject to any of the covenants in the indenture and will not guarantee the New Second Lien Notes or Cram-Down Notes or pledge any collateral to secure the New Second Lien Notes or Cram-Down Notes, and the Reorganized Debtors may not be able to rely on the cash flow or assets of those entities to pay the Reorganized Debtors' indebtedness*

The Reorganized Debtors will be permitted to designate other subsidiaries as unrestricted subsidiaries who will not be subject to compliance with the restrictive covenants contained in the indenture governing the New Second Lien Notes or Cram-Down Notes. If the Reorganized Debtors designate a subsidiary guarantor as an unrestricted subsidiary for purposes of the indenture governing the New Second Lien Notes or Cram-Down Notes, such subsidiary or any of its subsidiaries will be released under the indenture. Designation of a subsidiary as unrestricted will reduce the aggregate value of the collateral securing the New Second Lien Notes or Cram-Down Notes to the extent that liens on the assets of the unrestricted subsidiary and its subsidiaries are released. In addition, the creditors of such unrestricted subsidiary and its subsidiaries, will have a senior claim on the assets of such unrestricted subsidiary and its subsidiaries.

In addition, unrestricted subsidiaries and entities that are not subsidiaries will generally not be subject to the covenants under the indenture governing the New Second Lien Notes or Cram-Down Notes. Unrestricted subsidiaries and entities that are not subsidiaries may enter into financing arrangements that limit their ability to make loans or other payments to fund payments in respect of the New Second Lien Notes or Cram-Down Notes. Accordingly, the Reorganized Debtors may not be able to rely on the cash flow or assets of those entities to pay any of the Reorganized Debtors' indebtedness, including the New Second Lien Notes or Cram-Down Notes.

12.    *Any guarantees or liens on collateral provided after the New Second Lien Notes or Cram-Down Notes are issued could also be voided as preferential transfers*

The indenture governing the New Second Lien Notes or Cram-Down Notes will provide that certain future subsidiaries of the Reorganized Debtors will guarantee the New Second Lien Notes or Cram-Down Notes and secure their guarantees with liens on their assets (other than excluded assets and subject to permitted liens and first priority liens securing any existing or future permitted priority lien debt, including debt incurred under the New First Lien Credit Agreement, if any). The indenture governing the New Second Lien Notes or Cram-Down Notes will also require the Reorganized Debtors to grant first priority liens on assets (other than excluded assets and subject to permitted liens and first priority liens securing any existing or future permitted priority lien debt, including debt incurred under the New First Lien Credit Agreement, if any) that the Reorganized Debtors acquire after the New Second Lien Notes or Cram-Down Notes are issued. Any future guarantee or additional lien in favor of the collateral agent for the benefit of the holders of the New Second Lien Notes or Cram-Down Notes, and in particular, any such future guarantees or additional liens granted after the Effective Date after the Reorganized Debtors obtain the approval for these transactions by the applicable gaming commissions, might be voidable by the grantor (as debtor-in-possession) or by its trustee in bankruptcy or other third parties if certain events or circumstances exist or occur. For instance, if the entity granting the future guarantee or additional lien were insolvent at the time of the grant and if such grant was made within 90 days before that entity commenced a bankruptcy proceeding (or one year before commencement of a bankruptcy proceeding if the creditor that benefited from the guarantee or lien is an "insider" under the United States Federal Bankruptcy Code), and the granting of the future guarantee or additional lien enabled the noteholders to receive more than they would if the grantor were liquidated under chapter 7 of the United States Federal Bankruptcy Code, then such guarantee or lien could be voided as a preferential transfer.

13.    *You may be required to sell your New Second Lien Notes or Cram-Down Notes if any gaming authority finds you unsuitable to hold them*

The current policies of the Nevada State Gaming Commission and other applicable gaming regulatory agencies and authorities do not require you to be licensed or found suitable in order to own any New Second Lien Notes or Cram-Down Notes. However, the policy of any of these agencies could change. In the event that any of these regulatory agencies or authorities require you, as a holder of the New Second Lien Notes or Cram-Down Notes, to be licensed, qualified or found suitable under Nevada gaming laws, you will be required to submit an application for a license, qualification or a finding of suitability in accordance with such applicable gaming laws. If you are unable or unwilling to obtain such license, qualification or finding of suitability, such agencies and authorities may not grant the Reorganized Debtors a license or, if already granted, may suspend or revoke the Reorganized Debtors' licenses unless the Reorganized Debtors terminate their relationship with you. Under these circumstances, the Reorganized Debtors would be permitted to require you to dispose of your New Second Lien Notes or Cram-Down Notes within a time period that either the Reorganized Debtors prescribe or such other time period prescribed by the applicable gaming authority, or redeem your New Second Lien Notes or Cram-Down Notes. Under such circumstances, the redemption price would be the lesser of your cost for the New Second Lien Notes or Cram-Down Notes and the principal amount thereof, or such other amount as is required by applicable gaming authorities

14.  *The Reorganized Debtors may not be able to purchase your New Second Lien Notes or Cram-Down Notes upon a change of control or if the Reorganized Debtors generate excess cash flow*

Upon the occurrence of specified "change of control" events or if the Reorganized Debtors generate excess cash flow, the Reorganized Debtors will be required to offer to purchase each holder's New Second Lien Notes or Alternative. The Reorganized Debtors may not have sufficient financial resources in such circumstances to purchase all of the New Second Lien Notes or Cram-Down Notes that holders tender to the Reorganized Debtors upon a change of control offer or excess cash flow offer, or restrictions under the New First Lien Credit Agreement, if any, may prevent the Reorganized Debtors from being able to do so. If the Reorganized Debtors fail to make a change of control offer or excess cash flow offer or pay the required purchase price when due, an event of default will occur. Moreover, under the New First Lien Credit Agreement, the occurrence of a change of control could also constitute a default giving the Reorganized Debtors' lenders the right to accelerate the maturity of all or portions of the Reorganized Debtors' borrowings. The Debtors cannot assure you that under these circumstances the Reorganized Debtors would be able to obtain necessary consents from the Reorganized Debtors' lenders under the New First Lien Credit Agreement to permit the Reorganized Debtors to repurchase the New Second Lien Notes in connection with a change of control, excess cash flow or repayment or refinancing of all of the Reorganized Debtors' indebtedness under the New First Lien Credit Agreement

15.  *Holders of New Second Lien Notes or Cram-Down Notes may not be able to determine when a change of control giving rise to their right to have the New Second Lien Notes or Cram-Down Notes repurchased by the Reorganized Debtors has occurred following a sale of "substantially all" of the Reorganized Debtors' assets*

A change of control, as defined in the indenture governing the New Second Lien Notes or Cram-Down Notes, will require the Reorganized Debtors to make an offer to repurchase all outstanding New Second Lien Notes or Cram-Down Notes. The definition of change of control includes a phrase relating to the sale, lease or transfer of "all or substantially all" of the Reorganized Debtors' assets. There is no precise established definition of the phrase "substantially all" under applicable law. Accordingly, the ability of a holder of New Second Lien Notes or Cram-Down Notes to require the Reorganized Debtors to repurchase the New Second Lien Notes or Cram-Down Notes as a result of a sale, lease or transfer of less than all of the Reorganized Debtors' assets to another individual, group or entity may be uncertain.

16.  *If an active trading market does not develop for the New Second Lien Notes or Cram-Down Notes, you may not be able to resell them*

There has not been an established trading market for the New Second Lien Notes or Cram-Down Notes and there can be no assurance that a trading market will develop. In addition, the liquidity of the trading market in these New Second Lien Notes or Cram-Down Notes, and the market price quoted for these New Second Lien Notes or Cram-Down Notes, may be adversely affected by changes in the overall market for this type of

security and by changes in the Reorganized Debtors' financial performance or prospects or in the prospects for companies in the Reorganized Debtors' industry generally. As a result, you cannot be sure that an active trading market will develop for these New Second Lien Notes or Cram-Down Notes.

### E.    Material United States Federal Income Tax Considerations

THERE ARE A NUMBER OF MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN SECTION IX OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN" FOR A DISCUSSION OF THE MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES AND RISKS FOR THE DEBTORS AND FOR HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN RESULTING FROM THE TRANSACTIONS OCCURRING IN CONNECTION WITH THE PLAN.

## VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) liquidation of all of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative plan or plans of reorganization.

### A.    Liquidation Under Chapter 7

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) or (b) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. In that event, all creditors holding Allowed General Unsecured Claims likely would receive distributions of a lesser value on account of their Allowed Claims and would have to wait a longer period of time to receive such distributions than they would under the Plan. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of Holders of Claims and the liquidation analysis are set forth in Section IV.A.1 hereof. The liquidation analysis is attached as Exhibit C hereto.

### B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or any other party in interest, may attempt to formulate an alternative chapter 11 plan, which might provide for the liquidation of the Debtors' remaining assets other than as provided by the Plan. Any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Claims than are currently provided for under the Plan. Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims or Equity Interests with the least delay.

## IX.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THERE ARE A NUMBER OF MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN THIS SECTION IX OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES AND RISKS FOR THE DEBTORS AND FOR HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN RESULTING FROM THE TRANSACTIONS OCCURRING IN CONNECTION WITH THE PLAN.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are not impaired (e.g., Other Secured Claims, Other Priority Claims, General Unsecured Claims). In addition, the following summary does not address the U.S. federal income tax consequences to holders of Equity Interests.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to holders of Allowed Claims that are not "United States persons" (as such term is defined in the Tax Code), special classes of taxpayers (such as broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organization (including, without limitation, certain pension funds), persons who received their claims in whole or in part as compensation, persons holding their claims as part of an integrated constructive sale or straddle, and investors in partnerships and pass-through entities). This summary assumes, and the Debtors believe, that instruments issued pursuant to the Plan that are denominated as notes, debt or indebtedness will be treated as debt for U.S. federal income tax purposes.

For U.S. federal income tax purposes, income earned through a foreign or domestic partnership or other flow-through entity is attributed to its owners. Accordingly, the U.S. federal income tax treatment of the holder will generally depend on the status of the partner or other owner and the activities of the partnership or other flow-through entity. Partners in partnerships or other flow-through entities that own Claims should discuss the tax consequences of the Plan with their own tax advisor.

*Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**Debtors' Cancellation of Indebtedness Income**

In connection with the implementation of the Plan, the Joint Venture may incur a significant amount of cancellation of indebtedness income ("CODI") for U.S. federal income tax purposes. CODI is generally the amount by which the issue price of the indebtedness discharged exceeds the consideration given in exchange therefor, i.e., the amount of any cash, the issue price of any debt and the fair market value of any other consideration paid to holders of such debt. Although a significant amount of CODI may be recognized by the Joint Venture in connection with the Plan, because the Joint Venture is treated as a partnership for U.S. federal income tax purposes, any CODI will not directly result in taxes payable by the Joint Venture. Rather any CODI will be allocated to the Partners, each of which will be responsible for paying tax on its allocable share of CODI unless the Partner is able to exclude the CODI from taxable income under applicable law.

**Consequences to Holders of Allowed Mortgage Note Claims**

If Class 3 Acceptance occurs, each holder of an Allowed Mortgage Note Claim will receive cash and New Second Lien Notes in satisfaction of its Allowed Mortgage Note Claim.  If Class 3 Acceptance does not occur, each Holder of an Allowed Mortgage Note Claim will receive cash and Cram-Down Notes in satisfaction of its Allowed Mortgage Note Claim.  The receipt of cash and either New Second Lien Notes or Cram-Down Notes, as applicable, in satisfaction of an Allowed Mortgage Note Claim will be treated as a taxable exchange for holders of Mortgage Note Claims in which a holder of a Mortgage Note Claim should recognize gain or loss on the effective date unless the installment sale rules apply and a holder does not elect to have those rules not apply.  The gain or loss will generally equal the difference between the holder's "amount realized" in satisfaction of its Claim (other than any amount received in payment of accrued but unpaid interest) and the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).  The amount realized will equal the cash received plus the issue price of either the New Second Lien Notes or Cram-Down Notes received, as applicable.

The "issue price" of the New Second Lien Notes or Cram-Down Notes generally will equal their fair market value if the New Second Lien Notes or Cram-Down Notes, as applicable, are considered to be publicly traded for U.S. federal income tax purposes, or if the New Second Lien Notes or Cram-Down Notes are not considered publicly traded but the Mortgage Notes are so treated, the issue price of the New Second Lien Notes or Cram-Down Notes will be the fair market value of the Mortgage Notes exchanged therefor.  If neither the Mortgage Notes nor the New Second Lien Notes or Cram-Down Notes, as applicable, are considered to be publicly traded, the issue price of the New Second Lien Notes or Cram-Down Notes, as applicable, will be their stated principal amount. In general, a debt instrument will be considered publicly traded if (i) it is listed on a national securities exchange or certain interdealer quotation systems; (ii) it appears on a system of general circulation that provides a reasonable basis to determine its fair market value by disseminating either recent price quotations of one or more identified brokers, dealers or traders or actual prices of recent sales transactions; or (iii) under certain circumstances, price quotations for the debt instrument are readily available from dealers, brokers or traders.

A holder's basis in its Mortgage Notes will equal the amount paid for the notes plus any market discount previously taken into income and less any payments received by the holder on the Claims other than payments of qualified stated interest (defined below).  The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether Mortgage Notes constitute a capital asset in the hands of the holder, how long the Mortgages Notes have been held, whether the Mortgage Notes were acquired at a market discount (in which case the market discount rules described below may apply to recharacterize a portion of any gain as ordinary income) and whether and to what extent the holder previously had claimed a bad debt deduction.

A holder of Mortgage Notes that receives New Second Lien Notes or Cram-Down Notes, as applicable, pursuant to the Plan will hold the New Second Lien Notes or Cram-Down Notes, as applicable, with a basis equal to the issue price of those notes.  A holder's holding period in its new notes generally should begin on the day following receipt of the notes.

**Distributions in Discharge of Accrued but Unpaid Interest**

In general, to the extent that any consideration received pursuant to the Plan by a holder of Mortgage Notes is received in satisfaction of interest that accrued during the holder's holding period, such amount will be taxable to the holder as ordinary interest income if not previously included in the holder's gross income. Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.

Pursuant to the Plan, all amounts received in exchange for an Allowed Mortgage Note Claim will be allocated first to the principal amount of such Claim as determined for U.S. federal income tax purposes, and thereafter to accrued but unpaid interest.  However, there is no assurance that the IRS would respect such allocation for U.S. federal income tax purposes.

Each holder of an Allowed Mortgage Note Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

**Market Discount**

A holder of a Mortgage Note Claim acquired after the original issuance of the notes at a market discount (generally defined as the amount, if any, by which a holder's tax basis in the note immediately after its acquisition is less than the adjusted issue price of the note at such time, subject to a *de minimis* exception) generally will be required to treat any taxable gain recognized with respect to the debt as ordinary income to the extent of the market discount accrued during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.

**Consequences of Holding New Second Lien Notes or Cram-Down Notes**

*New Second Lien Notes* – The New Second Lien Notes will be treated as issued with original issue discount (OID) in an amount equal to the difference between their "stated redemption price at maturity" (the sum of all payments to be made on the New Second Lien Notes other than "qualified stated interest") and their "issue price." A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt, other than qualified stated interest. Stated interest is qualified stated interest if it is unconditionally payable in cash (or other property other than debt of the issuer) at least annually at a fixed rate or certain floating rate. Because the New Second Lien Notes include an option to pay interest in kind (PIK), interest on the notes will not be qualified stated interest but instead will be treated as part of the stated redemption price at maturity.

As discussed generally above under the heading **"Consequences to Holders of Allowed Mortgage Note Claims"**, the "issue price" of the New Second Lien Notes will depend on whether those notes are considered publicly traded for U.S. federal income tax purposes. Specifically, the "issue price" of the New Second Lien Notes will depend on whether, at any time during the 60-day period ending 30 days after the issuance of the new notes, the notes are treated as traded on an "established market," or, if the notes are not so treated, whether the Mortgage Note Claims are so traded. If either of those conditions is met, the issue price of the New Second Lien Notes will be based on the fair market value of the New Second Lien Notes or Mortgage Notes surrendered in exchange therefor, as the case may be, as of the issue date of the New Second Lien Notes and the new notes will be treated as issued with OID to the extent that its issue price is less than its stated redemption price at maturity as described in the immediately preceding paragraph. If neither the New Second Lien Notes nor the Mortgage Notes is traded on an established market, the issue price of the New Second Lien Notes should be the stated principal amount of the new notes.

The amount of OID that you must include in income if you are the initial holder of a New Second Lien Note will generally equal the sum of the "daily portions" of OID with respect to the New Second Lien Note for each day during the taxable year or portion of the taxable year in which you held such New Second Lien Note ("accrued OID"). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a New Second Lien Note may be of any length and may vary in length over the term of the New Second Lien Note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period other than the final accrual period is an amount equal to the product of the New Second Lien Note's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period). OID allocable to a final accrual period is the difference between the amount payable at maturity and the adjusted issue price at the beginning of the final accrual period. The yield to maturity of the New Second Lien Note is the discount rate that causes the present value of all payments on the note as of its original issue date to equal the issue price of such note. For purposes of determining the yield to maturity, the assumption is that we will pay interest in cash and not exercise the option to pay PIK interest, except in respect of any period in which we actually elect to pay PIK interest.

The "adjusted issue price" of a New Second Lien Note at the beginning of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period and reduced by any cash payments made on such New Second Lien Note on or before the first day of the accrual period. Under these rules, a holder may have to include in income increasingly greater amounts of OID in successive accrual periods. The Reorganized Debtors are required to provide information returns stating the amount of OID accrued on New Second Lien Notes held of record by persons other than corporations and other holders exempt from information reporting.

If cash interest is paid on the New Second Lien Notes, a holder will not be required to adjust its OID inclusions. Instead, each payment made in cash under a New Second Lien Note will be treated first as a payment of any accrued OID that has not been allocated to prior payments and second as a payment of principal. A holder generally will not be required to include separately in income cash payments received on the New Second Lien Notes to the extent such payments constitute payments of previously accrued original issue discount or payments of principal.

If, for any interest payment period, the option to pay PIK interest is exercised, the OID calculation for future periods will be adjusted by treating the New Second Lien Note as if it had been retired and then reissued for an amount equal to its adjusted issue price on the date preceding the first date of such interest payment period, and re-calculating the yield to maturity of the reissued note by treating the amount of PIK interest (and of any prior PIK interest) as a payment that will be made on the maturity date of such note.

The rules regarding OID are complex and the rules described above may not apply in all cases. Accordingly, you should consult your own tax advisor regarding their application.

*Cram-Down Notes* – Stated interest on the Cram-Down Notes will be paid in cash. As a result, all stated interest on the Cram-Down Notes should be treated as qualified stated interest. A holder of Cram-Down Notes will be required to include stated interest on the Cram-Down Notes in income in accordance with the holder's regular method of accounting. If the issue price of the Cram-Down Notes is less than its stated principal amount, the Cram-Down Notes will be treated as issued with OID for U.S. federal income tax purposes. See the discussion above under the heading **"Consequences of Holding New Second Lien Notes or Cram-Down Notes –** *New Second Lien Notes***"** for a discussion of issue price and tax treatment of holding a note issued with OID.

**Sale, Exchange or Redemption of New Debt**

Unless a non-recognition provision applies, a holder generally will recognize gain or loss upon the sale, exchange or redemption of New Second Lien Notes or Cram-Down Notes, as applicable, equal to the difference, if any, between the holder's adjusted tax basis and the amount realized on the sale exchange or redemption. Any gain or loss generally will be capital gain or loss, and generally should be long-term if the holder's holding period in the notes is more than one year at the time of the sale, exchange or redemption. Long-term capital gains of certain non-corporate U.S. holders (including individuals) may qualify for a maximum 15% tax rate (which is currently effective for tax years through 2012). The deduction of capital losses is subject to certain limitations under the Tax Code.

**Information Reporting and Withholding**

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails to properly report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions (including certain "reportable transactions" and "listed transactions") in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

*The foregoing summary has been provided for informational purposes only.  All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.*

## X.    CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims and Equity Interests. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  The Debtors urge holders of impaired Claims and Equity Interests entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than [4:00 p.m.], prevailing Pacific time, on [_____], 2012.

Dated:          Reno, Nevada
                [_____], 2012


                                        CIRCUS AND ELDORADO JOINT VENTURE
                                        SILVER LEGACY CAPITAL CORP.

**EXHIBIT A**

**The Plan**

Paul S. Aronzon (CA State Bar No. 88781)
Thomas R. Kreller (CA State Bar No. 161922)
Haig M. Maghakian (CA State Bar No. 221954)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:      (213) 892-4000
Facsimile:      (213) 629-5063

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Sallie B. Armstrong (NV State Bar No. 1243)
DOWNEY BRAND LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone:      (775) 329-5900
Facsimile:      (775) 786-5443
Email:          sarmstrong@downeybrand.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>CIRCUS AND ELDORADO JOINT VENTURE, *et al.*,<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Silver Legacy Capital Corp.<br><br><div align="right">Debtors.</div> | Chapter 11<br><br>Case No. BK-12-51156<br>Case No. BK-12-51157<br><br>(Jointly Administered)<br><br>**DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION (DATED JUNE 1, 2012)** |

#4821-9763-7648

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME ................... 1

    A.    DEFINED TERMS ............................................................................................................ 1

    B.    RULES OF INTERPRETATION AND COMPUTATION OF TIME ............................................... 7

        1.    Rules of Interpretation ....................................................................... 7

        2.    Computation of Time ......................................................................... 8

ARTICLE II. CLASSES OF CLAIMS AND EQUITY INTERESTS ............................................... 8

ARTICLE III. TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................................ 9

    A.    UNCLASSIFIED CLAIMS ................................................................................................ 9

        1.    Payment of Administrative Claims .................................................... 9

        2.    Payment of Priority Tax Claims ...................................................... 10

    B.    TREATMENT OF CLASSIFIED CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ............. 10

        1.    Class 1:  Allowed Other Secured Claims ......................................... 10

        2.    Class 2:  Allowed Other Priority Claims .......................................... 10

        3.    Class 3:  Allowed Mortgage Note Claims ........................................ 11

        4.    Class 4:  Allowed US Foods Secured Claims .................................... 11

        5.    Class 5:  Allowed General Unsecured Claims ................................... 11

        6.    Class 6:  Equity Interests ................................................................. 12

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................ 12

    A.    CONTINUED EXISTENCE AND VESTING OF ASSETS IN THE REORGANIZED DEBTOR ......................... 12

    B.    TRANSACTIONS DEPENDENT UPON CLASS 3 ACCEPTANCE/REJECTION ........................................... 13

        1.    Class 3 Acceptance. .......................................................................... 13

        2.    Class 3 Rejection .............................................................................. 13

    C.    FUNDING FOR CASH DISTRIBUTIONS TO OCCUR UNDER THE PLAN ............................................... 13

    D.    CORPORATE GOVERNANCE; EMPLOYMENT AND COMPENSATION ................................................... 13

        1.    Articles of Incorporation, Certificate of Designations and Bylaws ................. 13

        2.    Directors and Officers of the Reorganized Debtors ......................... 14

3.    Employment, Retirement, Indemnification and Other Related Agreements and Management Incentive Programs ..................................................... 14

4.    Corporate Action ....................................................................................... 14

E.    Preservation of Rights of Action .................................................................. 14

F.    Cancellation and Surrender of Instruments, Securities and Other Documentation ................................................................................................ 15

G.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ................................................................................................ 15

H.    Substantive Consolidation ............................................................................. 15

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................ 16

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ................... 16

B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ..................... 16

C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan .............................................................................................. 16

D.    Insurance Policies ........................................................................................... 16

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................................ 17

A.    Distributions for Claims Allowed as of the Effective Date ................................. 17

B.    Method of Distributions to Holders of Claims .................................................. 17

C.    Compensation and Reimbursement for Services Related to Distributions ................... 17

D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions .................. 17

1.    Delivery of Distributions ........................................................................... 17

2.    Undeliverable Distributions Held by Disbursing Agents and Indenture Trustee ............. 17

E.    Distribution Record Date ............................................................................... 18

F.    Means of Cash Payments ................................................................................ 18

G.    Minimum Distributions ................................................................................. 18

H.    Surrender of Canceled Instruments or Securities ............................................. 18

1.    Tender of Mortgage Notes ........................................................................ 18

2.    Lost, Stolen, Mutilated or Destroyed Mortgage Notes ................................. 18

3.    Failure to Surrender Mortgage Notes ........................................................ 19

ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ................................................... 19

ii

    A.     PROSECUTION OF OBJECTIONS TO CLAIMS ........................................................ 19

    B.     TREATMENT OF DISPUTED CLAIMS ................................................................ 19

    C.     DISTRIBUTIONS ON ACCOUNT OF DISPUTED CLAIMS ONCE ALLOWED ................... 19

    D.     ESTIMATION ........................................................................................... 19

**ARTICLE VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ................................................................................................................. 20

    A.     CONDITIONS PRECEDENT TO CONFIRMATION .................................................. 20

    B.     CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........................................... 20

    C.     WAIVER OF CONDITIONS PRECEDENT ............................................................ 21

    D.     EFFECT OF NONOCCURRENCE OF CONDITIONS TO THE EFFECTIVE DATE ................ 21

**ARTICLE IX. DISCHARGE, RELEASES, INJUNCTION AND SETTLEMENT** ................................ 21

    A.     DISCHARGE OF CLAIMS .............................................................................. 21

    B.     CLAIMS ENJOINED ................................................................................... 21

    C.     GLOBAL SETTLEMENT ............................................................................... 22

    D.     RELEASES ............................................................................................... 22

    E.     EXCULPATION ......................................................................................... 22

    F.     SUPPLEMENTAL INJUNCTION ...................................................................... 23

**ARTICLE X. RETENTION OF JURISDICTION** ................................................................. 23

**ARTICLE XI. MISCELLANEOUS PROVISIONS** ............................................................... 24

    A.     DISSOLUTION OF COMMITTEE ..................................................................... 24

    B.     MODIFICATION OF THE PLAN ...................................................................... 24

    C.     REVOCATION OF THE PLAN ........................................................................ 25

    D.     SEVERABILITY OF PLAN PROVISIONS ............................................................ 25

    E.     SUCCESSORS AND ASSIGNS ........................................................................ 25

    F.     ISSUANCE OF NOTES UNDER PLAN ............................................................... 25

    G.     FILING OF ADDITIONAL DOCUMENTS. ........................................................... 26

## INTRODUCTION

Circus and Eldorado Joint Venture, a Nevada general partnership, and Silver Legacy Capital Corp., a Nevada corporation (together, the "Debtors"), propose the following plan of reorganization (the "Plan") for the resolution of the outstanding claims against and equity interests in the Debtors. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, 11 U.S.C. § 1129. Reference is made to the *Disclosure Statement for Debtors' First Amended Joint Chapter 11 Plan of Reorganization (Dated June 1, 2012)*, as well as the additional solicitation materials that may be distributed contemporaneously with the Plan (collectively, the "Disclosure Statement"), for a discussion of the Debtors' history, business, results of operations, historical financial information, projections and properties, and for a summary and analysis of the Plan. There also are other agreements and documents that are referenced in the Plan or the Disclosure Statement that will be available for review at such time as they are filed with the Bankruptcy Court.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION
## AND COMPUTATION OF TIME

### A.      Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

"**Administrative Claim**" means a Claim for costs and expenses of administration allowed under sections 503(b), 507(a) or (b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the business of the Debtors, including adequate protection claims, if any, (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Fee Claims; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

"**Allowed Claim**" means, except as otherwise provided herein: (a) a Claim that has been listed by any Debtor in its Schedules as other than disputed, contingent or unliquidated and that is not otherwise a Disputed Claim; or (b) a Claim that is allowed: (i) in any stipulation with any Debtor; (ii) in any contract, instrument, indenture or other agreement or document entered into with any Debtor in connection with the Plan; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan.

"**Allowed** . . . **Claim**" means an Allowed Claim in the particular Class or category specified.

"**Available Balance Sheet Cash**" means all Cash on hand as of the Effective Date as reflected on the balance sheet of the Debtors or Reorganized Debtors, as applicable, but excluding (a) all Cash required to be held by the Debtors to satisfy applicable Nevada gaming regulations, including, but not limited to, items comprising the cage impress bankroll, including, but not limited to, ATM disbursements, jackpot payouts and check cashing amounts, (b) Cash in an amount necessary to satisfy or reserve for all payments required to be made under the Plan on the Effective Date, including, but not limited to, (i) payments on Allowed Claims or estimated Allowed Claims that may become due and payable after the Effective Date (including, but not limited to, all Allowed or estimated Administrative Claims, Priority Tax Claims, Other Secured Claims, Other Priority Claims, US Foods Secured Claims, and Allowed General Unsecured Claims that qualify for a single lump sum payment on the Effective Date pursuant to Article VI.G of the Plan) and (ii) if Class 3 Acceptance occurs, payments due to the New First Lien Administrative Agent pursuant to, and in connection with, the closing of the New First Lien Credit Agreement; (c) Cash in an amount of approximately $[4 million] that the Reorganized Debtors intend to use for general working capital purposes; (d) Cash in an amount necessary to satisfy any outstanding or estimated Prepetition Payments (as defined in the Cash Collateral Stipulation) or Adequate Protection Payments (as defined in the Cash Collateral Stipulation); (e) Cash in an amount necessary to satisfy the accrued and unpaid interest under the

1

Mortgage Notes as of the Effective Date; and (f) if Class 3 Acceptance occurs, the proceeds from the borrowings under the New First Lien Term Loan or from the issuance of the New Subordinated Notes.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

"**Bankruptcy Court**" means the United States District Court for the District of Nevada having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to 28 U.S.C. § 157, the bankruptcy unit of such District Court.

"**Bankruptcy Rules**" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as in effect during the pendency of the Chapter 11 Cases.

"**Bar Date Order**" means the order entered by the Bankruptcy Court on [_____], 2012 [Docket No. ___] establishing the general deadline for the filing of proofs of Claim against the Debtors and the Estates, as well as certain other deadlines and procedures relating to the filing of proofs of Claim.

"**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"**Cash**" means legal tender of the United States of America.

"**Cash Collateral Stipulation**" means the *Stipulation Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and Fed. R. Bankr. P. 4001(b) and (d) between Bank of New York Mellon Trust Company, N.A., as Trustee, and the Debtors-in-Possession re (A) Use of Cash Collateral and (B) Grant of Adequate Protection Pursuant Nunc Pro Tunc to the Petition Date* approved by final order of the Bankruptcy Court on June 27, 2012 [Docket No. 247].

"**Causes of Action**" means any and all claims, causes of action, demands, actions, suits, obligations, liabilities, cross-claims, counter-claims, offsets or setoffs of any kind or character whatsoever, in each case whether known or unknown, liquidated or unliquidated, matured or unmatured, contingent or non-contingent, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring at any time prior to the Effective Date.

"**Chapter 11 Cases**" means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on May 17, 2012.

"**Claim**" means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

"**Claims Agent**" means Kurtzman Carson Consultants LLC in its capacity as the Debtors' claims, noticing, and solicitation agent.

"**Class**" means a class of Claims or Equity Interests, as described in Article II.

"**Class 3 Acceptance**" means that the Holders of the Mortgage Note Claims that comprise Class 3 vote to accept this Plan in accordance with the requirements of section 1126(c) of the Bankruptcy Code.

"**Class 3 Consensual Cash Distribution**" means, if Class 3 Acceptance occurs, the following amounts to be paid pursuant to and in accordance with this Plan:  (a) $85 million in Cash; (b) Cash in an amount equal to the accrued and unpaid interest under the Mortgage Notes as of the Effective Date; and (c) the amount of Available Balance Sheet Cash as of the Effective Date.

"**Class 3 Cram-Down Cash Distribution**" means, if Class 3 Acceptance does not occur, the following amounts to be paid pursuant to and in accordance with this Plan:  (a) Cash in an amount equal to the accrued and unpaid interest under the Mortgage Notes as of the Effective Date and (b) the amount of Available Balance Sheet Cash as of the Effective Date.

"**Committee**" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases by the Office of the United States Trustee pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* filed on May 29, 2012 [Docket No. 103], as such Committee may be reconstituted from time to time.

"**Confirmation**" means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consenting Mortgage Noteholder**" means the Holders of Mortgage Note Claims party to the Restructuring Support Agreement.

"**Cram-Down Indenture**" means, if Class 3 Acceptance does not occur, the new indenture to be entered into on the Effective Date governing the Cram-Down Notes between the Reorganized Debtors, as issuers, and [_____], as indenture trustee, the terms of which are described in detail in the Disclosure Statement. The form of the Cram-Down Indenture and related documentation are described in the Disclosure Statement and included in the Plan Supplement.

"**Cram-Down Notes**" means, if Class 3 Acceptance does not occur, the new notes to be issued on the Effective Date by the Reorganized Debtors pursuant to and in accordance with this Plan, which notes either: (i) shall be secured by the liens on the Debtors' property securing the Mortgage Note Claims to the extent of the Allowed amount of such Mortgage Note Claims, and shall provide each Holder of Allowed Mortgage Note Claims deferred Cash payments totaling at least the amount of such Holder's Allowed Mortgage Note Claims, of a value, as of the Effective Date, of at least the value of such Holder's interest in the Estates' interest in such property; or (ii) shall provide the Holders of the Mortgage Note Claims with the indubitable equivalent of the Allowed Mortgage Note Claims.  The aggregate principal amount of the Cram-Down Notes will be equal to (a) the aggregate principal amount outstanding under the Mortgage Notes ($142,800,000), minus (b) the Available Balance Sheet Cash to be distributed to the Holders of the Allowed Mortgage Note Claims if Class 3 Acceptance does not occur.  The Cram-Down Notes will bear interest at 7.3% per annum.

"**Cure Amount Claim**" means a Claim based upon the Debtor's defaults pursuant to an executory contract or unexpired lease at the time such contract or lease is assumed by the Debtor under section 365 of the Bankruptcy Code.

"**Debtor**" means the Joint Venture or SLCC, as applicable.

"**Disbursing Agent**" means the Reorganized Debtors, in their capacity as disbursing agent pursuant to Article VI.B, or any Third Party Disbursing Agent.

"**Disclosure Statement**" means the Disclosure Statement, as defined in the Introduction hereto (including all exhibits, schedules and supplements thereto or referenced therein) that relates to the Plan and has been

prepared and distributed by the Debtors, as plan proponents, as the same may be amended, modified or supplemented.

**"Disputed Claim"** means any Claim as to which the Debtors or any other party in interest has filed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or any Claim otherwise disputed by the Debtors in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

**"Distribution Record Date"** means the close of business on the Business Day immediately preceding the Effective Date.

**"Effective Date"** means the first Business Day on which (a) all conditions to the Effective Date in Article VIII have been satisfied or waived and (b) the Plan is consummated.

**"Eldorado LLC"** means Eldorado Limited Liability Company.

**"Equity Interests"** means any and all of the general partnership interests, limited partnership interests, limited liability company interests, common stock of all classes or any other securities or equity interests issued by the Debtors and outstanding as of the Petition Date, along with any and all options, warrants or other rights to purchase any Equity Interests or demand the issuance of any Equity Interests, including: (a) redemption, conversion, exchange, voting, participation and dividend rights; and (b) liquidation preferences.

**"Estates"** means, collectively, the estates created for the Debtors in their Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**"Fee Claim"** means a Claim under sections 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation, indemnification or reimbursement of expenses of a Professional or other entity for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date.

**"File," "Filed"** or **"Filing"** means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order not to be a Final Order.

**"General Unsecured Claim"** means any Claim against any Debtor that is not an Other Secured Claim, an Other Priority Claim, a Mortgage Note Claim, a US Foods Secured Claim, or otherwise classified in a class other than and separate from the class of General Unsecured Claims.

**"Holder"** means a person or entity holding a Claim against, or Equity Interest in, any Debtor.

**"Indenture Trustee"** means The Bank of New York Mellon Trust Company, N.A., or its successor, as Trustee under the Mortgage Notes Indenture.

**"Joint Venture"** means Circus and Eldorado Joint Venture.

**"Mortgage Note Claim"** means (a) any Claim arising under or in connection with, or evidenced by, the Mortgage Notes or the Mortgage Notes Indenture and (b) any Claim of the Indenture Trustee or any Holder of Mortgage Note Claims, as applicable, arising under or in connection with, or evidenced by, the Cash Collateral Stipulation, including, but not limited to any Superpriority Claim (as defined in the Cash Collateral Stipulation).

**"Mortgage Notes"** means the $10^1/8\%$ Mortgage Notes due 2012 issued pursuant to the Mortgage Notes Indenture.

**"Mortgage Notes Indenture"** means that certain Indenture dated as of March 5, 2002 governing the $10^1/8\%$ Mortgage Notes due 2012 between the Debtors, as issuers, and The Bank of New York, as indenture trustee, as amended, modified, restated or supplemented from time to time.

**"New First Lien Administrative Agent"** means the administrative agent under the New First Lien Credit Agreement.

**"New First Lien Credit Agreement"** means, if Class 3 Acceptance occurs, a new first lien credit agreement dated as of the Effective Date, which will govern the New First Lien Term Loan, between the Reorganized Debtors, the New First Lien Administrative Agent, as administrative agent thereunder, and the lenders thereunder, which shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Required Consenting Mortgage Noteholders. The form of the New First Lien Credit Agreement and related documentation are described in the Disclosure Statement and will be included in the Plan Supplement.

**"New First Lien Term Loan"** means, if Class 3 Acceptance occurs, the new $70 million term loan to be issued pursuant to the New First Lien Credit Agreement, which shall be secured by first priority liens over the assets of the Reorganized Debtors that will be senior and prior to the liens of the holders of the New Second Lien Notes.

**"New Second Lien Indenture"** means, if Class 3 Acceptance occurs, the new indenture to be entered into on the Effective Date governing the New Second Lien Notes between the Reorganized Debtors, as issuers, and [_____], as indenture trustee, which shall be in a form and substance acceptable to the Debtors and reasonably acceptable to the Required Consenting Mortgage Noteholders. The form of the New Second Lien Indenture and related documentation are described in the Disclosure Statement and included in the Plan Supplement.

**"New Second Lien Notes"** means, if Class 3 Acceptance occurs, the new notes in the original principal amount of $27.5 million to be issued on the Effective Date by the Reorganized Debtors pursuant to and in accordance with the Plan which will mature on the five and a half year anniversary of the Effective Date. Interest on the New Second Lien Notes will be payable for the first two years of the term of the New Second Lien Notes at a rate equal to either (a) 10% per annum paid in cash, or (b) 12% accrual on PIK interest, with the Reorganized Debtors having the option to pay in cash or as PIK, provided, however, that the Reorganized Debtors will be prohibited from electing to pay interest as PIK for any period(s) when the terms of the New First Lien Credit Agreement would permit the payment of that interest in cash. At the beginning of third year of the term of the New Second Lien Notes, the interest rate will increase to 12% if paid in cash or 14% if paid as PIK interest, again at the election of the Reorganized Debtors; provided, however, that the Reorganized Debtors will be prohibited from electing to pay interest as PIK for any period(s) when the terms of the New First Lien Credit Agreement would permit the payment of that interest in cash. The New Second Lien Notes will be secured by second priority liens over the assets of the Reorganized Debtors securing the New First Lien Term Loan that will be junior and subordinate to the liens securing the New First Lien Term Loan.

**"New Subordinated Notes"** means, if Class 3 Acceptance occurs, the new subordinated notes issued to the Partners in the initial face amount of $15 million as contemplated by the Restructuring Support Agreement.

**"Other Priority Claim"** means any Claim afforded priority in right of payment under Bankruptcy Code section 507(a), other than a Priority Tax Claim or an Administrative Claim.

**"Other Secured Claim"** means any secured claim other than a Mortgage Note Claim or a US Foods Secured Claim.

**"Ordinary Course Professionals Order"** means any order of the Bankruptcy Court authorizing the continued employment and payment of certain professionals of the Debtors in the ordinary course of the Debtors' business.

**"Partners"** means Eldorado Limited Liability Company and Galleon, Inc.

**"Petition Date"** means May 17, 2012, the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

**"PIK"** means "pay in kind" or "payable in kind," as applicable.

**"Plan"** means this *Debtors' First Amended Joint Chapter 11 Plan of Reorganization (June 1, 2012)*, and all exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

**"Plan Supplement"** means the compilation of documents and form of documents, schedules and exhibits filed by the Debtors in connection with the Confirmation Hearing, as modified or supplemented prior to the Effective Date, which documents shall include definitive documents governing (a) the New First Lien Credit Agreement, the New Second Lien Indenture and the New Subordinated Notes, or (b) the Cram-Down Indenture and the Cram-Down Notes, as applicable, and other related document to which the Debtors will be a party and which therefore will be approved in connection with the Plan. If Class 3 Acceptance occurs, the documents included in the Plan Supplement shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Required Consenting Mortgage Noteholders.

**"Priority Tax Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

**"Pro Rata"** means, in reference to distributions under the Plan, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

**"Professional"** means any professional employed in the Chapter 11 Cases pursuant to sections 327, 328 or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

**"Reinstate"** or **"Reinstated"** or **"Reinstatement"** means such treatment as would render a Claim or equity interest unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**"Related Persons"** means without limitation any existing or former affiliate, subsidiary, member, officer, director, executive committee member, manager, general manager partner, stockholder, holder of a partnership interest, trustee, member, representative, employee, agent, attorney, advisor, financial advisor, accountant, other Professional, their heirs, successors or assigns, or any person who is or was in control of any of the foregoing.

**"Released Parties"** means the Debtors and their respective estates, the Reorganized Debtors, the Partners and, if Class 3 Acceptance occurs, each Holder of a Mortgage Note Claim that votes to accept the Plan and the Indenture Trustee, and the respective Related Persons of each of the foregoing.

**"Reorganized Debtor"** means any Debtor on and after the Effective Date, in whatever corporate form such entity may take as a result of the Effective Date transactions contemplated by the Plan.

6

#4821-9763-7648

**"Required Consenting Mortgage Noteholder"** means the Consenting Mortgage Noteholders holding a majority of the aggregate principal amount of Mortgage Note Claims held by all Consenting Mortgage Noteholders party to the Restructuring Support Agreement (as of date of any applicable action or consent).

**"Restructuring Support Agreement"** means that certain Restructuring Support Agreement entered into as of March 15, 2012, by and among the Debtors, the Consenting Mortgage Noteholders and the Partners, as amended, modified, supplemented or restated from time to time in accordance therewith.

**"Secured Claim"** means a Claim against a Debtor that is secured by a valid lien on property in which such Debtor's estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

**"Schedules"** means the Debtors' schedules of assets and liabilities and statements of financial affairs filed with the Court on June 18, 2012, as they may be amended, modified or supplemented.

**"SLCC"** means Silver Legacy Capital Corp.

**"Tax"** means (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

 **"Third Party Disbursing Agent"** means an entity designated by the Reorganized Debtors to act as a Disbursing Agent pursuant to Article VI.B.

**"US Foods"** means US Foods, Inc.

**"US Foods Customer Agreement"** means that certain Customer Account Application, dated as of January 26, 2012, executed by the Joint Venture in favor and for the benefit of US Foods.

**"US Foods Secured Claims"** means any and all Claims of US Foods that existed as of the Petition Date, based on, arising out of, or related to US Foods' sales and deliveries of goods to the Debtors prior to the Petition Date pursuant to the US Foods Customer Agreement, invoices or otherwise. The US Foods Secured Claims: (a) are secured by security interests on all assets of the Debtor; and (b) consist of (i) $210,944.10 based on US Foods' sales and deliveries of goods to the Debtors prior to the Petition Date pursuant to the US Foods Customer Agreement, invoices or otherwise, plus (ii) all accrued interest (calculated in accordance with the US Foods Customer Agreement) on the amount set forth in the immediately preceding clause (i), whether such interest accrued prior to or subsequent to the Petition Date.

**B.        Rules of Interpretation and Computation of Time**

            **1.        Rules of Interpretation**. For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan or Confirmation Order; (d) any reference to an entity as a Holder of a Claim or Equity Interest includes that entity's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and exhibits are references to Sections, Articles and

exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) subject to the provisions of any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the extent not inconsistent with any other provision of this Article I.B.1.

**2.** **Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

## ARTICLE II.
## CLASSES OF CLAIMS AND EQUITY INTERESTS

All Claims and Equity Interests, except Administrative Claims and Priority Tax Claims, are placed in the following Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Article III.A, have not been classified and thus are excluded from the following Classes. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the definition of that Class and is classified in such other Class or Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the definition of such other Class or Classes. Because the Plan provides for the substantive consolidation of the Debtors, all Claims and Equity Interests are classified on a consolidated basis.

| Class | Claim | Treatment | Voting Rights |
|-------|-------|-----------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| Class 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| Class 3 | Mortgage Note Claims | Impaired | Eligible to Vote |
| Class 4 | US Foods Secured Claims | Impaired | Eligible to Vote |
| Class 5 | General Unsecured Claims | Impaired | Eligible to Vote |
| Class 6 | Equity Interests | Unimpaired | Deemed to Accept |

#4821-9763-7648

# ARTICLE III.
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.      Unclassified Claims

#### 1.      Payment of Administrative Claims

##### a.      Administrative Claims in General

Except as specified in this Article III.A.1, unless the Holder of an Administrative Claim agrees to less favorable treatment with the Debtors or Reorganized Debtors or unless a Final Order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (i) on the Effective Date, (ii) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or as soon thereafter as is reasonably practicable, or (iii) in the ordinary course of business and dealings between the Debtors and such Holder.

##### b.      Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid in Cash equal to the amount of such Administrative Claims.  All fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Reorganized Debtors in accordance therewith until the closing of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

##### c.      Ordinary Course Liabilities

Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of their business (including Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years commencing after the Petition Date and Administrative Claims arising from those contracts and leases of the kind described in Article V.C) will be paid by the Reorganized Debtors pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims.

##### d.      Professional Compensation

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court an application for final allowance of such Fee Claim by no later than 60 days after the Effective Date; provided, however, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order.

**2.** **Payment of Priority Tax Claims**. The legal, equitable and contractual rights of the Holders of Priority Tax Claims are unaltered by this Plan. Subject to Article VII hereof, on, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (ii) such other less favorable treatment as agreed to in writing by such Holder; or (iii) pursuant to and in accordance with Bankruptcy Code sections 1129(a)(9)(C) and (D), Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date; provided, further, that Priority Tax Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors without further notice to or order of the Bankruptcy Court.

**B.**   **Treatment of Classified Claims Against and Equity Interests in the Debtors**

**1.**   **Class 1: Allowed Other Secured Claims**

*Classification*: Class 1 consists of Other Secured Claims against the Debtors.

*Treatment*: Each Holder of an Allowed Other Secured Claim will be placed in a separate subclass of Class 1, and each subclass will be treated as a separate class for distribution purposes. On or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, one of the following treatments as determined by the Debtors or the Reorganized Debtors, as applicable:

> (a)     the Debtors will pay the Allowed Other Secured Claim in full in Cash;
>
> (b)     the Debtors will Reinstate the Allowed Other Secured Claim;
>
> (c)     the Debtors will treat the Allowed Other Secured Claim in a manner indubitably equivalent to the treatments set forth in subsections (a) and (b) above; or
>
> (d)     the Holder will receive such other treatment otherwise agreed to between the Holder and the Debtors.

*Voting*: Allowed Other Secured Claims are unimpaired, and the Holders of Allowed Other Secured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject this Plan.

**2.**   **Class 2: Allowed Other Priority Claims**

*Classification*: Class 2 consists of the Other Priority Claims against the Debtors.

*Treatment*: The legal, equitable and contractual rights of the Holders of Allowed Other Priority Claims are unaltered by the Plan. Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, one of the following treatments, as determined by the Debtors or the Reorganized Debtors, as applicable:

> (a)     the Debtors will pay the Allowed Other Priority Claim in full, without interest, in Cash on the Effective Date or as soon thereafter as is practicable, provided that, any Allowed Other Priority Claim that was not due and owing as of the Petition Date and is not due and owing as of the Effective Date will be paid in full in Cash when such Allowed Other Priority Claim becomes due and owing in accordance with its terms; or

#4821-9763-7648

(b)      each Allowed Other Priority Claim will be treated in any other manner so that such Claim shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.

*Voting*:  Allowed Other Priority Claims are unimpaired, and the Holders of Allowed Other Priority Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject this Plan.

### 3.      Class 3:  Allowed Mortgage Note Claims

*Classification*:  Class 3 consists of the Mortgage Note Claims.

*Consensual Treatment*:  If Class 3 Acceptance occurs, on the Effective Date, each Holder of an Allowed Mortgage Note Claim will receive, on account, and in full satisfaction, of its Allowed Mortgage Note Claim:

(a)      its respective Pro Rata share of (i) the Class 3 Consensual Cash Distribution and (ii) the New Second Lien Notes; and

(b)      the benefit of the release and injunctive provisions set forth in Article IX of this Plan.

*Cram-Down Treatment*:  If Class 3 Acceptance does not occur, on the Effective Date, each Holder of an Allowed Mortgage Note Claim will receive, on account, and in final satisfaction, of its Allowed Mortgage Note Claim, its respective Pro Rata share of (i) the Class 3 Cram-Down Cash Distribution and (ii) the Cram-Down Notes.

*Voting*:  Allowed Mortgage Note Claims are impaired, and Holders of Allowed Mortgage Note Claims are entitled to vote to accept or reject the Plan.

### 4.      Class 4:  Allowed US Foods Secured Claims

*Classification*:  Class 4 consists of the US Foods Secured Claims.

*Treatment*:  The US Foods Secured Claims shall be Allowed in the amount of (a) $210,944.10 based on US Foods' sales and deliveries of goods to the Debtors prior to the Petition Date pursuant to the US Foods Customer Agreement, invoices or otherwise, plus (b) any and all accrued interest (calculated in accordance with the US Foods Customer Agreement) on the amount set forth in the immediately preceding clause (a), whether such interest accrued prior to or subsequent to the Petition Date.  On the Effective Date, (i) the Holders of the Allowed US Foods Secured Claims shall be paid, on account of such Allowed Claims, Cash in the amount of $210,944.10, and (ii) and there shall be no payment of any accrued interest (whether accrued prior to or subsequent to the Petition Date) included in the Allowed US Foods Secured Claims.

*Voting*:  Allowed US Foods Secured Claims are impaired, and Holders of the Allowed US Foods Secured Claims are entitled to vote to accept or reject the Plan.

### 5.      Class 5:  Allowed General Unsecured Claims

*Classification*:  Class 5 consists of the General Unsecured Claims against the Debtors.

*Treatment*:  Each Holder of an Allowed General Unsecured Claim will receive, on account, and in full satisfaction of its Allowed General Unsecured Claim, payment in full in Cash to be made in four equal quarterly installments, the last of which shall occur no later than one year after the Effective Date, with interest accruing at a rate of 5.0% per annum commencing on the Petition Date through the date that the

Allowed General Unsecured Claim is paid in full, provided that, (a) there shall be no payment of any interest accrued prior to the Petition Date on any Allowed General Unsecured Claim, and (b) notwithstanding the foregoing, this provision shall not accelerate the time that any Allowed General Unsecured Claim will become due and payable, and provided further that, in the event that any distribution to be made to a Holder of an Allowed General Unsecured Claim (on account of the principal amount of such Allowed General Unsecured Claims) in the aggregate totals less than $15,000, the Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall make any such distribution in a single lump sum on the Effective Date, without interest.

*Voting*:  Allowed General Unsecured Claims are impaired, and Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 6.      Class 6:  Equity Interests

*Classification*:  Class 6 consists of the Equity Interests in the Debtors.

*Treatment*:  The legal, equitable, contractual, and ownership rights of the Holders of Equity Interests are unaltered by the Plan.  Upon the Effective Date, the Holders of Equity Interests in the Joint Venture shall retain their Equity Interest in the Joint Venture, provided that, if the business form of the Joint Venture is changed pursuant to Article IV.A, the equity in the Joint Venture, as so reconstituted, shall be held equally among the Partners.

*Voting*:  Equity Interests are unimpaired, and the Holders of Equity Interests are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Equity Interests are not entitled to vote to accept or reject this Plan.

### ARTICLE IV.
### MEANS FOR IMPLEMENTATION OF THE PLAN

### A.      Continued Existence and Vesting of Assets in the Reorganized Debtor

The Debtors will, as the Reorganized Debtors, continue to exist after the Effective Date, with all the corporate or partnership powers, as applicable, under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law, and the Debtors may enter into and consummate one or more corporate restructuring transactions, including, but not limited to, changing the business or corporate form of either or both of the Debtors and/or dissolving SLCC.  Except as otherwise provided herein, as of the Effective Date, all property of the Estates of the Debtors, and any property acquired by the Debtors or Reorganized Debtors under the Plan, will vest in the Reorganized Debtors, free and clear of all Claims, liens, charges, other encumbrances and interests, other than those (i) provided for in the New First Lien Credit Agreement and the New Second Lien Indenture, or the Cram-Down Indenture, as applicable, and the respective collateral and security documents delivered in connection the New First Lien Credit Agreement, the New Second Lien Indenture or the Cram-Down Indenture, as applicable, or (ii) otherwise expressly provided for pursuant to this Plan.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

B.      **Transactions Dependent Upon Class 3 Acceptance/Rejection**

      1.      **Class 3 Acceptance.**  If Class 3 Acceptance occurs, on the Effective Date:

      (a)      the Reorganized Debtors shall enter into the New First Lien Credit Agreement, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the continuation or creation or perfection of liens in connection therewith;

      (b)      the Reorganized Debtors shall enter into or issue, as the case may be, the New Second Lien Indenture, the New Second Lien Notes, and any documents or agreements in connection therewith, including, without limitation, any documents required in connection with the continuation or creation or perfection of liens in connection therewith; and

      (c)      the Debtors shall enter into or issue, as the case may be, the New Subordinated Notes, and any documents or agreements in connection therewith, including, without limitation, any documents required in connection with the continuation or creation or perfection of liens in connection therewith.

      2.      **Class 3 Rejection.**  If Class 3 Acceptance does not occur, on the Effective Date, the Reorganized Debtors shall enter into the Cram-Down Indenture, the Cram-Down Notes, and any documents or agreements in connection therewith, including, without limitation, any documents required in connection with the continuation or creation or perfection of liens in connection therewith.

C.      **Funding for Cash Distributions to Occur Under the Plan**

If Class 3 Acceptance occurs, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan:

      (a)      to the Holders of Allowed Mortgage Note Claims will be obtained from (i) the Available Balance Sheet Cash, (ii) the Debtors' Cash Balances, (iii) proceeds from the issuance of the New Subordinated Notes, and (iv) proceeds from borrowings under the New First Lien Credit Agreement; and

      (b)      to all other Holders of Claims entitled to payment will be obtained from the Reorganized Debtors' Cash balances.

If Class 3 Acceptance does not occur, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan:

      (a)      to the Holders of Allowed Mortgage Note Claims will be obtained from the Available Balance Sheet Cash and the Debtors' Cash Balances; and

      (b)      to all other Holders of Claims entitled to payment will be obtained from the Reorganized Debtors' Cash Balances.

D.      **Corporate Governance; Employment and Compensation**

      1.      **Articles of Incorporation, Certificate of Designations and Bylaws**

Subject to Article IV.A, the Reorganized Debtors shall continue to be bound by the existing partnership agreements, articles of incorporation and bylaws of the Debtors, as applicable, and such partnership agreements, articles of incorporation and bylaws shall, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code, except to the extent necessary to comply with applicable gaming regulations; <u>provided</u> <u>that</u>, upon or after the Effective Date the Debtors will be authorized and

empowered to amend their respective organizational documents in accordance with each Debtor's existing organizational documents and applicable law and change their corporate structure, including but not limited to reforming, with respect to each Debtor, as a corporation or limited liability company in the Reorganized Debtors' sole discretion.

### 2.    Directors and Officers of the Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial officers, directors and executive committee members, as applicable, of each Reorganized Debtor will consist of the existing officers, directors and executive committee members of such Debtor.  The tenure of each officer, director and executive committee member of the Reorganized Debtors will be governed by the terms of the existing partnership agreements, articles of incorporation, or bylaws of the Debtors, as the same may be amended from time to time in accordance with this Plan, any existing employment agreements and applicable state law.

### 3.    Employment, Retirement, Indemnification and Other Related Agreements and Management Incentive Programs

As of the Effective Date, the Reorganized Debtors will have authority to: (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active directors, executive committee members, officers and employees, subject to the terms and conditions of any such agreement; and (b) adopt, execute and implement new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees, if any, as determined by the Reorganized Debtors' directors and executive committee members, as applicable.  To the extent any existing employment, retirement, welfare, incentive, severance, indemnification or other agreement with its active directors, executive committee members, officers and employees constitutes an executory contract, such executory contract shall be assumed as of the Effective Date.

Notwithstanding the foregoing, the obligation of the Debtors to indemnify any person or entity serving at any time on the Petition Date or thereafter as one of their directors, executive committee members, officers, or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any other corporation or legal entity, to the extent provided in the Debtors' constituent documents or by a written agreement with the Debtors or in accordance with any applicable law shall be deemed and treated as executory contracts that are assumed by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.

### 4.    Corporate Action.

The Reorganized Debtors have the authority to, without further act or action under applicable law, regulation, order or rule, and shall on the Effective Date: (a) if Class 3 Acceptance occurs, (i) enter into the New First Lien Credit Agreement, (ii) enter into the New Second Lien Indenture and issue the New Second Lien Notes, and (iii) issue the New Subordinated Notes and consummate the transactions contemplated thereunder; (b) if Class 3 Acceptance does not occur, enter into the Cram-Down Indenture and issue the Cram-Down Notes;  (c) make all distributions provided for in the Plan pursuant to the terms set forth herein; and (d) adopt, execute, deliver and implement all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing.  In addition, any other matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Debtors or corporate action to be taken by or required of the Debtors or Reorganized Debtors will occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the partners, managers, directors or executive committee members of the Debtors or the Reorganized Debtors.

### E.    Preservation of Rights of Action

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized

Debtors will retain and may enforce any claims, demands, rights and Causes of Action that the Debtors or the Estates may hold against any entity, to the extent not released under Article IX.D. The Reorganized Debtors or their successors may pursue such retained claims, demands, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successors holding such claims, demands, rights or Causes of Action.

### F.    Cancellation and Surrender of Instruments, Securities and Other Documentation

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III, the Mortgage Notes and any securities, notes, documents and instruments which evidence such Claims shall (1) be canceled and (2) have no further force and effect other than the right to participate in distributions, if any, provided under the Plan in respect of such Claims, without any further action on the part of the Debtors or Reorganized Debtors.  The holders of or parties to such canceled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that no distribution under the Plan will be made to or on behalf of any holder of an Allowed Claim evidenced by such canceled instruments or securities unless and until such instruments or securities are received by the applicable Disbursing Agent or Indenture Trustee to the extent required in Article VI.H.

On the Effective Date, the Indenture shall be cancelled, except for purposes of effectuating the distributions under the Plan and allowing the Indenture Trustee to retain all charging liens pursuant to the terms of the Indenture with respect to distributions under the Plan.  Except as otherwise provided in the Plan, the Debtors, on the one hand, and the Indenture Trustee, on the other hand, will be released from any and all obligations under the Indenture except with respect to the distributions required to be made to the Indenture Trustee as provided in the Plan or with respect to such other rights of the Indenture Trustee that, pursuant to the terms of the Indenture, survive the termination of the Indenture.

### G.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The General Manager, Chief Executive Officer, President and Chief Financial Officer of the Debtors or the Reorganized Debtors, as applicable, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The Secretary of the Debtors or the Reorganized Debtors, as applicable, will be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax or similar Tax: (1) the vesting of the assets of the Estate in the Reorganized Debtors on the Effective Date; (2) the creation of any mortgage, deed of trust, lien or other security interest pursuant to the terms of the Plan; (3) the assumption of any executory contract or unexpired lease or the making or assignment of any lease or sublease; (4) if Class 3 Acceptance occurs, the entry into the New First Lien Credit Agreement and the issuance of the New Second Lien Notes; (5) if Class 3 Acceptance does not occur, the issuance of the Cram-Down Notes; or (6) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan.

### H.    Substantive Consolidation

The Debtors' request for confirmation of the Plan also is a motion by the Debtors that the Confirmation Order include provisions ordering the substantive consolidation of the Estates into a single consolidated Estate for the limited purposes of confirming and consummating the Plan, including, but not limited to, voting and distribution.  If substantive consolidation of all of the Estates is ordered, then on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Joint Venture for the limited purposes of confirming and consummating the Plan, including, but not limited to, voting and distribution.

The Debtors believe that the limited substantive consolidation provided for in the Plan is legally justified, is in the best interest of the Debtors' Estates and will promote a more expeditious and streamlined distribution and recovery process for all creditors.  As had been disclosed in the Debtors' historic public filings, SLCC was established solely for the purpose of serving as a co-issuer of the Mortgage Notes and, as such, does not have, and

has never had, any operations, assets, or revenues. Thus, SLCC's creditors, effectively treated the Debtors as a single economic unit and did not rely on the Debtors' separate identity in extending credit. In addition, the proposed substantive consolidation will not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, any contract, instrument, or other agreement or document pursuant to the Plan (including the New First Lien Credit Agreement, the New Second Lien Indenture, the New Subordinated Notes or the Cram-Down Notes, as applicable), or, any contracts or leases that were assumed or entered into during the Chapter 11 Cases. Accordingly, substantive consolidation of SLCC with the Joint Venture will not affect creditor recoveries or prejudice any creditor rights in any manner whatsoever.

### ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES

**A.      Assumption and Rejection of Executory Contracts and Unexpired Leases**

Any executory contract and unexpired lease that (i) has not expired by its own terms on or prior to the Effective Date, (ii) has not been assumed or rejected by the Debtors during the pendency of the Chapter 11 Cases, (iii) is not listed in a Plan Supplement as executory contracts or unexpired leases to be rejected, and (iv) is not the subject of a pending motion to reject such executory contract or unexpired lease, shall be deemed assumed by the Debtors as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumption pursuant to section 365(a) and 1123 of the Bankruptcy Code. Any executory contract or unexpired lease listed in a Plan Supplement as an executory contract or unexpired lease to be rejected by the Debtors shall be deemed rejected by the Debtors as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

All proofs of claim arising from the rejection (if any) of executory contracts or unexpired leases must be filed with the Claims Agent by no later than 30 days after the earlier of:  (i) the date of entry of an order of the Bankruptcy Court approving any such rejection and (ii) the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease for which no proof of claim was timely filed will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates and property. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunctions set forth in this Plan.

**C.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan**

Any monetary amounts by which an executory contract or unexpired lease to be assumed pursuant to this Plan is in default shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of any dispute regarding the amount of any cure payments, (i) the Bankruptcy Court will retain jurisdiction to adjudicate any such dispute, and (ii) if the Bankruptcy Court determines that any such disputed cure amount is required to be paid (in full or in part) by the Debtors pursuant to section 365(b)(1) of the Bankruptcy Code, the Debtors will pay such cure amount in the ordinary course following entry of the Bankruptcy Court's Final Order resolving such cure dispute, provided that, the Debtor or Reorganized Debtor shall have the right, following entry of such a Final Order fixing a cure amount (if any) to reject the applicable executory contract or unexpired lease and any such rejection shall be deemed to have occurred immediately prior to the Effective Date.

**D.      Insurance Policies**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

**A.      Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in this Plan, distributions to Holders of Claims that are Allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (i) 60 days after the Effective Date or (ii) such later date when the applicable conditions of Article V.C (regarding cure payments for executory contracts and unexpired leases being assumed), Article VI.D.2 (regarding undeliverable distributions) or Article VI.H (regarding surrender of canceled instruments and securities) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Article VII.C.

**B.      Method of Distributions to Holders of Claims**

The Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion, and the Indenture Trustee with respect to distributions to Holders of Allowed Mortgage Note Claims, will make all distributions of Cash and other instruments or documents required under the Plan. Each Disbursing Agent and the Indenture Trustee will serve without bond, and any Disbursing Agent or the Indenture Trustee may employ or contract with other entities to assist in or make the distributions required by the Plan.

On the Effective Date, the Reorganized Debtors shall coordinate with the Indenture Trustee to effectuate the delivery of (i) if Class 3 Acceptance occurs, the New Second Lien Notes and Cash distributions required under the Plan, or (ii) if Class 3 Acceptance does not occur, the Cram-Down Notes and Cash distributions required under the Plan, to the Holders of Allowed Mortgage Note Claims.

**C.      Compensation and Reimbursement for Services Related to Distributions**

Each Third Party Disbursing Agent providing services related to distributions pursuant to the Plan will receive from the Reorganized Debtors, without further Bankruptcy Court approval, such reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services as may be agreed to by the Debtors or Reorganized Debtors. These payments will be made on terms agreed to with Reorganized Debtors and will not be deducted from distributions to be made pursuant to the Plan to Holders of Allowed Claims receiving distributions from a Third Party Disbursing Agent.

The Indenture Trustee shall not be required to give any bond or surety or other security for the performance of its duties as Disbursing Agent or stock transfer agent unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent or stock transfer agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

**D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1.      Delivery of Distributions**

Each distribution to a Holder of an Allowed Claim entitled to distribution will be made by the Disbursing Agent to the address set forth in (a) such Holder's proof of claim (if any) or (b) the Debtors' schedules of assets and liabilities, provided that, the Indenture Trustee will make distributions to Holders of Allowed Mortgage Note Claims in accordance with the addresses contained in its records.

**2.      Undeliverable Distributions Held by Disbursing Agents and Indenture Trustee**

**a.      Holding of Undeliverable Distributions**

Subject to Article VI.D.2.c, undeliverable distributions will remain in the possession of the applicable Disbursing Agent or Indenture Trustee pursuant to this Article VI.D.2.a until such time as a distribution becomes

17

deliverable.  Subject to Article VI.D.2.c, undeliverable New Second Lien Notes or Cram-Down Notes, as applicable, will be held by the Indenture Trustee for the benefit of the potential claimants of such securities.

### b.    After Distributions Become Deliverable

The Disbursing Agent or Indenture Trustees, as applicable, will promptly make all distributions that become deliverable to Holders of Allowed Claims.

### c.    Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable distribution to be made by the Disbursing Agent or Indenture Trustee within two years after the Effective Date will have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against the Reorganized Debtors or their property.  If any New Second Lien Notes or Cram-Down Notes, as applicable, remain unclaimed at the end of such period, those New Second Lien Notes or Cram-Down Notes, as applicable, will be surrendered to the Reorganized Debtors for cancellation. Nothing contained in the Plan will require the Debtors, Reorganized Debtors, Disbursing Agent or Indenture Trustee to attempt to locate any holder of an Allowed Claim.

### E.    Distribution Record Date

The Debtors, Reorganized Debtors, Disbursing Agent or Indenture Trustee will have no obligation to recognize the transfer or sale of any Mortgage Note Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those Holders of Mortgage Note Claims who are Holders of such Claims as of the close of business on the Distribution Record Date.

### F.    Means of Cash Payments

Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Debtors or Reorganized Debtors or, at the option of the Debtors or Reorganized Debtors, by wire transfer from a domestic bank; provided that, Cash payments to foreign holders of Allowed Claims may be made, at the option of the Debtors or Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### G.    Minimum Distributions

In the event that any distribution to be made to a Holder of an Allowed General Unsecured Claim (on account of the principal amount of such Allowed General Unsecured Claims) in the aggregate totals less than $15,000, the Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall make any such distribution in a single lump sum on the Effective Date, without interest.

### H.    Surrender of Canceled Instruments or Securities

**1.    Tender of Mortgage Notes**.  Except as provided in Article VI.H.2 for lost, stolen, mutilated or destroyed Mortgage Notes, as a precondition to receiving any distributions provided for under the Plan, each Holder of an Allowed Mortgage Note Claim must tender the applicable Mortgage Notes to the Indenture Trustee in accordance with a letter of transmittal to be provided to such Holders by the Indenture Trustee as promptly as practicable following the Effective Date.  All surrendered Mortgage Notes will be marked as canceled and delivered.

**2.    Lost, Stolen, Mutilated or Destroyed Mortgage Notes**.  Any Holder of an Allowed Mortgage Note Claim with respect to which the underlying Mortgage Notes have been lost, stolen, mutilated or destroyed must, in lieu of surrendering such notes, deliver to the Indenture Trustee: (a) evidence satisfactory to the Indenture Trustee of the loss, theft, mutilation or destruction and (b) such security or indemnity as may be required by the Indenture Trustee to hold the Indenture Trustee and the Reorganized Debtors harmless from any damages,

liabilities or costs incurred in treating such individual as a Holder of an Allowed Mortgage Note Claim.  Upon compliance with this Article VI.H.2 by a Holder of an Allowed Mortgage Note Claim, such Holder will, for all purposes under the Plan, be deemed to have surrendered the applicable Mortgage Note.

       **3.**      **Failure to Surrender Mortgage Notes**.  Any Holder of an Allowed Mortgage Note Claim that fails to surrender or is deemed not to have surrendered the applicable Mortgage Notes within two years after the Effective Date will to the fullest extent permitted by law have its right to distributions pursuant to the Plan on account of such notes discharged and will be forever barred from asserting any such Claim against the Reorganized Debtors or their respective property.  In such case, any New Second Lien Notes or Cram-Down Notes, as applicable, held for distribution on account of such Allowed Mortgage Note Claim will be treated pursuant to the provisions set forth in Article VI.D.2.c.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

**A.**      **Prosecution of Objections to Claims**

Pursuant to the Bar Date Order, the Bankruptcy Court established [August 17], 2012 as the general deadline for filing proofs of Claim against the Debtors or the Estates, as well as certain other deadlines and procedures relating to the filing of proofs of Claim.  After the Confirmation Date, only the Debtors or the Reorganized Debtors, as applicable, will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  After the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**B.**      **Treatment of Disputed Claims**

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of a Disputed Claims until such Claim becomes an Allowed Claim.

**C.**      **Distributions on Account of Disputed Claims Once Allowed**

The Disbursing Agent or Indenture Trustee, as applicable, will promptly make all distributions on account of any Disputed Claim that has become an Allowed Claim. Such distributions will be made pursuant to the provisions of the Plan governing the applicable Class.

**D.**      **Estimation**

The Debtors or the Reorganized Debtors, as the case may be, may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. If the Bankruptcy Court estimates any Disputed Claim, such estimated amount may constitute either (i) the Allowed amount of such Claim, (ii) the amount on which a reserve is to be calculated for purposes of any reserve requirement under the Plan, or (iii) a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as the case may be, may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

**A.    Conditions Precedent to Confirmation**

The Confirmation of this Plan shall be conditioned upon, and shall not occur, unless and until each of the following conditions have been satisfied or waived pursuant to the terms of this Article VIII:

(i)    The Bankruptcy Court shall have entered a Final Order, in form and in substance acceptable to the Debtors, approving the Disclosure Statement with respect to this Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(ii)    This Plan and all schedules, documents, supplements and exhibits relating to this Plan, including, but not limited to, any Plan Supplement, shall have been filed in form and in substance acceptable to the Debtors and, if Class 3 Acceptance occurs, reasonably acceptable to the Required Consenting Mortgage Noteholders.

(iii)    The proposed Confirmation Order shall be in form and substance acceptable to the Debtors and, if Class 3 Acceptance occurs, reasonably acceptable to the Required Consenting Mortgage Noteholders.

**B.    Conditions Precedent to the Effective Date**

The Effective Date shall be conditioned upon, and shall not occur, and the Plan shall not be consummated unless and until each of the following conditions have been satisfied or waived pursuant to the terms of this Article VIII:

(i)    The Confirmation Order, in form and substance acceptable to the Debtors, shall have become a Final Order.

(ii)    If Class 3 Acceptance occurs, the New First Lien Credit Agreement and the other documents effectuating the New First Lien Credit Agreement shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Required Consenting Mortgage Noteholders and shall have been executed and delivered by the parties thereto.

(iii)    If Class 3 Acceptance occurs, the New Second Lien Indenture, the New Second Lien Notes and the other documents effectuating the New Second Lien Indenture shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Required Consenting Mortgage Noteholders and shall have been executed and delivered by the parties thereto.

(iv)    If Class 3 Acceptance occurs, the New Subordinated Notes and the other documents effectuating the New Subordinated Notes shall be acceptable in form and substance to the Debtors and the Partners and shall have been executed and delivered by the parties thereto.

(v)    If Class 3 Acceptance does not occur, the Cram-Down Indenture, the Cram-Down Notes and the other documents effectuating the Cram-Down Notes shall be acceptable in form and substance to the Debtors and shall have been executed and delivered by the parties thereto.

(vi)    The Debtors or the Reorganized Debtors, as applicable, shall have paid in Cash in full all of the Prepetition Payments (as defined in the Cash Collateral Stipulation) and Adequate Protection Payments (as defined in the Cash Collateral Stipulation) that are due and owing as of the Effective Date; provided that, as to any Adequate Protection Payments that have not been invoiced to the Debtors at least five (5) Business Days in advance of the Effective Date, the Debtors may pay such Adequate Protection Payments as soon as practicable after the Effective Date and such payment

#4821-9763-7648

after the Effective Date shall not be deemed a failure of the condition set forth in this Article VIII.B(vi).

(vii)    All actions necessary to implement this Plan shall have been completed.

(viii)    All material consents, actions, documents, certificates and agreements necessary to implement this Plan, including any required governmental or regulatory consents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

### C.    Waiver of Conditions Precedent

The Debtors shall have the right to waive any of the conditions precedent set forth in Article VIII of this Plan at any time without leave of or notice to the Bankruptcy Court and without any formal action other than proceeding with consummation of this Plan.  Further, the stay of the Confirmation Order, pursuant to Bankruptcy Rule 3020(e), shall be deemed waived by entry of the Confirmation Order; provided that, (i) if Class 3 Acceptance occurs, any waiver of the conditions set forth in Article VIII.B(ii) and (iii) shall require the consent of the Required Consenting Mortgage Noteholders (such consent not to be unreasonably withheld) and (ii) any waiver of the conditions set forth in Article VIII.B(vi) shall require the consent of the Indenture Trustee.

### D.    Effect of Nonoccurrence of Conditions to the Effective Date

Subject to Article XI.C, if each of the conditions to the Effective Date is not satisfied, then upon motion by the Debtors or any party in interest made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Article VIII.D, (1) the Plan will be null and void in all respects, including with respect to: (a) the discharge of Claims pursuant to section 1141 of the Bankruptcy Code; (b) the assumptions of Executory Contracts and Unexpired Leases pursuant to Article V.A; and (c) the releases described in Article IX.D; and (2) nothing contained in the Plan will: (a) constitute a waiver or release of any Claims by or against, or any Equity Interest in, the Debtors; or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

### ARTICLE IX.
### DISCHARGE, RELEASES, INJUNCTION
### AND SETTLEMENT

### A.    Discharge of Claims

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims against the Debtors arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

### B.    Claims Enjoined

Except as provided in the Plan or the Confirmation Order or agreed to by the Debtors or the Reorganized Debtors, as of the Effective Date all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Plan will be permanently enjoined from taking any enforcement actions on account of any such discharged Claim, debt or other liability, including, but not limited to,

21

(i) commencing or continuing in any manner any action or other proceeding, (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (iii) creating, perfecting or enforcing any lien or encumbrance, (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors, and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the terms of the Plan.

C.      **Global Settlement**

Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement, and the Plan constitutes a request to authorize and approve such compromise and settlement, of all Claims among the Debtors, the Reorganized Debtors, the Released Parties and any Person (the "Global Settlement"). Any distributions or contributions (including the proceeds from the New Subordinated Notes) to be made pursuant to the Plan shall be made on account of and in consideration of the Global Settlement, which, upon the Effective Date of the Plan, shall be binding on the Debtors and their Estates, the Reorganized Debtors, the Released Parties and all Holders of Claims against and Equity Interests in any Debtor. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the Global Settlement and the Bankruptcy Court's finding that the Global Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests, and that the Global Settlement is fair, equitable, and reasonable, and otherwise satisfies the requirements of Bankruptcy Rule 9019.

D.      **Releases**

As of the Effective Date, each of the Released Parties and each of their respective Related Persons shall be, and shall be deemed to be, released from all claims owned, held, or which could have been, or may be asserted by, any other Released Party whether prior to or subsequent to the Petition Date but in all cases not subsequent to the Effective Date arising from or related to the Debtors, their assets, businesses, property or estates, the Chapter 11 Cases, the Disclosure Statement, this Plan or the solicitation of votes on this Plan; provided that, nothing herein will in any way limit or modify any and all debts or obligations of the Released Parties or the substantial consummation obligations of the Released Parties, as required under the Plan, all agreements entered into in connection with the Plan, or any prior order of the Bankruptcy Court. As of the Effective Date, for good and valuable consideration, including, but not limited to, the funding under the New Subordinated Notes, each Holder of a Claim or Equity Interest shall, and shall be deemed to, release the Released Parties and each of their respective Related Persons from any and all claims, whether arising prior to or subsequent to the Petition Date but in all cases not subsequent to the Effective Date arising from or related to the Debtors, their assets, businesses, property or estates, the Chapter 11 Cases, the Disclosure Statement, this Plan or the solicitation of votes on this Plan; provided that, these releases will have no effect on the liability of any Released Party arising out of gross negligence or willful misconduct; and provided further that, nothing herein will in any way limit or modify any and all debts or obligations owed to such a Holder pursuant to this Plan or prior order of the Bankruptcy Court. As used in this paragraph, "claims" shall include, without limitation, any and all claims, debts, demands, obligations, rights, causes of action, or liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, suspected or unsuspected, foreseen or unforeseen, now existing or hereafter arising, in law, equity or otherwise (including, but not limited to, those arising under section 541-550 of the Bankruptcy Code). It is the intent of the parties that this release be general and interpreted as broadly as possible under applicable law.

E.      **Exculpation**

The Released Parties and each of their respective Related Persons shall incur no liability to any Holder of a Claim or Equity Interest for any act, event, or omission in connection with, or arising out of, the Chapter 11 Cases, the Confirmation of the Plan, the solicitation in connection with the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, in each case relating to any fact or circumstance existing prior to or as of the Effective Date. The Debtors and their Related Persons have, and are deemed to have, participated in good faith (within the meaning of section 1125(e) of the Bankruptcy Code) and in compliance with the applicable provisions of the Bankruptcy Code with respect to the solicitation of acceptances or rejections of the Plan and the distributions made pursuant to the Plan. Specifically, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their Related Persons shall not have any liability for any violation of any

applicable law, rule or regulation arising from or connected with (i) the transmittal of solicitation packages (including transmittal of the Plan and Disclosure Statement), (ii) the solicitation of votes to accept or reject the Plan, or (iii) the offer, issuance, sale or purchase of any securities offered or sold under or in connection with the Plan.

F.    **Supplemental Injunction**

*In order to preserve and promote the settlements contemplated by and provided for in the Plan and as described in this Article, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons and any Person claiming by or through them, which have held or asserted, which currently hold or assert, or which may hold or assert any Claims or any other Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies, or liabilities of any nature whatsoever, and all Equity Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Equity Interest in any of the Debtors, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other Causes of Action, obligations, suits, judgments, damages, debts, rights remedies or liability, and all Equity Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date, including, but not limited to (i) commencing or continuing in any manner any action or other proceeding, (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (iii) creating, perfecting or enforcing any lien or encumbrance, (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Released Party, and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the terms of the Plan.*

Bankruptcy Rule 3016 Compliance.  The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

Consent to Injunction.  By accepting distributions pursuant to the Plan, each Holder of a Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this Article.

**ARTICLE X.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

i.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance, priority or classification of Claims or Equity Interests;

ii.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

iii.    Resolve any matters related to the assumption of any executory contract and unexpired lease to which a Debtor is a party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any disputed cure amount;

iv.    Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

#4821-9763-7648

v. Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors or the Reorganized Debtors that may be pending on the Effective Date or brought thereafter prior to the closing of the Chapter 11 Cases;

vi. Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

vii. Resolve any case, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

viii. Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, the Plan Supplement, or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement, the Plan Supplement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

ix. Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

x. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

xi. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; and

xii. Enter a final decree closing the Chapter 11 Cases.

## ARTICLE XI.
## MISCELLANEOUS PROVISIONS

### A.    Dissolution of Committee

On the Effective Date, the Committee will dissolve and the members of the Committee and any of its Professionals will be released and discharged from all duties and obligations arising from or related to the Chapter 11 Cases. The Professionals retained by the Committee and the respective members thereof will not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Article III.A.1.d and in connection with any appeal of the Confirmation Order.

### B.    Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, upon not less than ten days' prior written notice, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend or modify the Plan before its substantial consummation; provided that if Class 3 Acceptance occurs, any alterations, amendments or modifications of the Plan shall require the consent of the Required Consenting Mortgage

Noteholders (such consent not to be unreasonably withheld). In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Claims or Equity Interests pursuant to this Plan, the Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Confirmation Order or any related documents, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan.

### C.    Revocation of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors, (2) prejudice in any manner the rights of the Debtors or any other party in interest, or (3) constitute an admission of any sort by the Debtors of any other party in interest.

### D.    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan to the extent that the general intent of the Plan can be effectuated will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### E.    Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### F.    Issuance of Notes Under Plan

The issuance of the Second Lien Notes or the Cram-Down Notes, as applicable, to the Holders of Allowed Mortgage Note Claims shall be exempt from registration under the Securities Act of 1933, as amended and similar state or local laws pursuant to section 1145 of the Bankruptcy Code. The Confirmation Order shall include a finding and conclusion, binding upon all parties to the Chapter 11 Cases, the Securities and Exchange Commission and all state regulatory enforcement agencies, to the effect that such offer, issuance and sale fall within the exemption set forth in section 1145 of the Bankruptcy Code.

*[The remained of this page intentionally left blank.]*

**G.      Filing of Additional Documents**

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

Dated: June 29, 2012

Respectfully submitted,

**CIRCUS AND ELDORADO JOINT VENTURE**

By:              *Stephanie S. Lepori  /s/*
Name:        Stephanie Lepori
Title:          Chief Accounting and Financial Officer

**SILVER LEGACY CAPITAL CORP.**

By:              *Stephanie S. Lepori  /s/*
Name:        Stephanie Lepori
Title:          Chief Accounting and Financial Officer

#4821-9763-7648

**EXHIBIT B**

**Financial Projections**

**Financial Projections**

Reference is made to the *Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization (Dated June 1, 2012)* (the "Disclosure Statement") to which these Financial Projections are attached. Capitalized terms used and not otherwise defined herein shall have those meanings ascribed to them in the Disclosure Statement. The Financial Projections should be considered in conjunction with, and are subject to, the Disclosure Statement (including, but not limited to, the "Risk Factors" set forth in Section VII of the Disclosure Statement), the Plan and the Plan Supplement, each of which is incorporated by reference herein.

The Financial Projections consist of a projected statement of operations (the "Income Statement"), a projected, pro forma statement of financial position (the "Balance Sheet"), and a projected cash flow statement (the "Cash Flow Statement") for the time period from January 1, 2012 through December 31, 2016.[1] The Financial Projections are based on the actual and projected results of the Debtors' and Reorganized Debtors' ongoing business operations for the forecast period. Projected results for the fiscal year ending December 31, 2012 are shown on a full year basis and for the quarter ending December 31, 2012 based on an assumed Effective Date for the Plan of September 30, 2012, which Effective Date was assumed for purposes of the Financial Projections. The Financial Projections are based on the Debtors' 2012 business plan adjusted for actual financial performance through May 2012 and an updated outlook for the rest of the year as of June 2012. The Financial Projections are presented for two scenarios: (i) a Plan that effectuates the Consensual Treatment alternative for Class 3: Allowed Mortgage Note Claims; and (ii) a Plan that effectuates the Cram-Down Treatment alternative for Class 3: Allowed Mortgage Note Claims.[2] Additionally, a balance sheet (the "Pro Forma Balance Sheet") has been provided as of the assumed Effective Date of September 30, 2012 with pro forma adjustments to account for the reorganization and related transactions pursuant to the Plan. The Balance Sheet may not be in accordance with generally accepted accounting practices.

THE DEBTORS' MANAGEMENT PREPARED THE FINANCIAL PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH FINANCIAL PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS ("AICPA") OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER COMPILED NOR EXAMINED THE FINANCIAL PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH FINANCIAL PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF

---

[1] The Balance Sheet is projected as of September 30, 2012, and thereafter annually at the end of each calendar year.

[2] See Section III of the Disclosure Statement for a discussion of the alternative treatment scenarios for Class 3.

#4839-9208- 47522

ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS OR THE REORGANIZED DEBTORS, INCLUDING THE CONSUMMATION AND IMPLEMENTATION OF THE PLAN, ACHIEVING OPERATING EFFICIENCIES, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE VII OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS"), AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE DEBTORS' OR REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE DEBTORS' OR REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE ON WHICH THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

SCENARIO 1

PLAN EFFECTUATES CONSENSUAL TREATMENT
OF CLASS 3: ALLOWED MORTGAGE NOTE CLAIMS

## REORGANIZED DEBTORS' PROJECTED INCOME STATEMENT
### (CONSENSUAL SCENARIO)

| ($ in millions) | 10/1/2012 Thru 12/31/12 | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2012E | 2013E | 2014E | 2015E | 2016E |
| **Revenue** | | | | | | |
| Casino | $14.4 | $62.2 | $66.1 | $67.1 | $68.1 | $69.4 |
| Rooms | 6.6 | 30.7 | 32.8 | 33.3 | 33.5 | 34.5 |
| Food & Beverage | 7.8 | 32.0 | 34.0 | 34.5 | 35.0 | 35.7 |
| Other | 1.9 | 8.0 | 8.5 | 8.6 | 8.7 | 8.9 |
| **Gross Revenue** | **$30.7** | **$132.8** | **$141.4** | **$143.5** | **$145.4** | **$148.4** |
| Less: Promotional Allowances | (4.1) | (17.0) | (18.1) | (18.4) | (18.6) | (19.0) |
| **Net Revenue** | **$26.6** | **$115.8** | **$123.3** | **$125.2** | **$126.7** | **$129.4** |
| **Operating Expenses** | | | | | | |
| Casino | $6.1 | $24.6 | $25.9 | $26.3 | $26.7 | $27.1 |
| Rooms | 2.6 | 11.2 | 11.9 | 12.1 | 12.2 | 12.5 |
| Food & Beverage | 7.1 | 28.3 | 30.1 | 30.6 | 31.1 | 31.6 |
| Other Operating | 1.8 | 6.8 | 7.2 | 7.2 | 7.3 | 7.5 |
| Selling, General and Administrative | 6.8 | 27.7 | 28.7 | 29.1 | 29.5 | 30.0 |
| Depreciation | 3.2 | 12.8 | 11.4 | 10.9 | 10.3 | 10.1 |
| **Total Operating Expenses** | **$27.6** | **$111.4** | **$115.2** | **$116.2** | **$117.1** | **$118.9** |
| **Operating Income** | **($1.0)** | **$4.4** | **$8.1** | **$9.0** | **$9.6** | **$10.5** |
| **Other (Income) Expenses** | | | | | | |
| Interest Expense, Net | $2.7 | $13.6 | $10.6 | $10.5 | $11.1 | $11.4 |
| Professional Fees | -- | 8.8 | -- | -- | -- | -- |
| Other Expenses / (Income) | -- | (0.6) | -- | -- | -- | -- |
| (Gain) / Loss on Extinguishment of Debt | -- | (22.5) | -- | -- | -- | -- |
| **Total Other (Income) Expenses** | **$2.7** | **($0.7)** | **$10.6** | **$10.5** | **$11.1** | **$11.4** |
| **Net Income** | **($3.6)** | **$5.0** | **($2.5)** | **($1.5)** | **($1.5)** | **($0.9)** |
| **EBITDA[3]** | **$2.2** | **$17.1** | **$19.5** | **$19.9** | **$19.9** | **$20.6** |

---

[3] Defined as Net Income plus interest expense (net), depreciation, professional fees, other expenses/(income) and (gain)/loss of extinguishment of debt.

#4839-9208- 47525

## REORGANIZED DEBTORS' PROJECTED BALANCE SHEET STATEMENT
## (CONSENSUAL SCENARIO)

| ($ in millions) | Projected 9/30/2012 | Adjustments | Pro Forma 9/30/2012 | Fiscal Year Ended December 31, 2012E | 2013E | 2014E | 2015E | 2016E |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash and Cash Equivalents | $32.3 | ($22.3) | $10.0 | $12.0 | $14.0 | $15.6 | $16.9 | $19.5 |
| Accounts Receivable | 3.0 | -- | 3.0 | 3.0 | 3.2 | 3.3 | 3.3 | 3.4 |
| Inventories | 2.0 | -- | 2.0 | 2.0 | 2.2 | 2.2 | 2.2 | 2.3 |
| Prepaid Expense and Other | 5.9 | -- | 5.9 | 3.5 | 3.7 | 3.8 | 3.8 | 3.9 |
| **Current Assets** | **$43.4** | **($22.3)** | **$21.0** | **$20.6** | **$23.1** | **$24.8** | **$26.3** | **$29.0** |
| | | | | | | | | |
| Property and Equipment, Net | $209.1 | $-- | $209.1 | $206.8 | $197.9 | $192.0 | $187.7 | $183.6 |
| Other Assets | 8.8 | 2.4 | 11.2 | 11.0 | 10.3 | 9.7 | 9.0 | 8.3 |
| **Total Assets** | **$261.3** | **($20.0)** | **$241.3** | **$238.4** | **$231.3** | **$226.5** | **$223.0** | **$220.9** |
| | | | | | | | | |
| **Liabilities** | | | | | | | | |
| Accounts Payable | $6.4 | ($1.3) | $5.1 | $4.8 | $3.6 | $3.7 | $3.7 | $3.8 |
| Accrued Expenses | 8.8 | -- | 8.8 | 8.7 | 9.1 | 9.2 | 9.3 | 9.4 |
| Accrued Interest | 10.8 | (10.8) | -- | -- | -- | -- | -- | -- |
| **Current Liabilities** | **$26.1** | **($12.2)** | **$13.9** | **$13.6** | **$12.7** | **$12.9** | **$13.0** | **$13.2** |
| | | | | | | | | |
| Mortgage Notes | $142.8 | ($142.8) | $-- | $-- | $-- | $-- | $-- | $-- |
| New First Lien Term Loan Facility | -- | 70.0 | 70.0 | 70.0 | 62.0 | 54.0 | 46.0 | 38.0 |
| New Second Lien Notes | -- | 27.5 | 27.5 | 28.3 | 31.8 | 35.6 | 40.6 | 46.3 |
| New Subordinated Notes | -- | 15.0 | 15.0 | 15.2 | 16.0 | 16.8 | 17.6 | 18.5 |
| Other Long-Term Liabilities | 10.4 | -- | 10.4 | 10.4 | 10.4 | 10.4 | 10.4 | 10.4 |
| **Total Liabilities** | **$179.3** | **($42.5)** | **$136.8** | **$137.5** | **$132.9** | **$129.7** | **$127.6** | **$126.4** |
| Equity | 82.0 | 22.5 | 104.5 | 100.9 | 98.4 | 96.9 | 95.4 | 94.5 |
| **Total Liabilities and Equity** | **$261.3** | **($20.0)** | **$241.3** | **$238.4** | **$231.3** | **$226.5** | **$223.0** | **$220.9** |

REORGANIZED DEBTORS' PROJECTED CASH FLOW STATEMENT
(CONSENSUAL SCENARIO)

| ($ in millions) | 10/1/2012 Thru 12/31/12 | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2012E | 2013E | 2014E | 2015E | 2016E |
| **Operating Activities** | | | | | | |
| Net Income | ($3.6) | $5.0 | ($2.5) | ($1.5) | ($1.5) | ($0.9) |
| Depreciation | 3.2 | 12.8 | 11.4 | 10.9 | 10.3 | 10.1 |
| Amortization of Financing Fees | 0.2 | 0.2 | 0.7 | 0.7 | 0.7 | 0.7 |
| Non-Cash Interest Expense | 1.0 | 1.0 | 4.3 | 4.6 | 5.8 | 6.6 |
| Change in Accrued Interest Liability | -- | (4.7) | -- | -- | -- | -- |
| Change in Working Capital | 2.1 | 0.2 | (1.4) | 0.0 | 0.0 | 0.0 |
| (Gain) / Loss on Extinguishment of Debt | -- | (22.5) | -- | -- | -- | -- |
| **Cash from Operating Activities** | **$2.8** | **($8.0)** | **$12.4** | **$14.6** | **$15.4** | **$16.5** |
| **Investing Activities** | | | | | | |
| Capital Expenditure | ($0.8) | ($2.5) | ($2.5) | ($5.0) | ($6.0) | ($6.0) |
| **Cash from Investing Activities** | **($0.8)** | **($2.5)** | **($2.5)** | **($5.0)** | **($6.0)** | **($6.0)** |
| **Financing Activities** | | | | | | |
| Mortgage Notes | $-- | ($92.8) | $-- | $-- | $-- | $-- |
| New First Lien Term Loan Facility | -- | 70.0 | (8.0) | (8.0) | (8.0) | (8.0) |
| New Subordinated Notes | -- | 15.0 | -- | -- | -- | -- |
| Financing Fees | -- | (3.3) | -- | -- | -- | -- |
| **Cash from Financing Activities** | **$--** | **($11.2)** | **($8.0)** | **($8.0)** | **($8.0)** | **($8.0)** |
| Beginning Cash | $10.0 | $33.7 | $12.0 | $14.0 | $15.6 | $16.9 |
| Change in Cash | 2.0 | (21.7) | 1.9 | 1.6 | 1.4 | 2.5 |
| **Ending Cash** | **$12.0** | **$12.0** | **$14.0** | **$15.6** | **$16.9** | **$19.5** |

#4839-9208- 47527

SCENARIO 2

PLAN EFFECTUATES CRAM-DOWN TREATMENT
OF CLASS 3: ALLOWED MORTGAGE NOTE CLAIMS

REORGANIZED DEBTORS' PROJECTED INCOME STATEMENT
(CRAM-DOWN SCENARIO)

| ($ in millions) | 10/1/2012 Thru 12/31/12 | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2012E | 2013E | 2014E | 2015E | 2016E |
| **Revenue** | | | | | | |
| Casino | $14.4 | $62.2 | $66.1 | $67.1 | $68.1 | $69.4 |
| Rooms | 6.6 | 30.7 | 32.8 | 33.3 | 33.5 | 34.5 |
| Food & Beverage | 7.8 | 32.0 | 34.0 | 34.5 | 35.0 | 35.7 |
| Other | 1.9 | 8.0 | 8.5 | 8.6 | 8.7 | 8.9 |
| **Gross Revenue** | **$30.7** | **$132.8** | **$141.4** | **$143.5** | **$145.4** | **$148.4** |
| Less:  Promotional Allowances | (4.1) | (17.0) | (18.1) | (18.4) | (18.6) | (19.0) |
| **Net Revenue** | **$26.6** | **$115.8** | **$123.3** | **$125.2** | **$126.7** | **$129.4** |
| **Operating Expenses** | | | | | | |
| Casino | $6.1 | $24.6 | $25.9 | $26.3 | $26.7 | $27.1 |
| Rooms | 2.6 | 11.2 | 11.9 | 12.1 | 12.2 | 12.5 |
| Food & Beverage | 7.1 | 28.3 | 30.1 | 30.6 | 31.1 | 31.6 |
| Other Operating | 1.8 | 6.8 | 7.2 | 7.2 | 7.3 | 7.5 |
| Selling, General and Administrative | 6.8 | 27.7 | 28.7 | 29.1 | 29.5 | 30.0 |
| Depreciation | 3.2 | 12.8 | 11.4 | 10.9 | 10.3 | 10.1 |
| **Total Operating Expenses** | **$27.6** | **$111.4** | **$115.2** | **$116.2** | **$117.1** | **$118.9** |
| **Operating Income** | **($1.0)** | **$4.4** | **$8.1** | **$9.0** | **$9.6** | **$10.5** |
| **Other (Income) Expenses** | | | | | | |
| Interest Expense, Net | $2.4 | $13.3 | $9.6 | $9.6 | $9.6 | $9.5 |
| Professional Fees | -- | 8.8 | -- | -- | -- | -- |
| Other Expenses / (Income) | -- | (0.6) | -- | -- | -- | -- |
| **Total Other (Income) Expenses** | **$2.4** | **$21.6** | **$9.6** | **$9.6** | **$9.6** | **$9.5** |
| **Net Income** | **($3.4)** | **($17.2)** | **($1.4)** | **($0.6)** | **$0.1** | **$0.9** |
| **EBITDA[4]** | **$2.2** | **$17.1** | **$19.5** | **$19.9** | **$19.9** | **$20.6** |

---

[4] Defined as net income plus interest expense (net), depreciation, professional fees, other expenses/(income) and (gain)/loss of extinguishment of debt.

#4839-9208- 47529

## REORGANIZED DEBTORS' PROJECTED BALANCE SHEET STATEMENT
## (CRAM-DOWN SCENARIO)

| ($ in millions) | Projected 9/30/2012 | Adjustments | Pro Forma 9/30/2012 | Fiscal Year Ended December 31, 2012E | 2013E | 2014E | 2015E | 2016E |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash and Cash Equivalents | $33.3 | ($23.3) | $10.0 | $13.5 | $19.5 | $24.8 | $29.2 | $34.3 |
| Accounts Receivable | 3.0 | -- | 3.0 | 3.0 | 3.2 | 3.3 | 3.3 | 3.4 |
| Inventories | 2.0 | -- | 2.0 | 2.0 | 2.2 | 2.2 | 2.2 | 2.3 |
| Prepaid Expense and Other | 5.9 | -- | 5.9 | 3.5 | 3.7 | 3.8 | 3.8 | 3.9 |
| **Current Assets** | **$44.3** | **($23.3)** | **$21.0** | **$22.1** | **$28.7** | **$34.1** | **$38.6** | **$43.9** |
| | | | | | | | | |
| Property and Equipment, Net | $209.1 | $-- | $209.1 | $206.8 | $197.9 | $192.0 | $187.7 | $183.6 |
| Other Assets | 7.8 | -- | 7.8 | 7.8 | 7.8 | 7.8 | 7.8 | 7.8 |
| **Total Assets** | **$261.3** | **($23.3)** | **$238.0** | **$236.7** | **$234.4** | **$234.0** | **$234.2** | **$235.3** |
| | | | | | | | | |
| **Liabilities** | | | | | | | | |
| Accounts Payable | $6.4 | ($1.3) | $5.1 | $4.8 | $3.6 | $3.7 | $3.7 | $3.8 |
| Accrued Expenses | 8.8 | -- | 8.8 | 8.7 | 9.1 | 9.2 | 9.3 | 9.4 |
| Accrued Interest | 10.8 | (10.8) | -- | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 |
| **Current Liabilities** | **$26.1** | **($12.2)** | **$13.9** | **$16.0** | **$15.1** | **$15.3** | **$15.4** | **$15.6** |
| | | | | | | | | |
| Mortgage Notes | $142.8 | ($142.8) | $-- | $-- | $-- | $-- | $-- | $-- |
| Cram-Down Notes | -- | 131.6 | 131.6 | 131.6 | 131.6 | 131.6 | 131.6 | 131.6 |
| Other Long-Term Liabilities | 10.4 | -- | 10.4 | 10.4 | 10.4 | 10.4 | 10.4 | 10.4 |
| **Total Liabilities** | **$179.3** | **($23.3)** | **$156.0** | **$158.1** | **$157.2** | **$157.3** | **$157.5** | **$157.7** |
| | | | | | | | | |
| Equity | $82.0 | $-- | $82.0 | $78.6 | $77.2 | $76.6 | $76.7 | $77.6 |
| **Total Liabilities and Equity** | **$261.3** | **($23.3)** | **$238.0** | **$236.7** | **$234.4** | **$234.0** | **$234.2** | **$235.3** |

#4839-9208- 475210

REORGANIZED DEBTORS' PROJECTED CASH FLOW STATEMENT
(CRAM-DOWN SCENARIO)

| ($ in millions) | 10/1/2012 Thru 12/31/12 | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2012E | 2013E | 2014E | 2015E | 2016E |
| **Operating Activities** | | | | | | |
| Net Income | ($3.4) | ($17.2) | ($1.4) | ($0.6) | $0.1 | $0.9 |
| Depreciation | 3.2 | 12.8 | 11.4 | 10.9 | 10.3 | 10.1 |
| Change in Accrued Interest Liability | 2.4 | (2.3) | -- | -- | -- | -- |
| Change in Working Capital | 2.1 | 0.2 | (1.4) | 0.0 | 0.0 | 0.0 |
| **Cash from Operating Activities** | **$4.3** | **($6.6)** | **$8.5** | **$10.3** | **$10.4** | **$11.1** |
| **Investing Activities** | | | | | | |
| Capital Expenditure | ($0.8) | ($2.5) | ($2.5) | ($5.0) | ($6.0) | ($6.0) |
| **Cash from Investing Activities** | **($0.8)** | **($2.5)** | **($2.5)** | **($5.0)** | **($6.0)** | **($6.0)** |
| **Financing Activities** | | | | | | |
| Mortgage Notes | $-- | ($11.2) | $-- | $-- | $-- | $-- |
| **Cash from Financing Activities** | **$--** | **($11.2)** | **$--** | **$--** | **$--** | **$--** |
| Beginning Cash | $10.0 | $33.7 | $13.5 | $19.5 | $24.8 | $29.2 |
| Change in Cash | 3.5 | (20.2) | 6.0 | 5.3 | 4.4 | 5.1 |
| **Ending Cash** | **$13.5** | **$13.5** | **$19.5** | **$24.8** | **$29.2** | **$34.3** |

#4839-9208- 475211

I.    Income Statement and Cash Flow Statement

(A)  Approach

The Income Statement consolidates the financial performance of the Debtors' operations using an approach established by the Debtors' management and professionals to forecast operating results.  The Income Statement is based on assumptions with respect to overall Reno-Sparks market conditions including competitive pressures and demographic characteristics as well as property-specific factors, such as gaming floor composition, room quality, size of property, and future projected capital expenditures.

The Financial Projections were prepared on a "bottom-up" basis for each revenue-contributing department. Financial projections were then aggregated with selling, general and administrative ("SG&A") expenses and reviewed by senior management to create the Financial Projections.

Certain reclassifications, which have no effect on reported net income (loss), are made to the Debtors' publicly reported financial statements as compared to the Debtors' internal financial statements utilized in the preparation of these projections.  Pursuant to the guidance in the 2011 AICPA Audit and Accounting Guide (Gaming), the Debtors' reclassify the amounts paid under slot participation agreements from casino revenue to casino expense in the Debtors' publicly reported financial statements.  Additionally, in accordance with industry practice, the retail value of food, beverage, rooms and other services furnished to customers on a complimentary basis ("complimentaries") is included in gross revenues and then deducted as promotional allowances.  The Debtors' reclassify the cost of providing these complimentaries from hotel, food and beverage and other operating expenses to casino expenses in the Debtors' publicly reported financial statements to comply with SEC reporting guidelines.

Revenues were categorized into one of four categories: (i) Casino; (ii) Rooms; (iii) Food & Beverage; and (iv) Other.  Similarly, expenses were allocated to one of the same four categories or else to SG&A.  The estimates for each department were forecasted by analyzing key revenue drivers and anticipating the associated cost requirements.

(B)  Operational Drivers

Gross revenue represents aggregate revenues derived from casino operations, hotel operations, food and beverage, and other operations.  Net revenue represents gross revenue less promotional allowances, which include the retail value of accommodations, food and beverage and other services provided to casino patrons without charge ("complimentaries").

Casino operating revenue is derived primarily from patrons wagering at table games and slot machines and other gaming operations.  Table games include blackjack, craps, roulette, Pai Gow Poker, Let It Ride®, Baccarat and Pai Gow.  Casino operating revenue is recognized as earned at the time the relevant services are provided.  Rooms revenue is derived from hotel rooms and suites rented to guests.  Hotel room revenue is recognized at the time the hotel rooms are provided to guests.

Food and beverage revenues are derived from food and beverage sales in the food outlets of the casino properties, including restaurants, room service, and banquets.  Food and beverage revenue is recognized at the time the relevant food and/ or beverage service is provided to guests.

Other revenues are comprised of revenues generated by our retail outlets, entertainment, other miscellaneous items, and the Debtors' share of ballroom revenues.

(C)  Operating Expenses

#4839-9208- 475212

Operating expense represents the direct costs associated with, among other things, operating casino and rooms departments, food and beverage outlets, and other operations, and also includes the cost of providing complimentaries. These direct operating costs primarily relate to payroll, supplies and, in the case of food and beverage operations, the cost of goods sold. SG&A expenses typically consist of utility costs, marketing and advertising, repairs and maintenance, insurance, administrative and general expenses, and real estate and property taxes.

(D)  Professional & Financing Fees

Professional fees were projected by examining the run-rate for Professionals billing at hourly and fixed-rates and account for success-related fees. The projected fees are only an estimate based on the information available to the Debtors at this time and the actual fees may vary significantly depending on the progress and outcome of the Chapter 11 Cases. For illustrative purposes only, Professional fees paid are assumed to be expensed in the same period.

(i)  Scenario 1: Consensual Treatment of Class 3: Allowed Mortgage Note Claims

If Class 3 Acceptance occurs, management estimates that the Debtors will incur approximately $12.1 million of total fees in 2012. These fees are primarily Professional fees relating to the Chapter 11 Cases, but also include Professional fees relating to the Debtors' refinancing efforts in early 2012 and deferred financing costs relating to the New First Lien Term Loan Facility. The aforementioned deferred financing costs are assumed to be amortized over the life of the New First Lien Term Loan Facility.

(ii)  Scenario 2:  Cram-Down Treatment of Class 3: Allowed Mortgage Note Claims

If Class 3 Acceptance does not occur, management estimates that the Debtors will incur approximately $8.8 million of total fees in 2012. These fees are primarily Professional fees relating to the Chapter 11 Cases, but also include Professional fees relating to the Debtors' refinancing efforts in early 2012.

(E)  Interest Expense

Pre-emergence interest expense in 2012 includes $4.8 million of adequate protection payments on account of the Mortgage Notes.

(i)  Scenario 1:  Consensual Treatment of Class 3: Allowed Mortgage Note Claims

If Class 3 Acceptance occurs, post-emergence interest expense is assumed to primarily include interest on the New First Lien Term Loan Facility, New Second Lien Notes and New Subordinated Notes. Interest on the New First Lien Term Loan Facility is assumed to be paid in cash at an annual interest rate equal to LIBOR plus 7.5% with a LIBOR floor of 1.0%. This interest rate is being used for illustrative purposes only. Also included in interest expense is the estimated amortization of deferred financing costs relating to the New First Lien Term Loan Facility. The actual terms of the New First Lien Term Loan Facility (including, but not limited to, the applicable interest rate) is subject to negotiation and final agreement between the Debtors and the New First Lien Administrative Agent and also will be dependent on a variety factors, including general economic and market conditions and the availability of credit in the capital markets. Interest on the New Second Lien Notes is assumed to be paid as PIK interest for the duration of the projected period for illustrative purposes only, provided however that some portion of the interest on the New Second Lien Notes may be paid in Cash to the extent such Cash interest payment is permitted under the terms of the New First Lien Credit Agreement. Interest on the New Subordinated Notes is assumed to be paid as PIK interest for the duration of the projected period at an annual interest rate equal to 5%. This interest rate is being used for illustrative purposes only. The actual terms of the New Subordinated Notes, including the interest rate thereon, are subject to negotiation and final agreement between the Debtors and the Partners and will be dependent on a

variety factors, including general economic and market conditions and the availability of credit in the capital markets.

(ii)  Cram-Down Treatment of Class 3: Allowed Mortgage Note Claims

If Class 3 Acceptance does not occur, post-emergence interest expense is assumed to primarily include interest on the Cram-Down Notes.  Interest on the Cram-Down Notes is assumed to be paid in cash at an annual interest rate equal to 7.3% for illustrative purposes only.

(F)  Income Taxes

The Debtors are not subject to income taxes and the Partners include their respective shares of partnership taxable income (loss) in their income tax returns.  Therefore, a provision for income taxes is not included in the Financial Projections.

(G)  Operating Activities

Cash from operating activities captures cash flows generated from the Debtors' daily operations and includes the net impact of revenues less operating expenses, cash interest expense, cash interest income, and working capital.

(H)  Capital Expenditures

Capital expenditures projected in the Plan are primarily maintenance in nature.  Such expenses include various renovation projects and equipment purchases with the majority allocated to slot machine purchases.  Amounts projected in 2012 and 2013 are lower than historical amounts as a result of efforts to preserve cash balances during the Reorganized Debtors' restructuring period.  Capital expenditures in 2014 through 2016 are projected to increase and approach more normalized levels.  The Reorganized Debtors expect to make capital expenditures to the extent necessary to continue to maintain an attractive property and a competitive position in the marketplace.

(I)  Financing Activities

(i)  Consensual Treatment of Class 3: Allowed Mortgage Note Claims

If Class 3 Acceptance occurs, principal repayments and proceeds from borrowings reflected in the 2012 Cash Flow Statement represent the receipt of $70.0 million in proceeds from the New First Lien Term Loan Facility, $15.0 million in proceeds from the New Subordinated Notes less anticipated principal repayments on the Mortgage Notes of approximately $7.8 million from the Available Balance Sheet Cash.  Cash from financing activities in 2013 and subsequent periods represent assumed debt repayment on the New First Lien Term Loan Facility equal to $2.0 million per quarter.

(ii)  Under the Cram-Down Treatment of Class 3: Allowed Mortgage Note Claims

If Class 3 Acceptance does not occur, Available Balance Sheet Cash in the estimated amount of $11.2 million is used to repay a portion of the principal amount of the Mortgage Notes.


II.    Balance Sheet and Pro Forma Balance Sheet

The Pro Forma Balance Sheet contains certain adjustments as a result of consummation of the Plan.  The Pro Forma Balance Sheet reflects the Reorganized Debtors' pro forma projected Balance Sheet as of the Effective Date, based upon the Debtors' May 2012 Balance Sheet, as adjusted for the projected income and cash flow through the Effective Date.  Adjustments were made to the September 2012 Balance Sheet for illustrative purposes only to

#4839-9208- 475214

demonstrate the effect of the Plan on a Pro Forma Balance Sheet. For the purposes of these Financial Projections, the Debtors have not used "fresh start" accounting principles. If Class 3 Acceptance occurs, Available Balance Sheet Cash on an anticipated Effective Date of September 30, 2012, is estimated to be $7.8 million. If Class 3 Acceptance does not occur, Available Balance Sheet Cash on an anticipated Effective Date of September 30, 2012, is estimated to be $11.2 million due to an additional $3.3 million made available by not incurring the financing fees associated with the New First Lien Term Loan Facility. Available Balance Sheet Cash may vary from cash reflected in the Balance Sheet because of variances in the Financial Projections and potential changes in the Debtors' need for cash to consummate the Plan.

(i)    Consensual Treatment of Class 3: Allowed Mortgage Note Claims

If Class 3 Acceptance occurs, on the Effective Date, the Reorganized Debtors will enter into the New First Lien Term Loan Facility and New Subordinated Notes, and use the proceeds, along with the Debtors' Cash balances to fund the payment in cash of certain Allowed Claims pursuant to the Plan, including the Class 3 Consensual Cash Distribution.

(ii)   Cram-Down Treatment of Class 3: Allowed Mortgage Note Claims

If Class 3 Acceptance does not occur, on the Effective Date, the Reorganized Debtors will issue the Cram-Down Notes and use the Class 3 Cram-Down Cash Distribution to fully satisfy the Allowed Class 3 Claim. The Debtors' Cash balances also will be also be used to fund the payment in cash of certain other Allowed Claims pursuant to the Plan.

**EXHIBIT C**

**<u>Liquidation Analysis</u>**

**Liquidation Analysis**

## A. Introduction

 Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have prepared the following hypothetical liquidation analysis (the "Liquidation Analysis"), which is based upon certain assumptions that are set forth in the Disclosure Statement and in the notes accompanying the Liquidation Analysis (the "Notes"). Capitalized terms not defined in the Notes shall have the meanings ascribed to them in the Plan and the Disclosure Statement.

 The Liquidation Analysis estimates potential Cash distributions to Holders of Allowed Claims in a hypothetical chapter 7 liquidation of the Debtors' assets (the "Assets"). Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement. The Debtors prepared the Liquidation Analysis with the assistance of their Professionals.

## B. Scope, Intent, and Purpose of the Liquidation Analysis

 The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtors' Assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their Professionals. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. In addition, the Debtors' management cannot judge with any degree of certainty the impact of the forced liquidation asset sales on the recoverable value of the Debtors' Assets. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated and available for distribution to creditors if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. NEITHER THE DEBTORS NOR THEIR PROFESSIONALS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS' ASSETS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

 In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' books and records. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims incurred in the chapter 7 case, wind-down costs, and chapter 7 trustee fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. The Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis is based on the Debtors' review of their Schedules and should not be relied on for any purpose other than this Liquidation Analysis, including, but not limited to, the allowance, or  determination of the nature or priority, of any Claim or determining the value of any distribution to be made on account of Allowed Claims under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A

CONCESSION OR ADMISSION OF THE DEBTORS OR A WAIVER OF ANY SUBSTANTIVE OR PROCEDURAL RIGHT, REMEDY OR DEFENSE OF THE DEBTORS AT LAW OR IN EQUITY. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

## C. Global Notes to the Liquidation Analysis

(1)  Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on September 30, 2012 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' Estate.

(2)  Primary Assets of the Debtors

The Liquidation Analysis assumes a liquidation of all of the Debtors' Assets, which consists, among other things, of a silver mining themed hotel, casino, and entertainment complex in downtown Reno, Nevada (the "Casino Property"). The Casino Property includes an approximately 87,300 square-foot casino.  Also located on the property are (i) a 37-story hotel tower with 1,711 guest rooms, including many high-end suites, (ii) six dining venues, and (iii) approximately 50,000 square feet of in-house exhibit and convention space.  The Liquidation Analysis assumes that the Casino Property has its greatest potential recovery value if sold as a going-concern gaming establishment. It should be noted, however, that the Debtors cannot judge with any degree of certainty the impact that a forced going-concern sale would have on the recoverable value of the Casino Property. The Debtors believe that alternative uses for or sales of the Casino Property in a hypothetical chapter 7 case would not generate as significant a recovery of value for stakeholders as would a forced going-concern sale.

(3)  Forced Going-Concern Sale

Two different approaches were used to estimate the approximate range of values for the Casino Property in a forced going concern sale scenario - (a) a discounted cash flow analysis, and (b) a comparable company trading multiples analysis. Reductions to the values derived under the two approaches were made to reflect the forced sale nature of a chapter 7 liquidation. These reductions were derived by considering such factors as the shortened time period involved in the sale process, discounts buyers would require given a shorter due diligence period and therefore potentially higher risks buyers might assume, potentially negative perceptions involved in liquidation sales, the current state of the capital markets, the limited universe of prospective buyers in a forced going-concern sale, and the "bargain hunting" mentality of liquidation sales.

The Liquidation Analysis assumes an orderly and expedited wind-down of the estates following the forced going-concern sale (including a claims reconciliation and resolution process) to maximize recovery values. It is assumed that the process undertaken to sell the Casino Property will be completed on or about October 31, 2012. The sale may close after October 31, 2012 in order to allow the purchaser to obtain necessary regulatory approvals. This reflects an estimate of the time required to sell of the Casino Property. It is further assumed that casino operating activity would not be negatively impacted during the liquidation period and that cash flows during the liquidation period would be neutral and thus do not impact the hypothetical liquidation values. The Liquidation Analysis assumes that the Trustee will assume and assign to the purchaser all executory contracts and unexpired leases necessary to the ongoing operations of the Casino Property. This Liquidation Analysis also assumes that the existing staff currently

employed at the Casino Property will remain with the Debtors and maintain employment at the time of the hypothetical sale, at which time such staff would be transferred to the hypothetical purchaser.

This Liquidation Analysis assumes that the estimated sale proceeds for the Casino Property would be less than the tax basis of the assets and would not generate any additional tax liabilities. Should the tax treatment and impact of this transaction result in a tax liability that is not reduced by other tax shields, recovery percentages in the Liquidation Analysis could decrease materially.

(4)  Substantive Consolidation of the Debtors' Estates

Consistent with the structure of the Plan, the Liquidation Analysis assumes that the Debtors' Estates will be substantively consolidated into a single Debtor Estate from which all distributions to Creditors will be made.

(5)  Factors Considered in Valuing Hypothetical Liquidation Proceeds

Certain factors may limit the amount of the liquidation proceeds generated from the liquidation of the Debtors' Assets (together with the Cash estimated to be held by the Debtors on the Conversation Date, the "Liquidation Proceeds") available to the Trustee. Certain of these factors that relate specifically to the liquidation of the Assets are discussed in further detail below. In addition, it is possible that distribution of the Liquidation Proceeds would be delayed while the Trustee and his or her professionals become knowledgeable about the Chapter 11 Cases, the Debtors' businesses and operations, and the Claims against the Debtors. This delay could materially reduce the value, on a "present value" basis, of the actual recoveries distributed to creditors.

**D. Specific Notes to the Asset Assumptions Contained in the Liquidation Analysis**

The Liquidation Analysis refers to certain categories of Assets. The numerical designation below corresponds to the line items listed in the attached chart with a specific note.

(1)  Cash and Cash Equivalents

Cash and equivalents represent cash balances that the Debtors maintain at their depository banks (and an investment account) as well as Cash on the property that will be used for casino operations projected as of October 31, 2012. The Liquidation Analysis assumes cash and cash equivalents will not be purchased by the buyer in the transaction. Cash and equivalents represent encumbered and unencumbered cash. Unencumbered cash includes (i) cash on the premises, cage cash, cash in the slots/tables, and cash in deposit accounts for gaming operations on the casino floor required pursuant to Nevada gaming law and regulations (which deposit accounts are not subject to control agreements) and (ii) the cash surrender value of certain insurance policies held in the "Trust Under Silver Legacy Supplemental Executive Retirement Plan." Unencumbered cash will satisfy the unsecured creditors, including any deficiency claims held by secured creditors, after the Trustee, priority claims, and the administrative expenses of the chapter 11 and chapter 7 cases are paid.

(2)  Hypothetical Liquidation Value

The Liquidation Analysis assumes that the Casino Property is sold as a continuing operation with a normal level of working capital. Therefore, the recovery percentage related to these Assets is based on the estimated range of value that may be obtained in this forced going-concern sale transaction. This Liquidation Analysis assumes that the normalized working capital level (excluding cash) is purchased by the buyer of the Debtors' Casino Property.

**E. Specific Notes to the Liability Assumptions Contained in the Liquidation Analysis**

The Liquidation Analysis assumes that the Liquidation Proceeds will be available to the Trustee. The Liquidation Analysis sets forth an allocation of the Liquidation Proceeds to Creditors in accordance with the priorities set forth in section 726 of the Bankruptcy Code. The Liquidation Analysis provides for high and low recovery percentages with respect to each category of Claims based on the high and low ranges of estimated Liquidation Proceeds from the Trustee's sale of the Assets.

(3)  Estimated Chapter 7 Administrative Claims

Wind-down costs consist of the regularly occurring general and administrative costs required to operate the Debtors' Assets during liquidation process, including the period after the sale of substantially all of the Debtors' assets, and the costs of any professionals the Trustee employs to assist with the liquidation process, including investment bankers, brokers, attorneys, and other advisors. Chapter 7 Trustee fees necessary to facilitate the sale of the Debtors' Casino Property were assumed at the statutory rates based on available Liquidation Proceeds (25% of the first $25,000, 10% of the next $45,000, 5% of the next $950,000, and 3% of the balance of Liquidation Proceeds). Chapter 7 professional fees necessary to assist the chapter 7 Trustee with the liquidation process were estimated to be $3.0 million for the duration of the 12-month liquidation and wind-down period. Transaction costs were estimated at 2% of proceeds to facilitate the sale of the Casino Property by investment bankers or brokers. Given the complexity and nature of the Debtors' Estates, this Liquidation Analysis assumes that in addition to the one-month marketing process that an additional 11 months would be required to settle claims and wind down the accounting and tax affairs of the Debtors' Estates. Chapter 7 expenses and timing are estimates only and actual expenses incurred could be higher or lower than the amounts set forth in the Liquidation Analysis.

(4)  Estimated Chapter 11 Administrative Claims

Administrative Claims consist of Claims arising from the chapter 11 cases that are entitled to administrative expense priority under section 503 of the Bankruptcy Code. This category consists of unpaid Chapter 11 post-petition Professional Fees. Based on the Liquidation Analysis, these Claims will be satisfied in full in a chapter 7 liquidation case.

(5)  Secured Claims

Secured claims include Class 1 – Other Secured Claims, Class 3 – Mortgage Note Claims, and Class 4 – US Foods Secured Claims. Class 1 and Class 4 Secured Claim categories includes certain miscellaneous obligations secured by Liens on certain of the Debtors' assets. The Liquidation Analysis assumes that secured claims would not be entitled to default interest or interest-on-interest (i.e., compound interest). Should the Bankruptcy Court determine otherwise, projected recoveries for Creditors in the Liquidation Analysis may be reduced. Based on the liquidation analysis, Class 1 – Other Secured Claims and Class 4 – US Foods Secured Claims will be satisfied in full and Class 3 – Mortgage Note Claims will receive aggregate distributions of approximately 77.9% to 84.7% of such Claims.

(6) Tax Priority Claims and Other Priority Claims

Priority Tax Claims and Other Priority Claims consist of Claims that are entitled to priority under section 507 of the Bankruptcy Code. The Liquidation Analysis assumes that all Priority Tax Claims and

#4831-9654-3248

Other Priority Claims would have been satisfied in full prior to the Conversion Date pursuant to authority granted to the Debtors under various "first-day orders") and, accordingly, no Priority Tax Claims or Other Priority Claims are entitled to distribution from the Debtors' estates.

(7) General Unsecured Claims

Allowed Class 6 - General Unsecured Claims are estimated to total $15.2 million and will receive distributions of approximately 23.0 % to 28.4% of such Claims.

Liquidation Analysis

In re Circus and Eldorado Joint Venture, et al.

## Table I: Assets Available for Distribution

| ($ in Thousands) | Notes | Reorganization Value | Percentage Recovery Low | Percentage Recovery High | Encumbered Liquidation Proceeds Low | Encumbered Liquidation Proceeds High | Unencumbered Liquidation Proceeds Low | Unencumbered Liquidation Proceeds High | Total Liquidation Proceeds Low | Total Liquidation Proceeds High |
|---|---|---|---|---|---|---|---|---|---|---|
| Hypothetical Liquidation Value | (2) | 119,000 | 75.0% | 85.0% | 89,250 | 101,150 | | | 89,250 | 101,150 |
| Cash and Cash Equivalents: | (1) | | | | | | | | | |
| Encumbered Cash | | 26,388 | 100.0% | 100.0% | 26,388 | 26,388 | | | 26,388 | 26,388 |
| Unencumbered Cash | | 17,100 | 100.0% | 100.0% | | | 17,100 | 17,100 | 17,100 | 17,100 |
| **Total Liquidation Proceeds Available for Distribution** | | **162,488** | **81.7%** | **89.0%** | **115,638** | **127,538** | **17,100** | **17,100** | **132,738** | **144,638** |

## Table II: Estimated Chapter 7 Expenses

| ($ in Thousands) | Notes | Estimated Expense Low | Estimated Expense High | Percentage Recovery Low | Percentage Recovery High | Encumbered Liquidation Proceeds Low | Encumbered Liquidation Proceeds High | Unencumbered Liquidation Proceeds Low | Unencumbered Liquidation Proceeds High | Total Liquidation Proceeds Low | Total Liquidation Proceeds High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chapter 7 Expenses | (3) | | | | | | | | | | |
| Chapter 7 Trustee Fees | | 4,005 | 4,362 | 100.0% | 100.0% | 3,489 | 3,847 | 516 | 516 | 4,005 | 4,362 |
| Chapter 7 Professional Fees | | 3,000 | 3,000 | 100.0% | 100.0% | 1,000 | 1,000 | 2,000 | 2,000 | 3,000 | 3,000 |
| Sale Transaction Costs | | 1,785 | 2,023 | 100.0% | 100.0% | 1,785 | 2,023 | - | - | 1,785 | 2,023 |
| **Total Chapter 7 Expenses** | | **8,790** | **9,385** | **100.0%** | **100.0%** | **6,274** | **6,870** | **2,516** | **2,516** | **8,790** | **9,385** |
| **Net Proceeds after Chapter 7 Administrative Claims** | | | | | | **109,363** | **120,668** | **14,584** | **14,584** | **123,947** | **135,252** |

## Table III: Estimated Creditor Recoveries

| ($ in Thousands) | Notes | Estimated Claim High | Estimated Claim Low | Percentage Recovery Low | Percentage Recovery High | Encumbered Liquidation Proceeds Low | Encumbered Liquidation Proceeds High | Unencumbered Liquidation Proceeds Low | Unencumbered Liquidation Proceeds High | Total Liquidation Proceeds Low | Total Liquidation Proceeds High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administrative Claims | (4) | 1,000 | 1,000 | 100.0% | 100.0% | - | - | 1,000 | 1,000 | 1,000 | 1,000 |
| Class 1: Other Secured Claims | (5) | 47 | 47 | 100.0% | 100.0% | 47 | 47 | - | - | 47 | 47 |
| Class 2: Other Priority Claims | (6) | - | - | 0.0% | 0.0% | - | - | - | - | - | - |
| Class 3: Mortgage Note Claims (Including Deficiency Claims) | (5) | 153,082 | 153,082 | 77.9% | 84.7% | 109,106 | 120,410 | 10,101 | 9,278 | 119,207 | 129,689 |
| Class 4: US Foods Secured Claims | (5) | 211 | 211 | 100.0% | 100.0% | 211 | 211 | - | - | 211 | 211 |
| Class 5: General Unsecured Claims | (7) | 15,163 | 15,163 | 23.0% | 28.4% | - | - | 3,483 | 4,306 | 3,483 | 4,306 |
| **Total Claims (Excluding Equity)** | | **169,502** | **169,502** | **73.1%** | **79.8%** | **109,363** | **120,668** | **14,584** | **14,584** | **123,947** | **135,252** |
| Class 6: Equity Interests | | | | | | - | - | - | - | - | - |